ORIGINAL

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------------X

JOAQUIN FRANQUIIII, Administrator of the ESTATE
OF JACK FRANQUI IV,

**Plaintiff,**

-against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, POLICE OFFICER
KAREN GRENIA, POLICE OFFICERS JOHN AND
JANE DOES 1-10,

**Defendants.**

-------------------------------------------------------------------------X

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT

★ OCT 29 2013

LONG ISLAND OFFICE
Docket No.:

CV-**13 5943**

COMPLAINT

**SEYBERT, J**

WALL, M.

## COMPLAINT

Plaintiff, JOAQUIN FRANQUI III, Administrator of the Estate of JACK FRANQUI IV, by and through his attorney, ANTHONY M. GRANDINETTE, ESQ., states as follows:

### NATURE OF THE ACTION

1. This action arises from Suffolk County police officers' unlawful arrest, search, and seizure of JACK FRANQUI IV, their subsequent malicious and shameful physical abuse of JACK FRANQUI IV during that process, including the excessive use of both physical force and the unwarranted threatened use of deadly physical force, their subsequent deliberate indifference to his health, safety, and welfare, their failure to provide adequate medical care, their deliberate indifference in the proper supervision of JACK FRANQUI IV while in police custody, and the subsequent conspiracy to cover up their unlawful actions. As a proximate cause of their actions, and inaction where an affirmative duty to act was required, JACK FRANQUI IV died by hanging, while surrounded by countless law enforcement personnel in a Seventh Precinct holding cell, at the tender age of 26.

2. This action seeks compensation for the unconstitutional and tortious conduct by Suffolk County police officers and their supervisors who were the proximate cause of JACK FRANQUI IV's death and needless suffering the day he was entrusted to their care; the actions by the officers who unlawfully arrested and physically abused JACK FRANQUI IV, the actions by the officers who failed to provide JACK FRANQUI IV with adequate medical care and proper supervision, the actions by the officers who ignored JACK FRANQUI IV's repeated pleas for medical assistance, his threats to end his life if he did not receive medical treatment, which went unjustifiably ignored for hours, and the

1

subsequent acts by the officers who lied about the events that occurred that day and fabricated evidence to conceal their unlawful conduct, all in an effort to avoid criminal, civil, and administrative sanctions.

## JURISDICTION

3. This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, Due Process, and the laws of the State of New York.

4. Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

5. Plaintiff further invokes the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

6. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

## PARTIES

7. JOAQUIN FRANQUI III (hereinafter "JACK SR."), father of JACK FRANQUI IV, is a resident of Suffolk County.

8. Plaintiff, JACK SR., as Administrator of the Estate of JACK FRANQUI IV (hereinafter "JACK JR."), seeks relief on behalf of the Estate of JACK JR.

9. Defendant, Suffolk County, is a county within the State of New York and the public employer of the Suffolk County Police Department, individually named police officers, and police officers John and Jane Does 1-10 named as defendants in this action.

10. Defendant, Suffolk County Police Department, is a County agency, organized under and existing and operating by virtue of the laws of the State of New York and the County of Suffolk.

11. In addition to the facts alleged in the following paragraphs, defendants Police Officer Karen Grenia (hereinafter "GRENIA") and John and Jane Does 1-10 are all sued in their individual and official capacities and all acted within the scope of their employment and under color of state law, to wit, under color of the statutes, ordinances, regulations, policies, customs, and usage of the State of New York and/or the County of Suffolk.

2

## NOTICE OF CLAIM

12.  Plaintiff filed a timely notice of claim against the County of Suffolk and the Suffolk County Police Department in compliance with General Municipal Law § 50. *See* Exhibit 'A' annexed hereto.

13.  More than thirty days have elapsed since service of said Notice and the County has failed to pay or adjust the claim.

14.  § 50-h examinations of JACK SR. and JOHN BURKE, an eye witness to the events, were held in advance of commencing this action.

15.  This action has been commenced within one year and ninety days after the happening of the events upon which these claims arise.

## FACTUAL AND GENERAL ALLEGATIONS

16.  On January 23, 2013, at approximately 10:45 a.m., JACK JR., age 26, stopped by his friend, Simon Earl's (hereinafter "SIMON") home, for the purpose of showing SIMON the car he had just purchased; a 1972 yellow Cadillac El Dorado.

17.  SIMON resides with his parents, Nicholas and Anne Earl, at 6 Cordwood Path, Shoreham, New York. 6 Cordwood Path is in a residential neighborhood in East Shoreham, New York, called Sound View Estates, which is located in Suffolk County.

18.  At approximately 11:00 a.m., JACK JR. was talking and socializing with his friend SIMON, directly in front of SIMON's home. Excited about his new purchase, JACK JR. entered the car and popped the hood to show SIMON the engine; typical behavior young men have engaged in since the invention of motor vehicles. It was a beautiful winter day, and the two friends were enjoying each other's company.

19.  JACK JR. and SIMON were socializing in a peaceful manner and for a lawful purpose, and JACK JR.'s car was legally parked, parallel to the curb, directly in front of SIMON's home.

20.  Nothing under these factual circumstances provided reasonable cause to believe that either JACK JR. or SIMON had committed a crime, or were about to commit a crime. Additionally, no warrant had been issued for either young man's arrest.

21.  Notwithstanding the foregoing, while SIMON was standing in front of his home, in broad daylight, looking under the hood of his friend's car, he observed a marked Suffolk County radio motor patrol vehicle (hereinafter "RMP") traveling in his direction on Cordwood Path. The RMP accelerated, stopping abruptly at a 45 degree angle in the roadway in front of SIMON's home.

22.  Defendant GRENIA was operating the RMP, without a partner.

23.  After parking her vehicle at a 45 degree angle blocking the roadway, GRENIA existed her vehicle with her gun drawn. Prior to making any inquiry of either JACK JR. or SIMON, GRENIA pointed her gun at SIMON, threatening him at gunpoint, shouting out orders for SIMON to get down on his knees, raise his arms, and not move.

24.  SIMON complied, kneeling in the street directly in front of his home, with his hands in the air, in broad daylight, and in response to his attempts to orally communicate, was yelled at by GRENIA to shut up and not move.

25.  With SIMON kneeling on the street, arms raised in the air, GRENIA turned her weapon upon JACK JR., who at this time was seated in the driver's seat of his yellow Cadillac. GRENIA began screaming at JACK JR., ordering him to place his hands on the steering wheel were she could she them, not to move, or alternatively she threatened to shoot him.

26.  GRENIA's arrest report indicates she was responding to a 911 call for a suspicious vehicle in the area, *see* Exhibit 'B,' which may have warranted her approach and reasonable  inquiry for license, registration and the purpose of JACK JR. and SIMON's presence in the area. Even assuming that GRENIA mistakenly perceived a potential crime in progress or a dangerous situation afoot, she could have easily called for and waited on backup to arrive to avoid creating an unnecessarily dangerous and hostile situation.

27.  Under the existing circumstances, GRENIA's conduct, specifically her threatened use of deadly physical force against JACK JR., was objectively unreasonable, unjustified, contrary to proper police procedure, unconstitutional, and created an unnecessary risk to the health, safety, and welfare of those involved. Absolutely no exigent circumstances existed at the time GRENIA approached with her weapon drawn to warrant the threatened use of deadly physical force.

28.  Shortly thereafter, approximately four other marked police vehicles pulled up in front of the Earl residence. JACK JR. yelled out to the police officers who were quickly surrounding him that he had no intention of resisting and that they should not shoot him or his dog, a miniature Doberman Pinscher, *see* Exhibit 'C' annexed hereto, that was in the car with him.

29.  Defendant police officers, without having reasonable suspicion or probable cause, handcuffed SIMON, unlawfully searched his person and emptied his pockets without having obtained a warrant or consent to do so, and placed the items on the roof of a marked police vehicle.

4

30. Uniformed defendant police officers repeatedly questioned SIMON, demanding to know "where are the drugs?!" In response, SIMON told the officers that there were no drugs, either on his person or in his possession. Despite SIMON's repeated attempts to tell the police officers that there were no drugs and that he and his friend were socializing in front of his own home, he was ignored by police who threatened to strip-search SIMON right then and there, on the street in front of his own home, in broad daylight, if he did not tell them where the drugs they claimed he possessed, were located.

31. SIMON, still in handcuffs and not free to leave, in utter disbelief of what was happening, was then placed in the back of a marked police vehicle which was parked just a few feet behind JACK JR.'s yellow Cadillac.

32. GRENIA continued to act irrationally under the then-existing circumstances, violated proper police procedure, and continued to display excessive use of non-deadly physical force by brandishing her gun at JACK JR., and screaming at and ordering him to exit his vehicle.

33. In fear for his health, safety, and welfare, and in an attempt to fully comply with GRENIA's orders, JACK JR. opened his car door and began to exit his vehicle.

34. Notwithstanding the fact that JACK JR. was in complete compliance with the police directives and had made no effort to resist or engage in any hostile behavior, either verbally or physically, several uniformed police officers pulled JACK JR. from his car, and acting with malicious intent, engaged in acts constituting the unreasonable and excessive use of physical force; JACK JR. was thrown to the ground, beaten and struck by the defendants, over various parts of his body, despite the fact that he was lying prone on the ground and not resisting. These acts were in violation of police policy and procedure, were unlawful and unnecessary, and caused JACK JR. unnecessary and unwarranted physical pain and mental anguish.

35. Defendant GRENIA pressed her knee against JACK JR.'s back as he lay injured on the ground, and subsequently handcuffed and placed him in the back of a marked police vehicle without probable cause to arrest.

36. Defendants' actions were unreasonable, and constituted the excessive use of physical force under the then-exiting circumstances, assault and battery, and an unlawful arrest and seizure of JACK JR., all of which took place in the absence of reasonable suspicion or probable cause to arrest, in violation of the United States and New York State Constitutions and laws.

37. While JACK JR. was taken to the marked police vehicle, SIMON, who had been handcuffed and placed in the back of another police vehicle, noticed that the left side of JACK JR.'s face was bruised and bleeding. Prior to the police arriving at the Earl residence at approximately 11:00 am, JACK JR. did not have any visible bruises or blood on either his face or other visually exposed portions of his body.

5

38. The day after JACK JR.'s, death, *see* Exhibit 'D' annexed hereto, January 24, 2013, an autopsy was performed by the Suffolk County Office of the Medical Examiner which resulted in findings that JACK JR. had sustained "blunt impact injuries" to his head, torso, and upper and lower extremities. *See* Exhibits 'E' and 'F' annexed hereto. Specifically, the Medical Examiner's report described some of the injuries JACK JR. sustained as follows:

> **Head:** A 4 x 1-1/4" abrasion, with adherent clotted blood, is on the right cheek. Six, 1/8" abrasions are on the helix of the left ear.
>
> On a subsequent internal examination, there is a 1" left parietal subscapular hemorrhage; and two, 1" and 1-1/2" right parietal subscapular hemorrhages. . . .
>
> **Torso:** A 2 x 1-1/2" cluster of linear abrasions is on the right upper back. . . .
>
> On subsequent internal examination, there is a 1 x 1/2" subcutaneous hemorrhage of the mid upper back; and a 1 x 1/2" subcutaneous hemorrhage in the left upper back. . . .
>
> **Upper Extremities:** A 1/4", blue contusion is on the posterior right forearm. A 1/2", blue contusion is on the anterior left arm. Five, 1/8", pale, red and scabbed abrasions are on the posterior left arm, elbow and forearm. . . .
>
> **Lower Extremities:** A 1/2" red-brown contusion is on the medial right foot. A 5", curvilinear, red contusion is on the posterior right thigh. A 2", yellow to red-brown contusion is on the posterior right leg. Nine, 1/16" to 1-1/2" abrasions are on the left knee. A 1-1/2", faint blue contusion; and a 1/8" abrasion are on the medial left leg. Three, 1", faint blue contusions are on the posteromedial left leg. A 1/2", yellow-orange contusion is on the lateral left thigh. A 1/16" abrasion is on the medial left foot. . . .

*See* Exhibit 'E.'

39. Significantly, JACK JR. sustained physical injuries to both sides of his face, which, despite the use of makeup, where clearly visible at his wake. *See* Exhibit 'F.'

40. JACK JR. suffered these injuries as a direct and proximate result of defendants' illegal and unconstitutional use of excessive force and cruel and inhumane conduct.

41. None of the foregoing physical acts by the defendants were performed for the lawful purpose of restoring order. Additionally, when balanced with the severity of the crimes charged (misdemeanor offenses), the lack of any immediate threat to the safety of the

defendants (all of whom were armed and significantly outnumbered JACK JR.), coupled with the fact that JACK JR. did not attempt to resist arrest (JACK JR. was lying face down on the pavement), establish that the defendants' actions were unreasonable.

## EVENTS AT THE SEVENTH PRECINCT FOLLOWING JACK JR.'S UNLAWFUL ARREST

42. Subsequent to his unlawful arrest, JACK JR. was taken to the Seventh Precinct in Suffolk County where he was processed, and formally charged with the following crimes: NY VTL § 1192, operating a motor vehicle while under the influence of alcohol or drugs; NY PL § 195.05, obstructing government administration in the second degree; and NY PL § 205.30, resisting arrest.

43. All of these alleged charges constituted JACK JR.'s false arrest, and the subsequent fabricated police paperwork prepared in support of his illegal arrest constituted the malicious prosecution of his person and the denial of his right to due process of law.

44. For example, JACK JR. was charged with obstructing governmental administration for allegedly "sicking" his miniature Doberman Pincher on GRENIA, for resisting arrest despite being fully cooperative with police at the scene, and for operating a motor vehicle under the influence of drugs, *see* Exhibit 'B,' all false charges to cover up the defendants' gross and illegal misconduct. These fabricated police reports and sworn statements were made with the knowledge of their false and misleading content, and with the mutual understanding between the defendants that they would collectively lie in order to maliciously prosecute JACK JR., and cover up the true facts to avoid criminal, civil, and administrative sanctions.

45. Subsequent to his processing, JACK JR. was placed in the holding cell area of the Seventh Precinct. Specifically, in a holding cell adjacent to an individual named JOHN BURKE (hereinafter "BURKE"), who had been arrested by Detectives earlier that day. BURKE was unknown to JACK JR. prior to that time. *See* Exhibit 'G' annexed hereto.

46. The Seventh Precinct holding cell in which JACK JR. was placed is subject to New York State law which governs the confinement of pre-trial detainees, including but not limited to those proscribed by the New York State Department of Corrections, and the Suffolk County Police Department. Those applicable rules and regulations were violated by the defendants in this case resulting in JACK JR.'s unnecessary death.

47. On January 23, 2013, during the relevant time that JACK JR. was housed therein, the conditions inside the holding cell were inhumane; the temperature was bitterly cold, and JACK JR. was knowingly placed therein with nothing but the tee-shirt, jeans, and socks that he was permitted to keep.

48. JACK JR. was eventually given a small piece of a thin blanket to help keep himself warm. It was tossed to him by BURKE, who did so as an act of kindness—sharing his small thin blanket with JACK JR.

49. BURKE subsequently described the conditions of the Seventh Precinct holding cell area, as follows:

> I cannot stress how cold it was in the holding cell area. It was actually inhumane!! I remember being curled up on a bench, shivering, holding on to a small blanket that was like a piece of cardboard issued to me. Jack asked for a piece of my blanket, which I gave him. You could see your breath in the air.

*See* Exhibit 'H' annexed hereto.

50. Defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s health, safety, and welfare by maintaining a holding cell with unreasonably low temperatures, placing him in that holding cell, and failing to provide adequate means for JACK JR. to keep himself warm. The holding cell area was physically separated from the rest of the precinct by a door. No police officers were in the holding cell area itself, but were on the opposite side of the doorway, in an area which was heated. The defendants were also adequately dressed for the climate.

51. After JACK JR. was placed in the holding cell he yelled out to the defendants, over the course of hours, stating directly and unequivocally that he needed medical attention and begging to be taken to a hospital. *See* Exhibit 'G.'

52. JACK JR.'s cries for help were heard, but ignored by all defendants. *See* Exhibit 'F.'

53. However, early on, one officer did enter the holding cell area, asking JACK JR. why he was screaming. JACK JR. lowered his voice and politely and respectfully informed him that he needed to go to a hospital for medical attention. In an apparent attempt to dissuade him from seeking medical help, the officer told JACK JR. that even if the defendants took JACK JR. to a hospital, they would have to bring him right back to the precinct. Still desiring medical care, JACK JR. asked the officer if he could speak to the officer's supervisor. The officer responded words to the effect of "okay I will get him." Unfortunately, neither the officer nor his supervisor ever returned. *See* Exhibit 'G.'

54. After some time passed and no one came to speak to JACK JR., he began yelling and pleading once again for some medical assistance. Specifically, JACK JR. repeatedly yelled out that he needed medical attention, and that if he did not receive medical attention, he would be leaving the holding cell in a "body bag." *See* Exhibit 'G.'

55. Despite the doorway separating the holding cells from the rest of the precinct, the officers outside the holding cell area where able to hear JACK JR.'s pleas for medical attention because BURKE, who was being held in a cell just one cell away from JACK JR., was able to hear the defendants conversing in normal conversational levels. *See* Exhibit 'G.'

56. As more time passed and JACK JR.'s persistent cries for help were ignored, he told BURKE that BURKE should tell his father, JACK SR., that JACK JR. did not have drugs on him at the time he was arrested, that he did not let his dog out of his car to attack the police officers who were present at the scene, that SIMON knew the truth about what had occurred earlier that day, and that he could not go back to jail. JACK JR. requested that BURKE memorize his father's telephone number, and eventually told BURKE that he was "going to hang up." *See* Exhibit 'G.'

57. JACK JR. desperately tried to get the police officers' attention. At one point, he stuck his head in the toilet bowl and banged his head against the holding cell wall, all the while screaming and pleading for medical assistance, yelling that he would be leaving in a "body bag" if he was not given treatment. JACK JR. did this knowing that video cameras were positioned directly across from the individual holding cells for the specific purpose of monitoring detainees' conduct, and therefore, in large part, to prevent exactly what happened in this case—an inmate suicide. No officer responded to his cries for help. *See* Exhibit 'G.'

58. JACK JR. then took off his t-shirt and tied it around his cell bars fashioning a noose. At that point two officers entered the holding cell area and cut down the t-shirt to prevent JACK JR. from hanging himself. *See* Exhibit 'G.'

59. Notwithstanding the foregoing, the defendant officers did not offer JACK JR. any assistance or medical treatment. Rather, they left the holding cell area immediately after cutting down the t-shirt. They left JACK JR. with no way of keeping himself warm other than with his jeans and socks, despite the fact that it freezing in the cell and JACK JR.'s hair was now visually wet from having put his head in the toilet bowl. *See* Exhibit 'G.'

60. After the officers exited the holding cell area, JACK JR. began crying, stating that he could not go back to jail. JACK JR. asked BURKE to repeat his father's phone number to him, and told BURKE to tell JACK JR.'s father that he loved him. *See* Exhibit 'G.'

61. JACK JR. continuously screamed, yelled, and pleaded for medical assistance, telling the defendants that he would be leaving in a "body bag" if he was not given treatment. His desperate and repeated cries for medical help, display of protracted irrational behaviors, persistent verbal threats of suicide, and affirmative physical acts to carry out those threats of suicide, were all ignored by the defendants. Astonishingly and contrary to all rules, regulations, procedures, laws, and moral decency, JACK JR. was left alone to eventually carry out his threats, and kill himself by means of strangulation, by hanging himself with his own blue jeans affixed to his holding cell bars. *See* Exhibit 'G.'

62. Sometime later JACK JR. took off his blue jeans. Notwithstanding the fact that he stood in his holding cell in his underwear, no defendant took affirmative action to help JACK JR. *See* Exhibit 'G.'

63. Next, JACK JR. affixed his own jeans to the holding cell bars. Notwithstanding the fact that he stood in his holding cell in his underwear with his jeans tied to the cell bars, no defendant took affirmative action to help JACK JR. *See* Exhibit 'G.'

64. Next, JACK JR. fashioned a noose from his jeans which were affixed to the holding cell bars. Notwithstanding the fact that he stood in his holding cell in his underwear, jeans affixed to the cell bars tied like a noose, no defendant took affirmative action to help JACK JR. *See* Exhibit 'G.'

65. Next, JACK JR. placed his head and neck inside the noose fashioned from his jeans, which were affixed to the holding cell bars. Notwithstanding the fact that he stood in his holding cell in his underwear, jeans affixed to the cell bars with his head inside the fashioned noose, no defendant took affirmative action to help JACK JR. *See* Exhibit 'G.'

66. Next, JACK JR., as he repeatedly threatened to do if not afforded medical assistance by shouting to the defendants over the course of hours, hung himself from the noose, fashioned from his blue jeans which he had affixed to his holding cell bars. Notwithstanding the fact that JACK JR. was hanging, with his head inside the noose fashioned from his own blue jeans which he had affixed to the cell bars, virtually naked, clad only in his underwear, no defendant took affirmative action to help JACK JR. *See* Exhibit 'G.'

67. BURKE, hearing gasping sounds coming from JACK JR.'s cell, screamed out to the guards for help. However, no one responded for several minutes. *See* Exhibit 'G.'

68. Before officers finally entered the holding cell area, BURKE heard one officer ask another if he had a knife on him, suggesting that the defendants finally looked at their monitor, taking notice of JACK JR. hanging in his cell. *See* Exhibit 'G.'

69. After the defendant officers did finally approach JACK JR. and removed his body from the noose, BURKE heard one officer direct another to check for a pulse, and that officer responded that there was none. *See* Exhibit 'G.'

70. Defendants knew or should have known that JACK JR. was clearly suicidal and a danger to himself. Defendants knew or should have known that:

    a. JACK JR. repeatedly yelled that he would be leaving the holding cell in a body bag if he did not receive medical assistance,

    b. JACK JR. actually attempted to hang himself with his t-shirt prior to hanging himself with his jeans, and

    c.  JACK JR. had been acting irrationally for hours while in the defendants' direct presence including but not limited to verbal threats of suicide, physical acts in furtherance of suicide, irrational physical acts such as sticking his head in the toilet bowl, banging his head against the wall, and disrobing, amongst other evidence warranting medical assistance, all of which occurred while JACK JR. was in defendants' custody during which time they were charged with the responsibility of his care.

71.  Defendants individual and collectively failed to provide JACK JR. with the minimal standard of care proscribed by law for a detainee in custody within the confines of a holding cell within the State of New York. As a direct result of their failure to provide JACK JR. with the minimum standard of care required, their failure to comply with rules, regulations, and laws, their failure to act, and their deliberate inaction when a duty to act existed, the defendants herein were the proximate cause of JACK JR.'s death.

72.  Following JACK JR.'s death, the case was investigated by the Suffolk County Homicide Bureau. That same day, BURKE was interviewed by detectives wherein he conveyed his observations and account of the events.

73.  BURKE's statement was written by said detectives to ensure the detectives' control over the precise language used therein. By way of example of controlling the language within "BURKE's" written statement (written by Suffolk Homicide Detective Ciccotto), Ciccotto cleverly crafts the following paragraph:

> The guy [JACK JR.] was yelling that he needed medical assistance. He was telling me that he was going to hang himself.

*See* Exhibit 'I' annexed hereto.

74.  By way of contrast, in all BURKE's other statements and sworn testimony, BURKE makes it clear that JACK JR. told the *defendant officers* that they would be taking him out in a body bag if he did not receive medical treatment—over the course of hours. *See* Exhibits 'G' and 'H.' JACK JR.'s statements about suicide were not limited to conversations between himself and BURKE. To the contrary, the defendants were all on notice of JACK JR.'s state of mind.

75.  Notwithstanding the foregoing, BURKE, on the date of JACK JR.'s death conveyed to the Suffolk County Homicide Squad that JACK JR. had requested medical assistance, threatened suicide, had taken physical steps to hang himself prior to actually doing so, and that the defendants herein assigned to the Seventh Precinct had knowledge thereof. *See* Exhibit 'I.'

76.  Notwithstanding these facts, in multiple newspaper articles describing what happened in the Seventh Precinct holding cell on January 23, 2013, Lieutenant Fitzpatrick, Commander of the Suffolk County Police Department Homicide Squad, intentionally misled the media about what took place—both at the scene of JACK JR.'s arrest and at

the Seventh Precinct. As to the facts which preceded JACK JR.'s death at the Seventh Precinct, Lieutenant Fitzpatrick was quoted by several different papers that JACK JR. was calm and "appeared at ease with the police officers," and that "[t]here was no indication he was suicidal." *See* Exhibit 'J' annexed hereto.

77.   Defendants, under color of law, deprived JACK JR. of his constitutional right to medical treatment and inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s medical needs despite his continuous desperate pleas over the span of several hours for medical assistance.

78.   The rules governing the maintenance of holding facilities impose an affirmative duty upon officers maintaining such facilities to periodically check on the status and wellbeing of detainees being held in their care and custody and to provide them with medical care when necessary.

79.   Defendants failed to monitor JACK JR.'s status and wellbeing and failed to provide him with the minimum standard of medical care proscribed by laws, rules, regulations, and national, State, and local standards for health services in jails.

## CRUEL AND UNUSUAL TREATMENT

80.   By their conduct, defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct to JACK JR.'s health, safety, and welfare while he was being placed under arrest, given the severity of the crimes charged, the lack of any real danger posed to the officers at the scene, and the fact that he was not resisting arrest when the defendants repeatedly beat and struck him as he lay prone on the ground.

81.   By their conduct, defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct to JACK JR.'s health, safety, and welfare by maintaining a holding cell with unreasonably low temperatures, placing him in that holding cell in nothing more than a tee shirt, and failing to provide adequate means for JACK JR. to keep himself warm.

82.   By their conduct, defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct to JACK JR.'s health, safety, and welfare by their intentional failure to provide JACK JR. with medical care despite his repeated cries for medical assistance and his threat to hang himself, and by ignoring his irrational physical acts while in the holding cell as well as his prior physical acts in furtherance of a suicide attempt.

83.   By engaging in the aforementioned conduct, independently and collectively, defendants, under color of law, deprived JACK JR. of his constitutional right to be free from cruel and unusual treatment as a person in their custody, in violation of the United States and New York State Constitutions and laws.

84. The defendants' actions were objectively of sufficient seriousness such that JACK JR. was denied the minimal civilized measure of life's necessities, and the defendants' possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.

## DEFENDANTS' FAILURE TO INTERCEDE, TO PERFORM THEIR DUTIES AS REQUIRED BY LAW, AND THEIR FABRICATION AND CONCEALING OF EVIDENCE FROM INVESTIGATING STATE AND LOCAL AUTHORITES TO AVOID ADMINISTRATIVE, CIVIL, AND CRIMINAL SANCTIONS WHICH OTHERWISE WOULD FOLLOW FROM THE MISCONDUCT

85. The rules governing the actions of police officers impose an affirmative duty to intercede and prevent crimes and other misconduct committed by other police officers.

86. The rules governing the actions of police officers impose an affirmative duty to report such crimes and other misconduct whenever they become aware of it.

87. The rules governing the actions of police officers impose an affirmative duty to intercede when it is known that excessive force has been used.

88. The rules governing the actions of police officers impose an affirmative duty to intercede if medical care is being delayed or denied to a detainee who is suffering from an illness or injury.

89. The rules governing the actions of police officers impose an affirmative duty to intercede to prevent cruel and unusual treatment.

90. Defendants each had an opportunity to intercede on JACK JR.'s behalf to ensure that JACK JR. was not the victim of excessive physical force, unjustified threatened use of deadly physical force, false arrest, cruel and unusual treatment, and they each had an opportunity to intercede and ensure that he was provided adequate medical assistance— all clearly established statutory and constitutional rights of which a reasonable person would have known—yet failed to do so, knowing that their fellow officers' conduct did violate those rights guaranteed to JACK JR.

91. Defendants each failed to intervene or report the above mentioned conduct when they became aware of it.

92. Despite oral and physical acts placing defendants on notice of JACK JR.'s strong likelihood of committing suicide, as well JACK JR.'s numerous and continuous pleas for medical care, defendants ignored his medical needs.

93. Defendants failing to remove JACK JR. to a hospital or continuously monitor his behavior constituted deliberate indifference, an egregious deviation from acceptable administrative, legislative, and departmental rules and regulations and state and federal laws, regulations, and guidelines designed to ensure the health, safety, and welfare of detainees placed in holding cells within the State of New York.

94. Defendants failed to perform duties inherent in the nature of their office.

95. The individual defendants, under color of law, conspired with each other, reached a mutual understanding, and acted to undertake a course of conduct to injure, oppress, threaten, and intimidate JACK JR. and SIMON, a witness to the initial police misconduct, in the free exercise and enjoyment of the rights, privileges, and due process of the law secured to them by the United States and New York State Constitutions and laws, including the right to be free from the intentional use of unreasonable force; to be free from cruel and unusual treatment as one in the custody of the defendants; to be free from the denial of adequate medical attention; to be free from unnecessary and wanton infliction of pain; and to not be deprived of life without due process of law.

96. Thereafter, defendants fabricated evidence of what had occurred in an attempt to justify their unlawful and egregious conduct and avoid administrative, civil, and criminal sanctions. For example, defendants created false police reports, documents, and statements, both oral and written.

97. Members of the Suffolk County Police Department interviewed defendants who intentionally misrepresented and withheld material facts in an effort to falsely report the true nature of the events and to avoid and shield members of the Department from civil, criminal, and administrative sanctions for their acts and omissions which lead to JACK JR.'s unnecessary death.

98. Defendants lied to State investigators and fabricated and altered physical evidence and written incident reports to conceal wrongdoing to avoid and shield members of the Department from civil, criminal, and administrative sanctions for their acts and omissions which lead to JACK JR.'s unnecessary death.

99. Lieutenant Fitzpatrick, Commander of the Suffolk County Police Department Homicide Squad, intentionally misled the media about the factual events—both at the scene of JACK JR.'s arrest and at the Seventh Precinct.

## SUPERVISOR LIABILITY

100. Defendants John and Jane Does include supervisory personnel who were discharged with the responsibility to, and owed a duty of care to detainees such as JACK JR. to

    a. oversee the daily operations of the Seventh Precinct personnel,

14

    b.  supervise and ensure that police personnel comply with the Suffolk County Police Department rules, regulations, and protocol governing the arrest process, mental and physical health evaluations, and housing and supervision of pre-trial detainees held within the precinct holding cells,

    c.  supervise and ensure that police personnel comply with federal, state, and local laws, rules, regulations, and protocol governing the housing and supervision of pre-trial detainees held within the precinct holding cells, and

    d.  implement immediate redial measures when necessary to ensure the health, safety, and welfare of pre-trial detainees.

101. Based upon the facts outlined above, *see* ¶¶ 42-99, defendant supervisors John and Jane Does were aware of, or should have been aware of, JACK JR.'s need for constant supervision pending medical treatment.

102. Defendant supervisors John and Jane Does were made aware of JACK JR.'s request for medical attention based upon JACK JR.'s persistent cries for medical attention and threats of suicide, yet ignored those pleas for help thereby directly participating in the aforementioned violations of JACK JR.'s constitutional and statutory rights.

103. Defendant supervisors John and Jane Does were made aware of JACK JR.'s request for medical attention and threats of suicide through oral report(s) of a subordinate(s) and/or visual observations, yet ignored the report(s), thereby participating in the aforementioned constitutional and statutory violations against JACK JR.

104. Defendant supervisors John and Jane Does were grossly negligent in their supervision of their subordinates in that JACK JR. persistently cried out for medical attention and threatened suicide, yet defendant supervisors failed to give orders to ensure JACK JR.'s health, safety, and welfare under the existing circumstances, failed to monitor the situation, and failed to engage in remedial action, thereby allowing subordinate(s) to continue to engage in unconstitutional and unlawful acts.

105. Defendant supervisors John and Jane Does thereby breached the duty of care they owed to JACK JR.

106. Defendant supervisors' breach of their duty of care to JACK JR. directly and proximately caused the aforementioned constitutional and statutory violations against JACK JR. resulting in JACK JR.'s injuries.

107. Supervisors John and Jane Does were deliberately indifferent to JACK JR.'s clearly defined constitutional and statutory rights in that they ignored JACK JR.'s persistent cries for medical attention and threatened suicide, and/or ignored oral report(s) indicating JACK JR.'s repeated requests for medical attention and threats of suicide, and/or ignored their visual observations of JACK JR., individually and/or collectively, which placed the defendant supervisors on notice of a substantial risk of serious physical harm to JACK

15

JR.—the threat of suicide and a failed attempt of suicide—yet failed to give orders to ensure JACK JR.'s health, safety, and welfare under the existing circumstances, failed to monitor the situation and failed to engage in remedial action. The forgoing failures individually and/or collectively constitute deliberate indifference on the part of the defendant supervisors by failing to act on information indicating that unconstitutional acts were occurring.

108. As a direct and proximate result of defendants' actions, JACK JR. suffered the injuries and damages described above.

## DEFENFANTS ILLEGALLY SOUGHT TO OBTAIN EVIDENCE, AFTER JACK JR. AND SIMON HAD ALREADY BEEN ILLEGALLY DETAINED AND JACK JR. HAD ALREADY BEEN UNLAWFULLY ARRESTED WITHOUT REASONABLE SUSPICION, PROBABLE CAUSE, OR A WARRANT FOR HIS ARREST.

109. JACK JR. and SIMON had been socializing in a peaceful manner and for a lawful purpose in front of SIMON's home when defendants approached and intentionally, wrongfully, and maliciously violated JACK JR. and SIMON's constitutional rights.

110. Given that nothing under the existing factual circumstances provided defendants with reasonable suspicion or probable cause to arrest JACK JR. or SIMON, and that they did not have a warrant authorizing them to do so, they sought to obtain evidence of criminal activity, after the fact, in unlawful and unconstitutional manners, in an attempt to justify their prior unlawful actions.

111. Once the police vehicle in which JACK JR. had been placed left 6 Cordwood Path and transported JACK JR. to the Seventh Precinct, two uniformed police officers entered SIMON's home, without having obtained a warrant or having been granted consent to do so, and despite the fact that no exigent circumstances existed that would authorize their unwarranted and unconsented entry into SIMON's home.

112. Mr. and Mrs. Earl were not home on January 23, 2013. SIMON, who resides at 6 Cordwood Path with his parents, had a reasonable expectation of privacy in his home.

113. The defendant police officers knew that SIMON lived in that home because 6 Cordwood Path is the address listed on SIMON's New York State Driver's License which they had unlawfully taken from SIMON's pocket. However, the defendants nonetheless never sought SIMON's consent to enter his home prior to doing so, nor did they make an application for a warrant to a neutral magistrate.

114. Darryl Moore (hereinafter "MOORE"), a licensed contractor and owner of DTM contracting, Inc., and Jay Moshier (hereinafter "MOSHIER"), a carpenter for DTM Contracting, Inc., were present in the Earl residence on January 23, 2013, at the time the defendants entered SIMON's home.

115. After the two police officers entered the Earl home, without a warrant or consent, they called out "hello, hello," several times. MOORE, who had been working on remodeling a bathroom on the second floor of the Earl home, responded "hello?" to the police officers' calls, and made his way downstairs to see who had entered the house.

116. Before MOORE made his way to the front of the house, MOSHIER, who was walking down the first floor hallway toward the front entrance of the home on his way out of the house, observed two uniformed police officers, one male and one female, standing inside the home, in the foyer by the front door. The officers asked MOSHIER who he was, at which time he yelled for MOORE to come downstairs. MOSHIER told both officers that he did not authorize them to enter the home without a warrant given that Mr. and Mrs. Earl were not home at the time.

117. While MOSHIER informed the two police officers that they did not have consent to enter the home, MOORE came downstairs and approached the two police officers who were standing in the foyer by the entrance of the house. The male officer asked MOORE who he was and who had given him permission to be inside the home. MOORE explained that he was a contractor, hired by Nicholas and Anne Earl who were not home at the time, and that their son, SIMON, had been letting him into the house. The male officer showed MOORE SIMON's New York State Driver's License which had been taken from SIMON's pocket after SIMON was seized and searched unlawfully, and asked MOORE if that was the individual who had been letting him into the house. MOORE responded that it was him, SIMON.

118. MOORE then confronted the police officers and asked them who had given them permission to enter the house, to which they responded, "Nobody we walked in." When MOORE then asked them if they had permission to be inside the house, they responded asking "Why do you have something to hide?" and that "It's none of your business!" The officers appeared agitated at this time, and they informed MOORE that they were looking for drugs and weapons.

119. The two police officers inside the Earl residence then proceeded to the kitchen where they began searching through papers on the kitchen counter and looking inside ashtrays. Meanwhile, MOORE and MOSHIER went back to work.

120. Several minutes later MOSHIER observed the two police officers searching SIMON's car, which was parked inside the garage which is attached to the basement of the Earl home.

121. Police officers eventually removed SIMON's handcuffs, and SIMON was released from the police vehicle. SIMON immediately went inside his home, at which point he observed one male police officer searching his basement. SIMON asked the officer what he was doing in his basement, and the police officer smirked and left the house.

122. The next day, one day after JACK JR.'s death, MOSHIER observed GRENIA in front of 6 Cordwood Path. He observed her searching through the seats and glove box of JACK JR.'s vehicle which was still parked in front of the Earl home. Neither a warrant nor

consent authorizing the search had been obtained. MOSHIER overheard GRENIA speaking into what appeared to be her cell phone, stating that "I can't find anything. There's nothing in here."

## DEFENDANTS SUBSEQUENTLY HARASSED AND INTIMATED SIMON WHO WITNESSED THE INITIAL POLICE MISCONDUCT

123. Defendants GRENIA and others not yet known subsequently harassed and intimidated SIMON, a witness to the initial police misconduct, by intimidating him and his family and threatening them directly and indirectly by words and actions.

124. Defendant GRENIA harassed SIMON and his family by repeatedly driving by the family's home over the course of the ensuing months, entering their driveway and recording license plate numbers of the vehicles that were parked therein, and parking police cruisers at the top of Cordwood Path claiming to 'watch the stop sign.'

125. Additionally, GRENIA and others not yet known unlawfully seized and searched SIMON and his vehicle on April 9, 2013.

126. SIMON was pulled over on the corner of Southgate and Norman by GRENIA and others not yet known. When he told them that he did not want to get out of his car, GRENIA said that he didn't have a choice, he will be getting out one way or another, and that they will force him out if necessary.

127. GRENIA screamed and yelled at SIMON, demanding to know where he was going, and screaming that SIMON had better respect her authority.

128. Police officers on scene searched through SIMON's car after SIMON explicitly informed them that he did not consent to the search. They questioned him about JACK JR. and the incident that had occurred on January 23, 2013, even after SIMON specifically told them that he had a lawyer and that he did not want to answer their questions.

129. GRENIA mocked, threatened, and intimated SIMON, and shouted that "you are three seconds from being kneed in the balls."

130. When the police officers had approached SIMON's car, he had informed them that he was recording the encounter on his cell phone. The officers had ordered SIMON to close his cell phone, which he did. After they left the scene 30-40 minutes later, SIMON immediately checked his cell phone and noticed that the recording had been deleted, without his knowledge or consent.

131. The actions of all defendants complained of herein, *see* ¶¶ 16-130, were performed under color of law and within the scope of their employment and authority.

## CAUSES OF ACTION

### COUNT I
### 42 U.S.C. § 1983 – False Arrest

132. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-131 as though fully set forth herein.

133. Defendants, acting under color of law, violated JACK JR.'s right to be free from false arrest, in violation of the United States and New York State Constitutions and laws.

### COUNT II
### 42 U.S.C. § 1983 – False Imprisonment

134. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-133 as though fully set forth herein.

135. Defendants, acting under color of law, violated JACK JR.'s right to be free from false imprisonment, in violation of the United States and New York State Constitutions and laws.

### COUNT III
### 42 U.S.C. § 1983 –Denial of Adequate Medical Treatment

136. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-135 as though fully set forth herein.

137. Defendants, acting under color of law, violated JACK JR.'s right to adequate medical treatment, in violation of the United States and New York State Constitutions and laws.

### COUNT IV
### 42 U.S.C. § 1983 – Unreasonable and Excessive Force

138. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-137 as though fully set forth herein.

139. Defendants, acting under color of law, violated JACK JR.'s right to be free from unreasonable and excessive physical force, in violation of the United States and New York State Constitutions and laws.

## COUNT V
### 42 U.S.C. § 1983 – Unreasonable and Excessive Force

140. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-139 as though fully set forth herein.

141. Defendant GRENIA, acting under color of law, violated JACK JR.'s right to be free from unreasonable and excessive use of force, in violation of the United States and New York State Constitutions and laws.

## COUNT VI
### 42 U.S.C. § 1983 – Cruel and Unusual Treatment

142. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-141 as though fully set forth herein.

143. Defendants, acting under color of law, violated JACK JR.'s right to free from cruel and unusual treatment, in violation of the United States and New York State Constitutions and laws.

## COUNT VII
### 42 U.S.C. § 1983 –Failure to Intercede

144. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-143 as though fully set forth herein.

145. Defendants, acting under color of law, violated JACK JR.'s constitutional and statutory rights by their failure to intercede to protect his clearly established constitutional and statutory rights, in violation of the United States and New York State Constitutions and laws.

## COUNT VIII
### 42 U.S.C. § 1983 – Unnecessary and Wanton Infliction of Pain

146. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-145 as though fully set forth herein.

147. Defendants, acting under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s medical needs by denying him adequate medical care despite his continuous pleas to obtain such care, in violation of the United States and New York State Constitutions and laws.

## COUNT IX
### 42 U.S.C. § 1983 – Due Process Violations

148. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-147 as though fully set forth herein.

149. Defendants, acting under color of law, violated JACK JR.'s right to due process under law due to their intentional and malicious conduct, in violation of the rights and liberties guaranteed to JACK JR. by the United States and New York State Constitutions and laws.

## COUNT X
### 42 U.S.C. § 1983 – Supervisory Liability

150. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-149 as though fully set forth herein.

151. Defendants, acting under color of law, violated JACK JR.'s constitutional and statutory rights by their failure to properly supervise and intercede to protect JACK JR.'s clearly established statutory and constitutional rights.

## COUNT XI
### Pendent State Claim for False Arrest

152. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-151 as though fully set forth herein.

153. Defendants, acting under color of law, violated JACK JR.'s right to be free from false arrest, in violation of the United States and New York State Constitutions and laws.

## COUNT XII
### Pendent State Claim for False Imprisonment

154. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-153 as though fully set forth herein.

155. Defendants, acting under color of law, violated JACK JR.'s right to be free from false imprisonment, in violation of the United States and New York State Constitutions and laws.

## COUNT XIII
## Pendent State Claim for Battery

156. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-155 as though fully set forth herein.

157. JACK JR. suffered blunt impact injuries to his head, torso, and upper and lower extremities as a result of defendants' intentional and unlawful acts.

158. Defendants, acting under color of law, unlawfully battered JACK JR.

## COUNT XIV
## Pendent State Claims for Denial of Adequate Medical Treatment

159. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-158 as though fully set forth herein.

160. The rules governing the operation of holding facilities impose an affirmative duty upon defendants to provide medical care to pre-trial detainees.

161. Defendants breach that duty of care to JACK JR. thereby causing him injury.

162. Defendants, acting under color of law, violated JACK JR.'s right to receive adequate medical treatment pursuant to State and local rules and regulations.

## COUNT XV
## Pendent State Claim for Failure to Properly Maintain a Holding Cell
## Pursuant to State Law

163. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-162 as though fully set forth herein.

164. The rules governing the maintenance of holding facilities impose an affirmative duty upon defendants to maintain holding facilities in reasonable conditions.

165. The rules governing the maintenance of holding facilities prohibit confining detainees in holding cells with degrading conditions such as inadequate heating or conditions likely to be injurious to health, safety, and welfare.

166. The conditions in the Seventh Precinct holding cell were degrading and inhumane; there was no heating, the temperature was bitterly cold, and JACK JR. was given nothing to keep himself warm except his t-shirt, jeans, and socks that he was permitted to keep.

167. Defendants inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s health, safety, and welfare by maintaining a holding cell with unreasonably low temperatures, placing him in that holding cell, and failing to provide adequate means for JACK JR. to keep himself warm or transfer JACK JR. to a similar facility with adequate heating.

168. Defendants, acting under color of law, breached their duty of care to JACK JR. and failed to properly maintain a holding cell pursuant to State and local rules and regulations, thereby causing injury to JACK JR.

## COUNT XVI
### Pendent State Claim for Failure to Properly Supervise a Holding Cell Pursuant to State Law

169. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-168 as though fully set forth herein.

170. The rules governing the operation of holding facilities impose an affirmative duty upon officers maintaining such facility to periodically check the status of the physical and mental wellbeing of detainees, maintain a proper log book, and when warranted, continuously monitor detainees amongst other regulatory requirements. The defendants breached one or more of these duties of care thereby causing injury to JACK JR.

171. Defendants failed to comply with the statutory and regulatory requirements to supervise a holding cell within the State of New York.

172. Defendants, acting under color of law, failed to properly supervise JACK JR.'s holding cell pursuant to State and local rules and regulations, thereby causing injury to JACK JR.

## COUNT XVII
### Pendent State Claims for Intentional and Negligent Infliction of Emotional Distress

173. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-172 as though fully set forth herein.

174. Defendants acted intentionally and maliciously when they repeatedly beat and struck JACK JR. after they pulled him from his car and threw him on the ground.

175. These actions were extreme and outrageous given that JACK JR. was on the ground and not resisting arrest, and exceeds all bounds of decency usually tolerated by a civilized society.

176. These actions were committed with the intent to cause JACK JR. to suffer extreme mental and emotional distress, agony, and anxiety, or with the reckless disregard of the extreme mental and emotional distress, agony, and anxiety such actions would likely cause.

177. JACK JR. did indeed suffer extreme mental and emotional distress, agony, and anxiety as a direct and proximate result of defendants' actions.

178. Defendants' actions unreasonably endangered JACK JR.'s physical safety.

179. Defendants' actions caused JACK JR. to fear for his safety.

180. Defendants caused JACK JR. to hang himself just several hours later at the prospect of having to remain in jail under the supervision of law enforcement personnel.

181. Defendants acted intentionally and maliciously when they ignored JACK JR.'s continuous desperate pleas and cries for medical treatment while in their custody.

182. These actions were extreme and outrageous given that JACK JR. had been beaten by defendants while being placed under arrest, and suffered physical injuries as a result of the defendants' conduct.

183. These actions were extreme and outrageous given that JACK JR. screamed and pleaded for medical assistance continuously for several hours.

184. These actions were extreme and outrageous given that Defendants knew or should have known that JACK JR. was clearly suicidal and a danger to himself. Defendants knew or should have known that:

    a. JACK JR. repeatedly yelled that he would be leaving the holding cell in a body bag if he did not receive medical assistance,

    b. JACK JR. actually attempted to hang himself with his t-shirt prior to hanging himself with his jeans, and

    c. JACK JR. had been acting irrationally for hours while in the defendants' direct presence including but not limited to verbal threats of suicide, physical acts in furtherance of suicide, irrational physical acts such as sticking his head in the toilet bowl, banging his head against the wall, and disrobing, amongst other evidence warranting medical assistance, all of which occurred while JACK JR. was in defendants' custody during which time they were charged with the responsibility of his care.

185. Defendants' intentional failure to act where a duty to act existed, was done with the intent to cause JACK JR. to suffer extreme mental and emotional distress, agony, and anxiety, or with the reckless disregard of the extreme mental and emotional distress, agony, and anxiety such actions would likely cause.

186. JACK JR. did indeed suffer extreme mental and emotional distress, agony, and anxiety as result of defendants' actions.

187. Defendants' actions unreasonably endangered JACK JR.'s physical safety.

188. Defendants' actions caused JACK JR. to fear for his safety.

189. Defendants' actions perpetuated JACK JR.'s fear of the police, and caused him to hang himself at the prospect of having to remain in jail under the supervision of law enforcement personnel.

190. Defendants, acting under color of law, intentionally and/or negligently inflicted emotional distress to JACK JR.


## COUNT XVIII
### Pendent State Claim for Intentional or Malicious Harm (Prima Facie Tort)

191. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-190 as though fully set forth herein.

192. Defendants' actions were motivated by malice and/or disinterested malevolence.

193. Defendants acted without excuse or justification.

194. As a direct and proximate result of defendants' actions, JACK JR. suffered physical injuries—"blunt impact injuries" to his head, torso, and upper and lower extremities.


## COUNT XIX
### Pendent State Claim for Wrongful Death Pursuant to EPTL § 5-4.1
### and Survival Pursuant to EPTL § 11-3.2.

195. Plaintiff repeats and realleges the allegations set forth in paragraphs 1-194 as though fully set forth herein.

196. JACK JR. died on January 23, 2013. *See* Exhibit 'D.'

197. Plaintiff, JOAQUIN FRANQUI III, was appointed Administrator of the Estate of JACK FRANQUI IV on September 9, 2013. *See* Exhibit 'K' annexed hereto.

198. JACK JR. left surviving next of kin.

199. Defendants acted wrongfully when they intentionally failed to provide JACK JR. with medical assistance despite his repeated pleas for such treatment.

200. Defendants acted wrongfully when they intentionally failed to provide JACK JR. with medical assistance despite the fact that they knew or should have known that JACK JR. was clearly suicidal and a danger to himself. Defendants knew or should have known that:

    a.  JACK JR. repeatedly yelled that he would be leaving the holding cell in a body bag if he did not receive medical assistance,

    b.  JACK JR. actually attempted to hang himself with his t-shirt prior to hanging himself with his jeans, and

    c.  JACK JR. had been acting irrationally for hours while in the defendants' direct presence including but not limited to verbal threats of suicide, physical acts in furtherance of suicide, irrational physical acts such as sticking his head in the toilet bowl, banging his head against the wall, and disrobing, amongst other evidence warranting medical assistance, all of which occurred while JACK JR. was in defendants' custody during which time they were charged with the responsibility of his care.

201. Defendants' wrongful acts directly and proximately caused JACK JR. conscious pain and suffering.

202. Defendants' wrongful acts caused JACK JR.'s death given that he hung himself because of their failure to provide him with medical assistance, as he had repeatedly informed them he would do.

203. JACK SR., JACK JR.'s father, incurred funeral expenses in the amount of $7,775.00, and other expenses not yet known. *See* Exhibit 'L' annexed hereto.

204. If JACK JR. had not died in the Seventh Precinct holding cell on January 23, 2013, defendants would be directly liable to him for their intentionally wrongful acts.

**WHEREFORE**, Plaintiff requests the following relief jointly and severally as against all the defendants:

    1.  A trial by jury on all issues;

    2.  An award of compensatory damages in an amount to be determined at trial;

    3.  An award of punitive damages in an amount to be determined at trial;

    4.  Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

    5.  Such other and further relief as this Court may deem just and proper.

Dated:          Mineola, New York
                October 28, 2013

                                    Respectfully submitted,

                                    _____
                                    Anthony M. Grandinette, Esq.
                                    Attorney for Plaintiff
                                    114 Old County Road
                                    Mineola, NY 11501
                                    (516) 877-2889

CC:     Suffolk County Attorney's Office
        c/o ACA Arlene Zwilling
        H. Lee Dennison Building
        100 Veterans Memorial Highway
        Hauppauge, N.Y. 11788

        Suffolk County Police Department
        30 Yaphank Ave
        Yaphank, N.Y. 11980

27

# EXHIBIT A

```
------------------------------------------------------------------x
```
In the matter of the ESTATE OF JACK FRANQUI IV


       -against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
DEPARTMENT, POLICE OFFICERS JOHN AND JANE
DOES 1-10,
```
------------------------------------------------------------------x
```

**NOTICE OF CLAIM**

S I R S :

         PLEASE TAKE NOTICE, that claimant, Joaquin Franqui, on behalf of his deceased son JACK FRANQUI IV hereby files claim against the above captioned Defendants, for the following claims: assault and battery, harassment, false arrest, false imprisonment, malicious prosecution, conspiracy, failure to provide medical care, failure to properly supervise, failure to properly maintain and supervise a holding cell pursuant to state law, fabrication of evidence and records, denial of claimants right to due process of law, right to counsel, libel, slander, intentional and negligent infliction of emotional duress, excessive force, cruel and inhuman treatment, and other claims not yet known.


         The aforesaid occurrence took place on or about January 23, 2013 at approximately 11:00 am in front of 6 Cordwood Path, Shoreham, County of Suffolk, State of New York and thereafter at the 7th precinct station house. That Suffolk County Police Officer, Jane Doe, shield number 5736 and id #917351 and others yet unknown did

harassed, threatened, menaced, through the threatened use of deadly physical force, namely a loaded firearm, illegally stopped and searched JACK FRANQUI IV and SIMON EARL, both their person and property without lawful authority, and engage in such other violations of FRANQUI AND EARL'S civil rights. That said officers engaged in the

excessive use of non-deadly physical force against JACK FRANQUI IV striking, restraining and assaulting him. The Suffolk Officers engaged in this behavior individually and under color of state law while allegedly attempting to effectuate an arrest of JACK FRANQUI IV. Thereafter  FRANQUI was transported to the 7th precinct where he was processed and placed in a holding cell. FRANQUI'S repeated requests for medical care were ignored. Mr. FRANQUI'S oral statements about harming himself were ignored by police. Mr. FRANQUI'S first physical attempt at harming himself was also ignored by police, whom merely cut down his tee shirt which was affixed to the cell bars as a ~~hose~~ noose by FRANQUI. Despite oral and now physical acts placing police on notice of FRANQUI'S suicidal and obvious fragile state of mind, as well as FRANQUI'S numerous and continuous pleas for medical care, police ignored FRANQUI. Failing to remove FRANQUI to a hospital or continuously monitor his behavior was an egregious deviation from acceptable administrative, legislative and departmental regulations and state laws designed to insure the health safety and welfare of inmates placed in holding cells within the State of New York. As a result, FRANQUI hung himself with his own blue jeans.   The cause of death was preliminarily reported by Suffolk Medical examiner as "Hanging with ligature mark"(pulmonary congestion), and the manner of death labeled a suicide. FRANQI'S suicide by hanging occurred in the 7th precinct holding cell which was monitored by video cameras, inside a precinct full of police officers on notice of FRANQUI'S suicidal state of mind. Thereafter, members of the Suffolk police department arrived, interviewed parties whom misrepresented and withheld material facts, in an effort to falsely report the true nature of events to avoid and shield members of the department from administrative and civil responsibility for their acts and failure to act, all which lead to

the unnecessary death of JACK FRANQUI IV. Those directly involved lied to State investigators and fabricated and altered physical evidence to conceal wrongdoing to avoid and shield members of the department from administrative and civil responsibility for their actions and/or inaction which lead to the unnecessary death of JACK FRANQUI IV. Thereafter defendants' fabricated a factual account alleging Mr. FRANQUI 'S behavior in an attempt to justify otherwise unlawful and egregious conduct. As part of this plan, Suffolk police officer Jane Doe, shield number 5736 and id #917351 and others not yet none continue to harass SIMON EARL, a witness to the initial misconduct by intimidating him and his family, threatening them directly and indirectly by words and deeds after the date of events.

By conduct under color of State law, the defendant's committed numerous crimes against claimant including assault and battery, harassment, false arrest, false imprisonment, malicious prosecution, conspiracy and denial of claimants right to due process of law, right to counsel, libel, slander, intentional and negligent infliction of emotional duress, excessive force, cruel and inhuman treatment, denial of medical care, negligent supervision and other claims not yet known, and thereafter made false statements created and utilized to provide false evidence against the claimant while knowing such evidence was false and to be relied upon by a Judge, prosecutors, and State and local officials all against the rights guaranteed claimant by the U.S. and New York State Constitutions.

That as a direct result of defendants' conduct JACK FRANQUI IV unnecessarily died while surrounded by those sworn to protect and serve the citizens of the State of New York including JACK FRANQUI IV.

Dated:Mineola, New York ,   April 16, 2013

LAW OFFICES OF A. GRANDINETTE

By: Anthony M. Grandinette
Attorneys for Claimant
114 Old Country Road
Mineola, NY 11501
  (516) 877-2889(T)
  (516)294-5348(F)

Grandinettelaw@gmail.com

Joaquin Franqui III.

Sworn to on  18
Day of April2013

ROBERT LEAKE
Notary Public, State of New York
Registration #01LE6205017
Qualified In Nassau County
Commission Expires May 4, 2017

TO:   OFFICE OF THE  SUFFOLK COUNTY ATTORNEY

H. LEE DENISON BUILDING

VETERANS MEMORIAL HIGHWAY

Hauppauge, New York 11501


NEW YORK ATTORNEY GENERALS OFFICE

120 Broadway

New York City, NY 10271-0332

# EXHIBIT B

| CC # 2013-0068103 | Pct 7 | Sector 703 | Car 703 | SCPD Incident Report | Orig Supp X | Domestic | MVA | Missing Person |
|---|---|---|---|---|---|---|---|---|

## INCIDENT

| Report Date 1/23/2013 | Report Time 14:30 | Day WED | Date (Occurred On/From) 1/23/2013 | Time 11:11 | Day | Date (Occurred To) | Time |
|---|---|---|---|---|---|---|---|

Business name and type (if residence, so indicate)                    Town Code

Incident Address
6 CORDWOOOD PA  EAST SHOREHAM

| No. | LAW | NAME OF OFFENSE | DEG | ART/SECTION | SUB | CAT | ATT | CTS | TARGET (J) | WEAPON CODES (A) |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | VTL | OP MV DRUGS 1ST | 0 | 1192 | 04 | M | C | 1 | | 88 |
| 1 | PL | RESIST ARREST | 0 | 205.30 | 00 | M | C | 1 | | 88 |
| 1 | PL | OBS GOVT ADMN 2 | 2 | 195.05 | 00 | M | C | 1 | | |

Person Type: C=Complainant V=Victim A=Arrestee S=Identified Suspect W=Witness N=Neighbor P=Person Interviewed O=Other

## ASSOCIATED PERSONS

| Per 1 | Type A | Name (Last,First,Middle) FRANQUI, JACK | D.O.B 12/14/1986 | Sex | Race | Home Tel# | Work Tel# | Cell Tel# |
|---|---|---|---|---|---|---|---|---|

| Address 83 MAGNOLIA RD ROCKY POINT NY | Offense | Offender | K | L | M | N | Q | R |
|---|---|---|---|---|---|---|---|---|

| Per 2 | Type C | Name (Last,First,Middle) SCPD, | D.O.B | Sex | Race | Home Tel# | Work Tel# | Cell Tel# |
|---|---|---|---|---|---|---|---|---|

| Address 1491 CR 46  SHIRLEY NY | Offense | Offender | K | L | M | N | Q | R |
|---|---|---|---|---|---|---|---|---|

| Neighborhood Canvass ☐ | Inv. Notified ☐ | Investigating Officer (Name, Shield) | Reporting Officer GRENIA, KAREN PO/5736/3A2 |
|---|---|---|---|
| | Inv. Responding ☐ | | |

## PROPERTY

| Veh 1 | Status 08 | License Plate No. GCA9733 | Partial ☐ | State NY | Exp Yr. | Plate Type PASS | Mileage 0 | Keys in Vehicle |
|---|---|---|---|---|---|---|---|---|

| Veh. Year 1972 | Make CADILLAC | Model | Style | VIN |
|---|---|---|---|---|

| Color(s) GOLD | Insurance Carrier | Vehicle Notes |
|---|---|---|

| | | | # of Crime Guns Recovered 0 | # of Crime Guns Sent to Crime Lab 0 |
|---|---|---|---|---|

| Per # | Quantity | Measure | Description (Include make, model, serial no., etc.) | Property Type | Property Status | Drug Type | Measure Source | Value |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | Property Total | |

## NARRATIVE

| T |
|---|
| U |

ABOVE ARRESTED FORR THE ABOVE CHARGES AND TRANSPORTED TO THE 7TH PRECINCT FOR PROCESSING WITHOUT INCIDENT.

Did reporting officer provide the victim with information on Victim's Rights and Services pursuant to NYS Law?    ☐ Yes    ☒ No

## ADMINISTRATIVE

Evidence/Tech work performed

| Teletype No. | Connected CC #'s | | # of Affidavits Prepared 0 |
|---|---|---|---|

| Reclassification ☐ | Reclassified to: | Reclassified From: | IRS Updated ☐ | PDCS 1099-1 to follow ☐ | Confidential ☐ |
|---|---|---|---|---|---|

| ☐ ACTIVE | ☐ CLOSED (NON-CRIMINAL ONLY) | ☒ CLEARED BY ARREST | Exceptionally Cleared Code | Status Date 1/23/2013 | TOT |
|---|---|---|---|---|---|
| ☐ PENDING | ☐ EXCEPTIONALLY CLEARED | ☐ WARRANT ISSUED | | | |

*** End of Report ***

POLICE DEPARTMENT
COUNTY OF SUFFOLK
MAR – 7 2013

| CC # 2013-0068103 | Reporting / Investigating Officer GRENIA, KAREN PO/5736/3A2 | Supervisor GINLEY, WILLIAM SGT/1179 | Pages 1 of 1 |
|---|---|---|---|

Printed by: GANZEANN    On: 3/7/2013 12:12:55 PM PDCS-1099ev

13-D068103/SPD

**POLICE DEPARTMENT, COUNTY OF SUFFOLK NY**
ACCREDITED LAW ENFORCEMENT AGENCY
**ARREST REPORT**     **PDCS-1045C**

LAST NAME, FIRST: FRANQUI,JACK

| DATE OF ARREST | TIME OF ARREST | ARREST TYPE | LOCATION OF ARREST | | ( ) INSIDE  (X) OUTSIDE |
|---|---|---|---|---|---|
| 01/23/13 | 1146 | SIGHT (SUMMARY) | 6 CORDWOOD PATH, SHOREHAM | | |

| INCIDENT LOCATION: | | OCCURRED: | DATE:01/23/13 | TO DATE: |
|---|---|---|---|---|
| 6 CORDWOOD PATH   SHOREHAM, BROOKHAVEN | | (X) ON  ( ) BETWEEN   TIME:1111 | | TIME: |

| ARRESTING OFFICER: | PID # | SHIELD | RANK | COMMAND |
|---|---|---|---|---|
| GRENIA,KAREN | 40054 | 5736 | PO | 0710 |

| FINGER PRINTED: (X) YES  ( ) NO | PHOTOGRAPHED: (X) YES  ( ) NO | WEAPON (DESCRIBE) |
|---|---|---|

| CT 001 002 003 | LAW VTL PL PL | ART 1192 205.30 195.05 | SUB 04 | CLASS U A A | DEG 0 0 2 | CAT M M M | DESCRIPTION OPER MV IMPAIRED BY DRUGS 1ST RESISTING ARREST OBSTRUCT GOVERNMENTL ADMIN-2ND | ATT.  COMP. X X X |
|---|---|---|---|---|---|---|---|---|

| LAST NAME | FIRST | MI | NICKNAME / ALIAS | DATE OF BIRTH |
|---|---|---|---|---|
| FRANQUI | JACK | | | 12/14/1986 |

| ADDRESS | CITY | STATE | ZIP | NYSID# | SOCIAL SECURITY # |
|---|---|---|---|---|---|
| 83 MAGNOLIA DRIVE | ROCKY POINT | NY | 11778 | 02484984J | 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 |

| HOME PHONE | CELL PHONE | CELL CARRIER | EMAIL ADDRESS |
|---|---|---|---|
| 6318213086 | 6318792577 | PREPAID | JDFRANQUI@GMAIL.COM |

| MARITAL STATUS | MOTHER'S MAIDEN NAME | CITIZENSHIP | RESIDENCY STATUS | IMMIGRATION STATUS |
|---|---|---|---|---|
| SINGLE | DAILEY | US | Resident | |

| BIRTHPLACE: CITY | COUNTY | STATE | COUNTRY | MILITARY SERVICE |
|---|---|---|---|---|
| ISLIP | SUFFOLK | NY | US | |

| SEX | RACE/ETHNICITY | HEIGHT | WEIGHT | EYE COLOR | EYE DEFECTS | HAIR COLOR | HAIR LENGTH / STYLE |
|---|---|---|---|---|---|---|---|
| M | WHITE NON HISPANIC | 602 | 180 | HAZ | NOR BAG | BRO | SHO STR |

| BUILD | COMPLEXION | L/R HANDED | SPEECH | CLOTHING | | MUST/BEARD | VISIBLE SCARS/MOLES | AMPUTATION |
|---|---|---|---|---|---|---|---|---|
| MED | WHI | R | SLU | CASUAL EVERYDAY JEANS | | NON | NON NON | |

| LANGUAGE | TRANSLATOR UTILIZED | GANG MEMBER | GANG NAME | STREET NAME |
|---|---|---|---|---|
| ENG | ( ) YES  ( ) NO | ( ) YES  (X) NO | | |

| TATTOO (DESCRIBE) |
|---|
| TATOO BACK MIL/SYM,TAT OTHER PICTURES,TAT BACK PICTURES,TATOO BACK WORDS,TATOO F |

| EMPLOYER | | PHONE NUMBER |
|---|---|---|
| UNEMPLOYED | | |

| BUSINESS ADDRESS | CITY | STATE | ZIP | GOVERNMENT ENTITY ( ) YES  ( ) NO |
|---|---|---|---|---|

| OCCUPATION | COLLECTING UNEMPLOYMENT ( ) YES  ( ) NO | DISABILITY BENEFITS ( ) YES  ( ) NO |
|---|---|---|

| VIN # | PLATE # | STATE | YEAR | MAKE | MODEL | COLOR |
|---|---|---|---|---|---|---|
| 6L47S2Q406125 | GCA9733 | NY | 1972 | CADI | ELDORADO | GOLD |

| LICENSE # | | DISPOSITION | VIOLATION(S) |
|---|---|---|---|
| 385 668 341    NY | | IN CUSTODY OF ARRESTEE | . |

| DWI TEST TYPE: | COURT ORDERED: ( ) YES  (X) NO | TEST DATE: | TEST TIME: | TEST KIT NUMBER: |
|---|---|---|---|---|

| TEST ADMINISTERED BY: | TEST LOCATION: |
|---|---|

BRIEF DETAILS OF OFFENSE:
THE DEFENDANT, AT 6 CORDWOOD PATH, SHOREHAM, IN THE TOWN OF BROOKHAVEN, SUFFOLK COUNTY, NEW YORK, ON OR ABOUT JANUARY 23, 2013, AT APPROXIMATELY 11:11 A.M., OPERATED A MOTOR VEHICLE WHILE HIS ABILITY TO OPERATE SUCH A MOTOR VEHICLE WAS IMPAIRED BY THE USE OF A DRUG; IN THAT, THE DEFENDANT DID OPERATE A 1972 CADILLAC NY REGISTRATION GCA9733 IN A NORTHERLY DIRECTION ON CORDWOOD PATH, A PUBLIC HIGHWAY, WHILE HIS ABILITY WAS IMPAIRED BY DRUGS, NAMELY MARIJUANA. DEFENDANT STATED TO YOUR DEPONENT " I SMOKED A BOWL OF MARIJUANA WITH MY FRIEND SIMON ABOUT 30 MINUTES BEFORE YOU GOT ME." " I KNOW I SHOULD NOT HAVE BEEN DRIVING, I AM ON PROBATION ALREADY." UPON INTERVIEWING THE DEFENDANT, IT WAS OBSERVED AND NOTED THAT HE HAD RED BLOODSHOT EYES, SLOW SLURRED SPEECH, AND THE VEHICLE EMITTED A STRONG SMELL OF MARIJUANA. THE DEFENDANT WAS ARRESTED AND TRANSPORTED TO THE 7TH PRECINCT, SHIRLEY, NY WHERE ON 01/23/13 AT 1236, 1246, AND 1256 DID REFUSE TO SUBMIT TO A BLOOD TEST.

CERTIFIED
CENTRAL RECORDS SECTION
SUFFOLK COUNTY POLICE DEPARTMENT

| REPORTING OFFICER NAME | RANK | SHIELD | COMMAND | PCT | SECTOR |
|---|---|---|---|---|---|
| GRENIA,KAREN | PO | 5736 | 0710 | 07 | 703 |

REVIEW COPY     PRINT DATE:02/28/13 PRINT TIME:15:05:55

Arrest Number: 002624-13    Agy: SPD   Date: 01/23/13    Time: 1146

PJN: 458248    Name: FRANQUI,JACK              NYSID: 02484984J
Address: 83 MAGNOLIA DRIVE, ROCKY POINT, NY  11778
Phone: 6318213086   Cell: 6318792577

Race: W       Sex: M      DOB: 12/14/86

Arrest Location:
6 CORDWOOD PATH

Pct: 07   Sector: 703   Town: BR   Hamlet: SHOREH

Arrested By:
Officer: GRENIA,KAREN                    PO    5736  / 0710

How: S - Sight (Summary)            Reason: P - Personal Knowledge

## Arrest/Charge Data
------------------

CC Number: 13-0068103

001   VTL   1192   04   UMO   C      OPER MV IMPAIRED BY DRUGS 1ST

THE DEFENDANT, AT 6 CORDWOOD PATH, SHOREHAM, IN THE TOWN OF BROOKHAVEN,
SUFFOLK COUNTY, NEW YORK, ON OR ABOUT JANUARY 23, 2013, AT APPROXIMATELY
11:11 A.M., OPERATED A MOTOR VEHICLE WHILE HIS ABILITY TO OPERATE SUCH A
MOTOR VEHICLE WAS IMPAIRED BY THE USE OF A DRUG; IN THAT, THE DEFENDANT DID
OPERATE A 1972 CADILLAC NY REGISTRATION GCA9733 IN A NORTHERLY DIRECTION ON
CORDWOOD PATH, A PUBLIC HIGHWAY, WHILE HIS ABILITY WAS IMPAIRED BY DRUGS,
NAMELY MARIJUANA.  DEFENDANT STATED TO YOUR DEPONENT " I SMOKED A BOWL OF
MARIJUANA WITH MY FRIEND SIMON ABOUT 30 MINUTES BEFORE YOU GOT ME." " I KNOW
I SHOULD NOT HAVE BEEN DRIVING, I AM ON PROBATION ALREADY."  UPON
INTERVIEWING THE DEFENDANT, IT WAS OBSERVED AND NOTED THAT HE HAD RED
BLOODSHOT EYES, SLOW SLURRED SPEECH, AND THE VEHICLE EMITTED A STRONG SMELL OF
MARIJUANA.  THE DEFENDANT WAS ARRESTED AND TRANSPORTED TO THE 7TH PRECINCT,
SHIRLEY, NY WHERE ON 01/23/13 AT 1236, 1246, AND 1256 DID REFUSE TO SUBMIT TO
A BLOOD TEST.

002   PL   205.30   AMO   C      RESISTING ARREST

THE DEFENDANT, AT 6 CORDWOOD PATH, SHOREHAM, IN THE TOWN OF BROOKHAVEN,
SUFFOLK COUNTY, NEW YORK, ON OR ABOUT JANUARY 23, 2013, AT APPROXIMATELY
11:11 A.M., INTENTIONALLY PREVENTED OR ATTEMPTED TO PREVENT A POLICE OFFICER
OR PEACE OFFICER FROM EFFECTING AN AUTHORIZED ARREST OF HIMSELF OR ANOTHER
PERSON; IN THAT, WHILE ATTEMPTING TO PLACE DEFENDANT UNDER ARREST FOR THE
CHARGE OF DRIVING WHILE ABILITY IMPAIRED BY DRUGS IN THAT THE DEFENDANT DID
OPERATE A 1972 CADILLAC NY REGISTRATION GCA9733 IN A NORTHERLY DIRECTION ON
CORDWOOD PATH WHILE IMPAIRED BY DRUGS NAMELY MARIJUANA.  IT WAS OBSERVED AND
NOTED THAT DEFENDANT HAD RED BLOODSHOT EYS, SLURRED SLOW SPEECH AND VEHICLE
EMITTED STRONG SMELL OF MARIJUANA. DEFENDANT STATED TO YOUR DEPONENT " I
SMOKED A BOWL OF MARIJUANA WITH MY FRIEND SIMON ABOUT 30 MINUTES BEFORE YOU
GOT ME." " I KNOW I SHOULD NOT HAVE BEEN DRIVING, I AM ON PROBATION ALREADY"
WHILE ATTEMPTING TO PLACE DEFENDANT UNDER ARREST FOR ABOVE CHARGES, DEFENDANT
FLAILED HIS ARMS AND LEGS AND REFUSED TO PUT HIS HANDS BEHIND HIS BACK UNTIL
HE WAS EVENTUALLY SUBDUED.

CERTIFIED
CENTRAL RECORDS SECTION
SUFFOLK COUNTY POLICE DEPARTMENT

THE DEFENDANT, AT 6 CORDWOOD ROAD, SHOREHAM, IN THE TOWN OF BROOKHAVEN, SUFFOLK COUNTY, NEW YORK, ON OR ABOUT JANUARY 23, 2013, AT APPROXIMATELY 11:11 A.M., INTENTIONALLY OBSTRUCTED, IMPAIRED OR PERVERTED THE ADMINISTRATION OF LAW OR OTHER GOVERNMENTAL FUNCTION OR PREVENTED OR ATTEMPTED TO PREVENT A PUBLIC SERVANT FROM PERFORMING AN OFFICIAL FUNCTION, BY MEANS OF INTIMIDATION, PHYSICAL FORCE OR INTERFERENCE, OR BY MEANS OF ANY INDEPENDENTLY UNLAWFUL ACT, OR BY MEANS OF INTERFERING, WHETHER OR NOT PHYSICAL FORCE IS INVOLVED, WITH RADIO, TELEPHONE, TELEVISION OR OTHER TELECOMMUNICATIONS SYSTEMS OWNED OR OPERATED BY THE STATE, OR A COUNTY, CITY, TOWN, VILLAGE, FIRE DISTRICT OR EMERGENCY MEDICAL SERVICE OR BY MEANS OF RELEASING A DANGEROUS ANIMAL UNDER CIRCUMSTANCES EVINCING THE ACTOR'S THAT THE ANIMAL OBSTRUCT GOVERNMENTAL ADMINISTRATION; IN THAT, WHILE YOUR DEPONENT WAS ATTEMPTING TO APPROACH THE DEFENDANT WHO WAS SEATED IN THE DRIVER'S SEAT OF A 1972 CADILLAC NY PLATE# GCA9733, IN RESPONSE TO A 911 CALL DETAILING A SUSPICIOUS VEHICLE IN THE AREA, AND AFTER MULTIPLE COMMANDS BY YOUR DEPONENT TO SECURE HIS DOG, A PINSCHER, THE DEFENDANT INTENTIONALLY OPENED THE VEHICLE DOOR AND DID STATE TO THE DOG, " GO GET HER."  THE RELEASE OF THE ANIMAL WAS ONLY PREVENTED BY YOUR DEPONENT WHO SLAMMED THE VEHICLE DOOR SHUT BEFORE THE ANIMAL COULD EXIT SAME. THE DEFENDANT STATED TO YOUR DEPONENT, " I WAS SCARED SO I WANTED THE DOG TO GO AFTER YOU."

CERTIFIED
CENTRAL RECORDS SECTION
SUFFOLK COUNTY POLICE DEPARTMENT

# EXHIBIT C





Page 1 of 1

# EXHIBIT D

DEPARTMENT OF HEALTH

# CERTIFICATE OF DEATH

**STATE FILE NUMBER**

REGISTER NUMBER: 5757 / 0214

RESIDENCE

| 1. NAME: FIRST | MIDDLE | LAST | 2. SEX: MALE ☒1 FEMALE ☐2 | 3A. DATE OF DEATH: MONTH 01 DAY 23 YEAR 2013 | 3B. HOUR: Approx. 6:20 P.M |
|---|---|---|---|---|---|

| 4A. PLACE OF DEATH: (Check one) HOSPITAL DOA ☐ HOSPITAL OUTPATIENT ☐ HOSPITAL INPATIENT ☐ NURSING HOME ☐ PRIVATE RESIDENCE ☐ HOSPICE FACILITY ☐ OTHER (Specify): ☒ Jail cell | 4B. IF FACILITY, DATE ADMITTED: MONTH DAY YEAR |

NCHS

1. NAME: FIRST **Jack** MIDDLE **Franqui** LAST **IV**

4C

4C. NAME OF FACILITY: (If not facility, give address) **Suffolk County Police Dept. 7th Prct., Shirley** | 4D. CITY ☐ VILLAGE ☐ TOWN ☒ **Brookhaven** | 4E. COUNTY OF DEATH: **Suffolk**

4G

| 4F. MEDICAL RECORD NO. | 4G. WAS DECEDENT TRANSFERRED FROM ANOTHER INSTITUTION? (If yes, specify institution name, city or town, county and state) NO ☐ YES ☐ |

DECEDENT

| 5. DATE OF BIRTH: MONTH 12 DAY 14 YEAR 1986 | 5A. AGE IN YEARS: 26 yrs. | 6B. IF UNDER 1 YEAR ENTER months days | 6C. IF UNDER 1 DAY ENTER hours minutes | 7A. CITY AND STATE OF BIRTH: (If not USA, Country and Region/Province) **West Islip, NY** | 7B. IF AGE UNDER 1 YEAR, NAME OF HOSPITAL OF BIRTH: |

7A

| 8. SERVED IN U.S. ARMED FORCES? (included prior years) NO ☒0 YES ☐1 | 9. DECEDENT OF HISPANIC ORIGIN? Check the boxes that best describe whether the decedent is Spanish/Hispanic/Latino. A ☐ No, not Spanish/Hispanic/Latino   B ☐ Yes, Mexican, Mexican American, Chicano   C ☒ Yes, Puerto Rican   D ☐ Yes, Cuban   E ☐ Yes, Other Spanish/Hispanic/Latino (Specify) | 10. DECEDENT'S RACE: Check one or more races to indicate what the decedent considered himself or herself to be. A ☒ White/Caucasian   B ☐ Black or African American   C ☐ Asian Indian   D ☐ Chinese   E ☐ Filipino   F ☐ Japanese   G ☐ Korean   H ☐ Vietnamese   I ☐ Native Hawaiian   J ☐ Guamanian or Chamorro   K ☐ Samoan   M ☐ American Indian or Alaska Native (specify)   P ☐ Other Asian (specify)   Q ☐ Other Pacific Islander (specify)   S ☐ Other (specify) |

7B

| 11. DECEDENT'S EDUCATION: Check the box that best describes the highest degree or level of school completed at the time of death. 1 ☐ ≤ 8th grade   2 ☐ 9th-12th grade; no diploma   3 ☒ High school graduate or GED   4 ☐ Some college credit, but no degree   5 ☐ Associate's degree   6 ☐ Bachelor's degree   7 ☐ Master's degree   8 ☐ Doctorate/Professional degree |

| 12. SOCIAL SECURITY NUMBER: 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 | 13. MARITAL STATUS: NEVER MARRIED ☒1 MARRIED ☐ WIDOWED ☐ DIVORCED ☐ SEPARATED ☐ | 14. SURVIVING SPOUSE: Enter birth name of spouse if married or separated. |

| 15A. USUAL OCCUPATION: (not enter retired) **Cook** | 15B. KIND OF BUSINESS OR INDUSTRY: **Food** | 15C. NAME AND LOCALITY OF COMPANY OR FIRM: **American Red Cross** |

SI

| 16A. RESIDENCE: (State or Country if not USA) **New York** | 16B. County or Region/Province if not USA: **Suffolk** | 16C. LOCALITY: (Check one and specify) CITY ☐ VILLAGE ☐ TOWN ☒ **Brookhaven** | 16D. IF CITY OR VILLAGE RESIDENCE WITHIN CITY OR VILLAGE LIMITS? ☐ YES   IF NO, SPECIFY TOWN. |

25

| 16D. STREET AND NUMBER OF RESIDENCE: **83 Magnolia Dr. Rocky Point** | 16E. ZIP CODE: **11778** |

30

| 17. BIRTH NAME OF FATHER / PARENT: FIRST **Joaquin** MI LAST **Franqui** | 18. BIRTH NAME OF MOTHER / PARENT: FIRST **Phyllis** MI LAST **Daily** |

31

| 19A. NAME OF INFORMANT: **Joaquin Franqui** | 19B. MAILING ADDRESS: (include zip code) **83 Magnolia Dr. Rocky Point, NY 11778** |

DISPOSITION

| 20A. 1 ☐ BURIAL 2 ☒ CREMATION 3 ☐ REMOVAL 4 ☐ HOLD 5 ☐ DONATION 6 ☐ ENTOMBMENT   MONTH 01 DAY 28 YEAR 2013 | 20B. PLACE OF BURIAL, CREMATION, REMOVAL OR OTHER DISPOSITION: **Washington Memorial Park Mount Sinai, NY** | 20C. LOCATION: (City or town and state) |

31B

| 21A. NAME AND ADDRESS OF FUNERAL HOME: **Branch Funeral Home 551 Route 25 A Miller Place, NY 11764** | 21B. REGISTRATION NUMBER: **00208** |

OR

| 22A. NAME OF FUNERAL DIRECTOR: **John H. Vigliante** | 22B. SIGNATURE OF FUNERAL DIRECTOR: ▶ | 22C. REGISTRATION NUMBER: **13688** |

GRS

| 23. SIGNATURE OF REGISTRAR: ▶ *Catherine C. Eddington* | 23B. DATE FILED: 01 28 2013 | 24A. BURIAL OR REMOVAL PERMIT ISSUED BY: *Mary Dugan* | 24B. DATE ISSUED: 01 27 2013 |

**ITEMS 25 THRU 33 COMPLETED BY CERTIFYING PHYSICIAN – OR – CORONER / CORONER'S PHYSICIAN OR MEDICAL EXAMINER**

OCOD

| 25A. CERTIFICATION: To the best of my knowledge, death occurred at the time, place and due to the cause(s) stated. Certifier's Name: **Odette R. Hall, M.D.** | License No.: **243777** | Signature: | MONTH 01 DAY 24 YEAR 2013 |

CANCER

| 25B. Certifier's Title: 0 ☐ Attending Physician   1 ☐ Physician acting on behalf of Attending Physician   2 ☒ Medical Examiner / Deputy Medical Examiner | Address: **SUFFOLK COUNTY MEDICAL EXAMINER SUFFOLK COUNTY OFFICE BLDG. ... N.Y. 11788** |

CERTIFIER

| 25B. If coroner is not a physician, enter Coroner's Physician's name & title. | License No.: | Address: |

| 25C. If certifier is not attending physician, enter Attending Physician's name & title. | License No.: | Address: |

| 26A. Attending physician attended deceased: FROM MONTH DAY YEAR TO MONTH DAY YEAR | 26B. Deceased last seen alive by attending physician: MONTH DAY YEAR | 26C. Pronounced Dead: MONTH 01 DAY 23 YEAR 2013 AT Time 7:50 P |

| 27. MANNER OF DEATH: NATURAL CAUSE ☐1 ACCIDENT ☐2 HOMICIDE ☐3 SUICIDE ☒4 UNDETERMINED CIRCUMSTANCES ☐5 PENDING INVESTIGATION ☐6 | 28. WAS CASE REFERRED TO CORONER OR MEDICAL EXAMINER? NO ☐ YES ☒ | 29A. AUTOPSY? NO ☐ YES ☒ REFUSED ☐ | 29B. IF YES, WERE FINDINGS USED TO DETERMINE CAUSE OF DEATH? NO ☐ YES ☒ |

CONFIDENTIAL — SEE INSTRUCTION SHEET FOR COMPLETING CAUSE OF DEATH — CONFIDENTIAL

CAUSE OF DEATH

| 30. DEATH WAS CAUSED BY: (ENTER ONLY ONE CAUSE PER LINE FOR (A), (B), AND (C).) | APPROXIMATE INTERVAL BETWEEN ONSET AND DEATH |
|---|---|
| PART I. IMMEDIATE CAUSE: (A) **HANGING** | |
| DUE TO OR AS A CONSEQUENCE OF: (B) | |
| DUE TO OR AS A CONSEQUENCE OF: (C) | |

| PART II. OTHER SIGNIFICANT CONDITIONS CONTRIBUTING TO DEATH BUT NOT RELATED TO CAUSE GIVEN IN PART I (A). | DID TOBACCO USE CONTRIBUTE TO DEATH? 0 ☐ NO   1 ☐ YES   2 ☐ PROBABLY   3 ☒ UNKNOWN |

| 31A. DATE OF INJURY: MONTH 01 DAY 23 YEAR 2013 | HOUR: 6:20 P | 31B. INJURY LOCALITY: (City or town and county and state) **Shirley Suffolk, N.Y.** | 31C. DESCRIBE HOW INJURY OCCURRED: **HANGED SELF** | 31D. PLACE OF INJURY: **Jail Cell** | 31E. INJURY AT WORK? NO ☒   YES ☐ |

| 31F. IF TRANSPORTATION INJURY, SPECIFY: 1 ☐ Driver/Operator   2 ☐ Passenger   3 ☐ Pedestrian   4 ☐ OTHER (specify) | 32. WAS DECEDENT HOSPITALIZED IN LAST 2 MONTHS? NO ☐ YES ☐ | 33A. IF FEMALE: 1 ☐ Not pregnant within last year   2 ☐ Pregnant at time of death   3 ☐ Not pregnant, but pregnant within 42 days of death   4 ☐ Not pregnant, but pregnant 43 days to 1 year before death   5 ☐ Unknown if pregnant within past year | 33B. DATE OF DELIVERY: MONTH DAY YEAR |

*(left margin, handwritten)* For use by physician or institution — NAME OF DECEDENT: **Jack Franqui** — DATE OF DEATH: — AM/PM — TIME OF DEATH: **13-00391**

# EXHIBIT E




# SUFFOLK COUNTY, NEW YORK
# OFFICE OF THE MEDICAL EXAMINER

## REPORT OF AUTOPSY

**NAME:** JACK FRANQUI IV
**AUTOPSY PERFORMED BY:** Odette R. Hall, M.D.

**ME#:** 13-00391
**DATE:** January 24, 2013

## FINAL ANATOMIC DIAGNOSES

I.  **HANGING WITH LIGATURE MARK**
    A. PULMONARY CONGESTION

II. **BLUNT IMPACT OF HEAD**
    A. CUTANEOUS ABRASIONS
    B. SUBSCAPULAR HEMORRHAGE, PARIETAL, BILATERAL

III. **BLUNT IMPACT OF TORSO WITH CUTANEOUS ABRASIONS AND SUBCUTANEOUS HEMORRHAGE, UPPER AND MIDDLE BACK**

IV. **BLUNT IMPACT OF UPPER EXTREMITIES WITH CUTANEOUS ABRASIONS AND CONTUSION**

V.  **BLUNT IMPACT OF LOWER EXTREMITIES WITH CUTANEOUS ABRASIONS AND CONTUSIONS**

VI. **DIVERTICULOSIS**

---

**CAUSE OF DEATH:**     HANGING

**MANNER OF DEATH:**     SUICIDE (HANGED SELF)

Odette R. Hall, M.D.
Deputy Medical Examiner

1/30/13
Date

ORH/

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

Virginia Falone

OFFICE OF THE MEDICAL EXAMINER

SUFFOLK COUNTY, N.Y.

**JACK FRANQUI IV**

**CASE 13-00391**

I hereby certify that I, Odette R. Hall, M.D., Deputy Medical Examiner, have performed an autopsy on the body identified as Jack Franqui IV on January 24, 2013 at the Suffolk County Medical Examiner's Office commencing at 11:15 a.m.

EXTERNAL EXAMINATION:

**General Appearance:** The body is that of a well-developed, 6' 1", 234 lbs, obese (Body Mass Index: 30.9), White man whose appearance is consistent with the given age of 26 years. The head, torso and extremities are symmetrical without malformation or palpable skeletal trauma. See "INJURIES".

**Postmortem Changes:** There is moderate, symmetrical rigor mortis of the jaw, neck and extremities. Livor mortis is pink-purple and blanching; it is distributed over the neck, upper chest, back, and throughout the upper and lower extremities. The lividity has a lacy and blotchy pattern. The body is cool to the touch.

**Head and Neck:** The head, face and neck are free of conspicuous scars. The scalp hair is straight and brown; it measures up to 1" in length. The facial hair consists of a 1/2", brown mustache and beard. There are bilateral and symmetrical 1-1/2 x 1/2" clusters of pinpoint, yellow-tan papules beneath the eyes. A 1/8", erythematous macule is on the right cheek. The corneas are translucent. The irides are brown. The conjunctivae are free of hemorrhage, petechiae or jaundice. The oral cavity has an atraumatic mucosa and a complete complement of natural teeth in fair to poor repair. The tongue is free of laceration or contusion.

**Torso:** Linear striae are on the axillae and abdomen. A 1", linear and vertical scar, with suture marks, is on the right upper quadrant of the abdomen. A 1/2", irregular scar is on the right lower quadrant of the abdomen. A 7", linear and vertical scar, with suture marks, is on the midline of the abdomen. The chest, buttocks and anus are unremarkable.

**Extremities:** Five, 1/4", linear and oblique scars are on the anterior right forearm. A 1/2", irregular scar is on the anterior right wrist. Five, 1", linear and horizontal scars are on the posterolateral right forearm. A 1" scar, in the shape of a cross, is on the dorsum of the right hand. A 1/2", linear and oblique scar is on the lateral right hand. Three, 1" to 1-1/2", linear and horizontal scars are on the lateral left arm. A 3-1/2", linear and oblique scar is on the anterior left arm. Three, 1/16" to 1/8" erythematous papules are on the anterior right thigh. Two, 1/4", erythematous papules are on the posterior left leg. The interdigital spaces of the feet are flaky and show scant amounts of gray-black residue. All of the digits are present. The fingernails are short with unremarkable texture. The toenails extend up to 1/8" beyond the skin edge and have unremarkable texture.

**Genitalia:** The external genitalia are atraumatic and that of a circumcised adult man. The testes are descended.

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

2

OFFICE OF THE MEDICAL EXAMINER                                    SUFFOLK COUNTY, N.Y.

**JACK FRANQUI IV**                                             **CASE 13-00391**

**Tattoos and Adornments:** A monochromatic tattoo of the words "DEATH BEFORE DISHONOR" and a polychromatic tattoo of a marijuana leaf caricature are on the mid upper back and right upper back, respectively.

CLOTHING:

The body is received wearing white socks and green, brown and black deer print camouflage underwear.  The clothing is labeled with the case formation and submitted to the Crime Laboratory.

THERAPEUTIC PROCEDURES:

The body is free of therapeutic procedures or devices.

INJURIES:

There are findings consistent with hanging; and blunt impact injuries of the head, torso and extremities.  The descriptions and directions are stated with reference to the standard anatomical planes with the body measured in the horizontal position.  The order of description makes no implied reference to the sequence of occurrence.

FINDINGS CONSISTENT WITH HANGING

A ligature mark composed of a flat, near-circumferential pattern of discontinuous, irregular, dry, orange-brown abrasions; and blanching is around the neck.  The ligature mark is centered 3/4" below the laryngeal prominence where it measures 1-3/4" in width; 1/2" below the right external auditory canal where it measures 3/4" in width; and 1-3/4" below the left external auditory canal where it measures 1" in width.  The ends of the ligature mark terminate at the lateral corners of the posterior hairline.  A 4" void is in the ligature mark at this point.  The ends of the ligature mark are centered 1-1/2" below the external occipital protuberance.

A 1 x 1/2", blanched abrasion is at the superior aspect of the neck, below the right jaw line.

On subsequent internal examination, the paratracheal soft tissues and strap muscles are free of hemorrhage.  A 1/2 x 1/4" area of hemorrhage is in the left semispinalis capitis muscle.  The cervical vertebrae, hyoid bone, thyroid cartilage and tracheal cartilages are free of fractures.

Accompanying the body is a cut pair of blue jeans.  The right leg of the jeans is intact.  The left leg is cut off below the seat.  An additional cut extends vertically through the seat of the jeans, and above the left back pocket. The jeans are labeled with the case information and submitted to the Crime Laboratory.

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

*Virginia Falcone*

3

OFFICE OF THE MEDICAL EXAMINER                                      SUFFOLK COUNTY, N.Y.

**JACK FRANQUI IV**                                                **CASE 13-00391**

BLUNT IMPACT INJURIES

**Head:** A 4 x 1-1/4" abrasion, with adherent clotted blood, is on the right cheek. Six, 1/8" abrasions are on the helix of the left ear.

On subsequent internal examination, there is a 1" left parietal subscapular hemorrhage; and two, 1" and 1-1/2" right parietal subscapular hemorrhages. The skull has no fractures. There is no epidural, subdural or subarachnoid hemorrhage. The brain is free of edema, signs of herniation, laceration, contusion or hemorrhage.

**Torso:** A 2 x 1-1/2" cluster of linear abrasions is on the right upper back. The chest, abdomen, buttocks and anus are free of trauma.

On subsequent internal examination, there is a 1 x 1/2" subcutaneous hemorrhage of the mid upper back; and a 1 x 1/2" subcutaneous hemorrhage in the left upper back. The clavicles, sternum, ribs, vertebrae and pelvis are free of fracture. The thoracic, peritoneal, retroperitoneal and pelvic viscera are free of trauma.

**Upper Extremities:** A 1/4", blue contusion is on the posterior right forearm. A 1/2", blue contusion is on the anterior left arm. Five, 1/8", pale, red and scabbed abrasions are on the posterior left arm, elbow and forearm. The upper extremities are free of palpable fractures.

**Lower Extremities:** A 1/2" red-brown contusion is on the medial right foot. A 5", curvilinear, red contusion is on the posterior right thigh. A 2", yellow to red-brown contusion is on the posterior right leg. Nine, 1/16" to 1-1/2" abrasions are on the left knee. A 1-1/2", faint blue contusion; and a 1/8" abrasion are on the medial left leg. Three, 1", faint blue contusions are on the posteromedial left leg. A 1/2", yellow-orange contusion is on the lateral left thigh. A 1/16" abrasion is on the medial left foot. The lower extremities are free of palpable fractures.

These injuries, having been described, will not be repeated.

INTERNAL EXAMINATION:

**Habitus:** The subcutaneous adipose tissue at the umbilicus measures 4 cm in thickness.

**Body Cavities:** The organs are in their normal situs. The pleural cavities are free of excess fluid. The left pleural cavity shows focal posterior adhesions. The right pleural cavity is free of adhesions. The peritoneal cavity is free of excess fluid. There are adhesions of the anterior cavity, centered at the liver. The pericardial sac is free of excess fluid and adhesions. Each of the body cavities is free of erythema or exudates.

**Head and Central Nervous System:** The brain weighs 1475 gm. The cerebral hemispheres are symmetrical with the usual developmental patterns of sulci and gyri. The leptomeninges are thin and translucent. The intracranial vessels are free of aneurysms and atherosclerosis. The cranial

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.
*Virginia Falcone*

                                              4

OFFICE OF THE MEDICAL EXAMINER                                    SUFFOLK COUNTY, N.Y.

**JACK FRANQUI IV**                                              **CASE 13-00391**

nerves are normally distributed.  The brainstem and cerebellum have the usual patterns on cut surface.  The cortex, white matter and deep nuclei are free of hemorrhage, and mass or cavitary lesions.  The ventricles and cerebral aqueduct are patent and unremarkable in size and configuration.

**Neck:** The upper airway is patent and has a smooth, intact mucosa.

**Cardiovascular System:** The heart weighs 400 gm.  There is a normal distribution of right dominant coronary arteries that are free of atherosclerosis.  There are no recent thrombi.  The myocardium is homogeneous and red-brown without focal areas of pallor, hemorrhage, softening or fibrosis.  The thicknesses of the myocardium are as follows: left ventricle- 1.4 cm, right ventricle- 0.2-0.4 cm and interventricular septum- 1.5 cm.  The endocardial surfaces are smooth.  The cardiac valves and chordae tendineae are thin and pliable.   The interatrial and interventricular septae are intact.   The aorta is free of atherosclerosis.  The vena cavae and pulmonary arteries are free of thrombi or emboli.  The celiac, mesenteric and renal arteries are free of atherosclerosis or stenoses.

**Respiratory System:** The trachea and mainstem bronchi are patent.  The trachea has a slightly erythematous and slightly granular mucosa.  The bronchi have intact, smooth mucosae.  The right lung weighs 850 gm; the left lung weighs 700 gm.  Each lung shows normal lobation.  The parenchyma is dark red and minimally crepitant; it is free of masses, hemorrhages, consolidations, obstructions, destructive emphysema, or frothy or sanguinous fluid.   The pulmonary arteries and intrapulmonary branches are free of atherosclerosis.

**Liver, Gallbladder and Pancreas:** The liver weighs 2350 gm.  The capsule is intact.  The parenchyma is red-brown with slight, fine variegations.  The gallbladder contains approximately 30 ml of bile and is free of stones.  The pancreas is pink-beige and firm with an unremarkable lobular pattern.

**Hematopoietic System:** The spleen weighs 230 gm.  The capsule is intact.  The parenchyma is firm and uniform in color.  The white pulp is prominent.  The cervical and carinal lymph nodes are enlarged.  The bone marrow is red-brown and uniform.

**Genitourinary System:** The kidneys each weigh 175 gm.  Each has a nonadherent capsule; and smooth, dark red cortical surface.   The corticomedullary junctions are well-defined on cut sections.  The ureters maintain uniform caliber into the bladder which has a non-erythematous and smooth mucosa.  There is approximately 50 ml of urine.  The prostate is not enlarged.

**Endocrine System:** The pituitary, thyroid and adrenals are unremarkable in color, size and consistency; they are free of mass or cystic lesions.

**Gastrointestinal System:** The esophagus and gastroesophageal junction are patent and have smooth, intact mucosal surfaces.  The stomach contains approximately 100 ml of beige, viscid fluid.  The gastric mucosa and that of the intestines show the usual patterns of mucosal folding

I HEREBY CERTIFY THAT THIS IS A TRUE AND CORRECT COPY


5

OFFICE OF THE MEDICAL EXAMINER                                    SUFFOLK COUNTY, N.Y.

**JACK FRANQUI IV**                                              **CASE 13-00391**

and are free of masses, ulcerations, perforations or exudates.  A few diverticuli are in the distal colon.  The vermiform appendix is present.

**Musculoskeletal System:** The musculature is unremarkable with normal distribution and development.

HISTOPATHOLOGY:

Sections are submitted for microscopic analysis; a separate report will be issued.

TOXICOLOGY:

Specimens are submitted for toxicologic analysis; a separate report will be issued.

ORH/
DRAFT: 1/24/2013
FINAL: 1/30/2013

I HEREBY CERTIFY THAT THIS IS
A TRUE AND CORRECT COPY.

6





# EXHIBIT F

# EXHIBIT G

ORIGINAL

50-H HEARING

- - - - - - - - - - - - - - x

In the Matter of the Estate of

JACK FRANQUI IV,

        Claimant,

    -against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, POLICE OFFICERS JOHN
AND JANE DOES 1-10,

        Respondents.

- - - - - - - - - - - - - - x

                100 Veterans Memorial Highway
                Hauppauge, New York

                August 21, 2013
                3:06 p.m.


        EXAMINATION of JOHN BURKE, a Non-Party
Witness in the above-entitled action, held at
the above time and place, pursuant to Section
50-H of the General Municipal Law, taken
before Nicole Limoncelli, a shorthand reporter
and Notary Public within and for the State of
New York.

```
 1

 2      A P P E A R A N C E S:

 3          THE LAW OFFICES OF ANTHONY M. GRANDINETTE
                    Attorneys for Claimant and
 4                  John Burke
                    114 Old Country Road, Suite 420
 5                  Mineola, New York 11501

 6          BY:  ANTHONY M. GRANDINETTE, ESQ.

 7


 8          SUFFOLK COUNTY DEPARTMENT OF LAW
                    Attorneys for Respondents
 9                  100 Veterans Memorial Highway
                    Hauppauge, New York 11788
10
            BY:  ARLENE ZWILLING, ESQ.
11

12

13      ALSO PRESENT:

14          Mirel Fisch - The Law Office of Anthony M.
                    Grandinette
15

16

17

18

19

20

21

22

23

24

25
```



1

2    J O H N    B U R K E, the witness herein,

3    having been first duly sworn by a Notary

4    Public of the State of New York, was examined

5    and testified as follows:

6    EXAMINATION BY

7    MS. ZWILLING:

8        Q.   State your name for the record,

9    please.

10       A.   John Burke.

11       Q.   State your address for the record,

12   please.

13       A.   95A Tuckahoe Road, Eastchester, New

14   York.

15       Q.   Good afternoon, Mr. Burke.

16       A.   Good afternoon, ma'am.   How are you?

17       Q.   I'm Arlene Zwilling, Assistant

18   County Attorney.   I'm going to be conducting

19   a 50-H hearing today with respect to a Notice

20   of Claim filed by the family of Jack Franqui.

21   What that means is I'm going to be asking you

22   some questions about the events mentioned in

23   that Notice of Claim which I would like you

24   to answer.

25       A.   Sure.

---

Five Star Reporting, Inc.   90 John Street - Ste. 411  New York, NY 10038  Phone: 631.224.5054  Fax 631.224.3926



JOHN BURKE

1

2      Q.  If for any reason you don't

3  understand one of my questions, let me know

4  that and I will rephrase the question so that

5  it is clear to you.

6      A.  Okay.

7      Q.  There's two things I would ask you

8  to keep in mind before we begin with the

9  questions.  One is:  Even if you think you

10  know what the question is going to be, allow

11  me to finish my question before you begin

12  your answer.  It's the job of the court

13  reporter that you see here to take down

14  everything that's said in the room

15  accurately.  If two people speak at the same

16  time, it makes it very difficult for her to

17  take down everything that's being said

18  accurately.

19      The other thing I would ask you to

20  keep in mind is that when you're responding

21  to question, please speak your answer instead

22  of just nodding your head yes or no?

23      A.  Okay.

24      Q.  The reporter can only take down

25  spoken words.  She cannot obviously take down

JOHN BURKE

1
2    nods of the head.

3        **A.   Yes.**

4        Q.   Now, before we went on the record,

5    Mr. Grandinette indicated that he was

6    appearing for you and that we should send him

7    the transcript of your testimony for him to

8    forward to you.

9        **A.   Yes.**

10       Q.   That's agreeable to you?

11       **A.   Yes.**

12       Q.   Just so you know, what we do is:

13   Once the reporter prepares the transcript and

14   gets it to us, we do have the witness review

15   it.  So we will forward it to

16   Mr. Grandinette, he will forward it to you,

17   and you will have an opportunity to review

18   it --

19       **A.   Okay.**

20       Q.   -- and sign it.

21           How did you learn of this hearing?

22       **A.   This -- the deposition?**

23       Q.   Yes.

24       **A.   I was contacted by Mr. Grandinette.**

25       Q.   When did Mr. Grandinette contact

JOHN BURKE

2    you?

3         A.   This is a few weeks ago.   After I

4    spoke to the ADA, I believe in the same

5    building, he mentioned a deposition would be

6    next, and now I was contacted by his office

7    saying that today is the date of the

8    deposition.

9         Q.   You mentioned an ADA that you spoke

10   with.   Who is the ADA?

11        A.   I can't think of his name, and also

12   a Detective Lane (phonetic) was present at

13   this meeting.   This was about three weeks ago

14   I would say, probably a little more.   But the

15   ADA, I can't think of his name off the top of

16   my head.

17        Q.   Where did this meeting take place?

18        A.   I believe it was in this building,

19   the Dennison Building.

20             MS. ZWILLING:   Mr. Grandinette,

21        are you --

22             MR. GRANDINETTE:   Sure.   I'll

23        provide that.   By counsel, it was in

24        the DA's office in Hauppauge across

25        the street.

7

1           JOHN BURKE

2           THE WITNESS:  Okay, across the

3      street.

4           MR. GRANDINETTE:  I'll provide

5      you with the names of the Assistant

6      District Attorney and the detective.

7      His name was Detective Lane.

8           MS. ZWILLING:  Is that a

9      Suffolk County Police Detective or

10     from some other agency?

11          MR. GRANDINETTE:  Suffolk

12     County Detective employed by the

13     Suffolk County DA's office.  To my

14     understanding, he's not a Suffolk

15     County police officer.  He's a County

16     employee retained by the Suffolk

17     County DA's office.

18          MS. ZWILLING:  You don't have

19     the ADA's name offhand?

20          MR. GRANDINETTE:  ADA Todd

21     Pettigrew, P-E-T-T-I-G-R-E-W.

22          MS. ZWILLING:  Thanks.

23          MR. GRANDINETTE:  And it's

24     Directive Richard Lane.

25          MS. ZWILLING:  Can we go off

---



JOHN BURKE

2          the record for a moment?

3                  (Whereupon, a discussion was held

4          off the record.)

5      Q.   Now, the meeting that you referred

6  to, was anyone present at the meeting other

7  than you, the ADA and the detective?

8      A.   Yes.   Anthony Grandinette, my

9  counsel, and also a Mr. Bobby Leak

10 (phonetic).

11     Q.   Who is Bobby Leak?

12     A.   He's employed by Mr. Grandinette.

13     Q.   Had you requested this meeting?

14     A.   No.   I received a phone call from

15 Detective Lane about a week before that and

16 he requested that I meet with them.   And then

17 I informed Mr. Grandinette's office and he

18 advised me that it would be good to have

19 counsel during this meeting.

20     Q.   Now, how did Detective Lane contact

21 you?

22     A.   He -- I'm on probation, so he

23 contacted my probation officer who's located

24 in Queens and left a message with her.   Her

25 name is Officer Cantres, C-A-N-T-R-E-S, and

JOHN BURKE

1

2      she in turn contacted me.

3          Q.   Had you ever had contact with

4      Detective Lane before?

5          A.   Never before, no.

6          Q.   Had you ever heard of his name

7      prior?

8          A.   Never, no.

9          Q.   When were you informed of Detective

10     Lane's contact by your probation officer?

11         A.   I don't know.  The date of the

12     meeting was -- it was about a week before the

13     date I called.  The day my probation officer

14     let me know he called, I called him

15     immediately.  Sometime in mid-July, I don't

16     know the exact date.  But I called him and

17     spoke to him for about five to ten minutes,

18     and he requested that I meet with them,

19     himself and the ADA to go over what happened

20     that day.

21         Q.   Meet with the probation officer?

22         A.   No, meet with -- meet with Detective

23     Lane himself and the ADA Mr. Pettigrew,

24     whatever his -- so then I said okay, no

25     problem.  I let Mr. Grandinette's know --



10

JOHN BURKE

```
 1              JOHN BURKE
 2    Grandinette's office know, and then they
 3    advised me that it would be a smart thing to
 4    meet with them, but meet with them with
 5    counsel.
 6         Q.  Did you pay Mr. Grandinette or his
 7    office for going to the meeting with you that
 8    day?
 9         A.  No, I did not.
10         Q.  Have you been asked to pay?
11         A.  No.
12         Q.  Is it your understanding that you
13    need to pay for that service?
14         A.  No, I have not been asked to pay.
15         Q.  When for the first time did you have
16    contact with Mr. Grandinette or someone from
17    his office?
18         A.  That would be back in -- I believe
19    that would be back in April sometime.  When I
20    was released, I called Jack's father who,
21    also goes by the name of Jack, and I told him
22    what had happened and I said do with this
23    information as you will, gave him my
24    information.  And he obtained counsel with
25    Mr. Grandinette and I came in with -- to tell
```



JOHN BURKE

1
2      my -- well, what happened, explain what
3      happened.
4           Q.   You mentioned you called
5      Mr. Franqui's father when you were released.
6      What is the release you're talking about?
7           A.   When I was released from jail in
8      Yaphank.
9           Q.   Do you know when it was that you
10     were release from Yaphank?
11          A.   I was released March 22nd.
12          Q.   How long had you been in Yaphank
13     for?
14          A.   I was there for six weeks.  Prior to
15     that, two weeks in Riverhead.
16          Q.   Now, before you met with Detective
17     Lane a few weeks ago, had you ever spoken
18     directly to him?
19          A.   No, only -- no, before I spoke to
20     him when I got the message, I called him
21     immediately and I spoke to him I'd say for a
22     duration of about ten minutes on the phone.
23          Q.   What did the two of you speak about
24     at that time?
25          A.   He just basically wanted to know,



JOHN BURKE

1
2      you know, if I would meet with them and tell
3      my side, you know, what happened that day.
4      He said he wanted to get to the truth about
5      what happened, and like I said, I said okay,
6      no problem.  And that was about it.   It
7      wasn't really, you know -- he didn't go into
8      details what happened that day on the phone.
9      It was just basically I want to meet you,
10     we'll come in and meet you and so on and so
11     forth.   I said okay, no problem, I'll be
12     willing to help in any way I can.
13            And then I advised Mr. Grandinette,
14     his office that they got in touch with me,
15     and then he said okay, it would be better if
16     you had some representation while you meet
17     them, so...  So then we met obviously across
18     the street, I thought it was this building,
19     but across the street the following week.
20     Q.  Now, when you had that first
21     conversation with Detective Lane, did you
22     discuss the incident at all that day?
23     A.  No, I mean, obviously it was
24     discussed in, you know -- but it wasn't
25     discussed in detail.  It was just, you know,



JOHN BURKE

1

2  obviously this is a tragic event, what

3  happened.  And he basically said just come

4  in, tell the truth, tell what happened that

5  day, that's all we need you to do.  And

6  that's what I did.

7      Q.  Now --

8      A.  That was -- the only time I spoke to

9  him was the day I returned his call.

10      Q.  When for the first time did you

11  actually have direct contact with

12  Mr. Grandinette, either in person or by phone

13  or --

14      A.  First time I had contact with him

15  was I believe when Jack Franqui, Sr. obtained

16  his counsel.  I believe he left me a voice

17  mail saying that he wanted to talk to me,

18  which I didn't get back to.  But the first

19  time I had any contact with him was that

20  first time I had met him, which I believe was

21  some time in April.

22      Q.  Of this year?

23      A.  Yes.

24      Q.  How many times before today have you

25  met with Mr. Grandinette?



JOHN BURKE

1

2      A.   I met with him that day and then I

3  met with him a few weeks ago when we had the

4  meeting with the ADA.

5      Q.   Did he give you any papers to sign?

6      A.   No, he did not.

7      Q.   Did he take any written statements

8  from you?

9      A.   Yes, he did, the initial meeting.

10     Q.   How many statements were taken?

11     A.   I don't know how many pages it was,

12  but it was two pages, two and a half pages,

13  two pages.  I just told him what happened

14  that day, what transpired, and he wrote it

15  down as I spoke.

16     Q.   Did you sign it?

17     A.   I do not believe I did.  I don't

18  think I did, no.

19     Q.   Did you get a copy --

20     A.   I could be wrong, but I don't think

21  I did.

22     Q.   Did you get a copy of it?

23     A.   I've seen it since, but I did not

24  get a copy.  I mean, I know exactly what

25  happened.  It's in my head.  I know what I

1          JOHN BURKE

2    said.

3              MR. GRANDINETTE:  I'll be more

4         than happy to mail you a copy.  I

5         don't have a copy of the statement.

6              MS. ZWILLING:  That's fine.

7         You can mail it to us.

8         Q.  Were any of your discussions tape

9    recorded as far as you know?

10        A.  No, they were not.

11        Q.  What about when you met with

12   Detective Lane and the ADA, did they take any

13   statements or writings from you?

14        A.  I don't believe I saw them writing.

15   What they were basically asking me was

16   questions that I gave on my original

17   statement, which I believe you have before

18   you, to the detectives that evening of the

19   incident.  So I know they were just asking me

20   questions, but I don't recall -- I don't --

21   they didn't write -- they weren't writing

22   anything down.

23        Q.  Did they have you sign anything?

24        A.  They did not.

25        Q.  Did they tape record any

16

JOHN BURKE

1

2    conversations you had with them to your

3    knowledge?

4         A.   To my knowledge, no.

5         Q.   Now, has Mr. Grandinette or his

6    office ever represented you in connection

7    with anything other than this matter?

8         A.   No, ma'am.

9         Q.   When and where were you born?

10        A.   I was born December 1st, 1977 in

11   Stamford, Connecticut.

12        Q.   How long have you lived at your

13   present address for?

14        A.   Only a few months.  It's temporary.

15        Q.   When you call it temporary, is it

16   your intention to return to a somewhat

17   permanent residence?

18        A.   No.  I am currently without

19   permanent residence, so I am just kind of

20   staying with somebody.  And before that, I

21   was staying in a men's shelter, to be honest

22   with you, in Manhattan.  My apartment was

23   lost.

24        Q.   Who is it that you're saying with

25   now?



JOHN BURKE

A.   It's an uncle and aunt.

Q.   From how long have you lived in the State of New York for?

A.   I moved to the State of New York in 1989 from Massachusetts.  I was about 11 years old.

Q.   How long have you lived on Long Island for?

A.   I lived in East Meadow from '89 till about 2001.  And then I lived -- I got an apartment in Suffolk County, actually Lindenhurst for about six months.  Then from there I moved to -- I moved to the Yonkers area to a different apartment.

Q.   Now, you mentioned a probation officer.  Are you currently still on probation?

A.   Yes, ma'am.

Q.   How long is your probation?

A.   Five years.

Q.   How far into the five years are you now?

A.   I'm in my first year.

Q.   For what charge are you on



JOHN BURKE

1

2      probation?

3         A.   Well, my legal counsel told me to

4    take the Fifth Amendment on that.   I'd rather

5    not discuss that.

6             MS. ZWILLING:   On the charge

7             that he was convicted of?   I'm not

8             going to ask him the particulars of

9             it.   I just want to know what the

10            conviction was.

11            MR. GRANDINETTE:   His defense

12            attorney requested that.

13            I don't see a problem with you

14            stating the nature of the charge

15            itself, but then you can invoke the

16            Fifth, but I don't want to --

17            MS. ZWILLING:   I have no

18            intention of asking him about the

19            particulars of the charge.   I just

20            want to know what the conviction was

21            for.

22            MR. GRANDINETTE:   You want us

23            to just supply that to you?

24            MS. ZWILLING:   Yes, but if he

25            could just tell me what charge he

JOHN BURKE

1
2          pled guilty to or got convicted of,
3          I'm going to move on from there.
4          That's the only information I need.
5      A.  It's endangering the welfare of a
6   minor, a child.  That was...
7      Q.  Did you plead guilty or were you
8   convicted by the court?
9      A.  I took a plea.
10     Q.  In what court?
11     A.  This was in Suffolk County Court.
12     Q.  Do you know which court?
13     A.  It was Judge Barbara Kahn
14  (phonetic).  I guess it would be criminal
15  court.
16     Q.  In Riverhead or Central Islip?
17     A.  This was in Riverhead.
18     Q.  Do you know when it was that you
19  gave the guilty plea?
20     A.  It was about 11 days before my
21  release date, so that would make it March --
22  I think like March 11th.
23     Q.  You're referring to your release
24  date from Yaphank?
25     A.  That was -- yeah, my release date

JOHN BURKE

1

2  was March 22nd and I did my plea about

3  ten days before that.  But I remember because

4  the lawyer said I had ten days to go to

5  complete my 60 days, so that must have been

6  about March 12th or March 11th.

7      Q.  Since you seem to have the dates at

8  your fingertips, if you can trace out for me

9  how you came -- when and where you came into

10  custody and where you were until you were

11  released from Yaphank.

12     A.  I was arrested on January 23rd by

13  Suffolk County detectives.

14     Q.  Where were you arrested?

15     A.  I was in Brooklyn, New York.

16     Q.  Okay.

17     A.  From there I was escorted to the 7th

18  Precinct in Shirley.  Then later on that

19  night after the incident I was escorted to

20  another precinct.  I'm not sure which one.

21     Q.  Do you know where it was?

22     A.  Somewhere in Suffolk, 20 minutes

23  away, but I'm not sure what precinct.  Then

24  from there I went to Riverhead.

25     Q.  When you say went to Riverhead,



JOHN BURKE

1

2      you're talking about the jail?

3          A.   Yes.

4          Q.   Okay.

5          A.   I was there for about two weeks.

6      Then from there I was transferred to Yaphank

7      and I was there for six weeks.

8          Q.   Now, what were the charges for which

9      you were arrested?  I don't need to know the

10     particulars.  I just want to know what you

11     were charged with at that time.

12         A.   Well, I mentioned the charge.

13         Q.   That was the same charge?

14         A.   Yes.

15         Q.   You were continuously in custody

16     from the time you were arrested until you

17     were released from Yaphank?

18         A.   Yes, ma'am.

19         Q.   Now, were you charged with any

20     parole violation in connection --

21         A.   No.

22         Q.   So you were being held purely on the

23     arrest charges?

24         A.   Yeah, yeah.

25         Q.   Are there any other criminal charges

JOHN BURKE

1

2    pending against you at this time?

3        A.   No.

4        Q.   Are there any open probation

5    violations against you?

6        A.   No.

7        Q.   Do you happen to know how it worked

8    out that you got a probation officer in

9    Queens instead of on Long Island?

10       A.   Because I don't reside on Long

11   Island and I reside -- when I got out, I was

12   staying in Queens.  So the judge, Judge Kahn

13   transferred my case to Queens.

14       Q.   What was your address in Queens that

15   you were staying at at that time?

16       A.   I believe it was 34-10 South Conduit

17   Avenue, Jamaica, Queens.

18       Q.   When was the last time you were

19   staying there?

20       A.   About -- I'd say about five weeks

21   ago.

22       Q.   Was us your current marital status?

23       A.   I'm single.

24       Q.   Have you ever been married?

25       A.   No, I have not.

JOHN BURKE

1

2    Q.   Do you have any children?

3    A.   No, I do not.

4    Q.   How far did you go in school?

5    A.   High school graduate.

6    Q.   From where?

7    A.   East Meadow High School, class of

8 '96.  And a little bit of community college,

9 Nassau Community.

10    Q.   Have you ever been convicted of

11 anything other than the charge that you just

12 mentioned?

13    A.   I had a misdemeanor DWI about

14 ten years ago in 2003.

15    Q.   Anything else?

16    A.   That's it.

17    Q.   Have you ever met Jack Franqui, Sr.

18 face to face?

19    A.   Yes, I have.

20    Q.   On how many occasions?

21    A.   I'd say about four.

22    Q.   What are the circumstances under

23 which you met him?

24    A.   Well, I met him the first time when

25 he picked me up to go to see Mr. Grandinette

JOHN BURKE

2   for that initial meeting.  I've seen him --

3   he was -- I met him when I was here for

4   meeting the ADA a few weeks ago.  And then

5   one time he actually drove me out to court

6   for my case.

7        Q.   That was for your own court

8   appearance?

9        A.   Yeah.  I was stuck for a ride and I

10  had to go out there, and I called him and he

11  was nice enough to drive me there and drive

12  me back, dropped me off at the train.

13       Q.   Have you met any other members of

14  the family?

15       A.   No, I have not.

16       Q.   Have you ever met Earl Simon

17  (phonetic) or Simon Earl (phonetic) or

18  someone with a similar name?

19       A.   My initial time at Mr. Grandinette's

20  office, I believe he was in the office.  He

21  walked by me, but there was no pleasantries

22  exchanged or anything.  I did not speak to

23  him.

24       Q.   Do you know anything about him?

25       A.   I know he was there when Jack was



JOHN BURKE

1
2       arrested.  I know a little bit of the details
3       about that situation.
4           Q.  How did you learn that?
5           A.  I learned that through discussion
6       with Jack Franqui, Sr.  He mentioned that to
7       me.
8           Q.  Was there --
9           A.  During -- well, I'm getting ahead of
10      myself, but during my conversation with Jack,
11      Jr. he mentioned for me to tell his father to
12      talk to Simon because Simon was there and he
13      knew what happened.  So I knew of him from
14      Jack, Jr.
15          Q.  Did Jack, Jr. ever tell you anything
16      about the events leading to his arrest?
17          A.  He mentioned to me that he was
18      arrested for an expired inspection and, you
19      know, he was very upset.  And he was saying
20      how -- how am I in jail for an expired
21      extension -- inspection, excuse me.  That he
22      was telling me a few times to, you know, tell
23      my dad to talk to Simon, Simon was there,
24      Simon knows what happened, you know.  He
25      mentioned that to me a few times, make sure



JOHN BURKE

1

2    to tell my dad to talk to Simon.  So that's

3    when I first heard the name of Simon.  I did

4    not know his last name.

5          So what was the initial question

6    again?  I'm sorry.

7          MS. ZWILLING:  Do you want to

8       read back the question?

9          (Whereupon, the record was read by

10      the reporter.)

11   A.  Yeah.  Well, again, yeah.  He was

12   mentioning the expired inspection and then he

13   was going on about how the cops mistreated

14   him, how he was sore, and he kept on

15   mentioning how a female officer -- not by

16   name, just a female officer at the scene of

17   the arrest planted something on him, like

18   weed or something.  And he was saying that

19   the cops were out for him, they were out for

20   me, they were out to get him.

21          I had no -- I never met him before

22   until that day, so I had no idea what he was

23   talking about or what he was referring to,

24   that the cops were out to get him and all

25   that.  I mean, I do now know currently,

JOHN BURKE

1

2      presently about his previous run-in, but

3      that's what he was talking about, what led to

4      his arrest, that they were out to get him,

5      that he had an expired inspection sticker,

6      the charges were bogus, they were just out to

7      get him and that they mistreated him during

8      the time of the arrest physically.

9           Q.   Now, you he mentioned the name

10     Simon.   Were there any other names he

11     mentioned?

12          A.   No other names, no.   He mentioned

13     Simon, and he was talking about his dog, how

14     his dog was -- they -- the dog ran away or

15     something like that.   He was very upset about

16     that.   But as far as any names goes, Simon

17     was the only name he mentioned during the

18     arrest.   Then the other person he spoke about

19     was his father.

20          Q.   Did he give you any details about

21     how he said the police mistreated him?

22          A.   He basically said they roughed him

23     up, that they roughed him up during the

24     arrest.   Again, he kept on talking about how

25     they were out to get him.   They were out to

JOHN BURKE

1

2     get me, I shouldn't be here for an expired,

3     you know, inspection sticker, how am I in

4     jail for an inspection sticker, you know,

5     being expired.  And he was just mentioning

6     how like during the arrest they kind of got

7     physical with him and they roughed him up and

8     they were out to get him, and this was during

9     the process of him yelling out for medical

10    attention which I'm sure you'll ask me about.

11    But that's what he mentioned about the

12    arrest.

13         Q.  Can you --

14         A.  He --

15         Q.  I'm sorry.

16         A.  Go ahead.

17         Q.  You used the term roughed up.  Did

18    he say they beat him, they hit him, they

19    kicked him?  Did he give you any details of

20    that nature?

21         A.  He said they -- he mentioned that

22    they roughed him up and that his -- he was

23    sore on his -- so, I mean...  But I hear

24    someone say they got roughed up, obviously

25    it's physically.  I mean, punching him or,



1                           JOHN BURKE

2      you know, just being rough with him.

3           Q.   Well, did he tell you exactly what

4      he meant by that?

5           A.   He said basically like they just

6      roughed me up, they roughed me up, I'm

7      hurting now, I'm sore.  Whether he said now

8      or not if he -- if they punched him or not, I

9      don't recall if he said that.  But he just

10     said that they roughed him up, they

11     mistreated him.

12          Q.   Now, did he give you the name of the

13     woman officer who he said planted something

14     on him?

15          A.   No, he did not.  He just said a

16     female officer.  He did not give a name.

17          Q.   Did he say what it was she planted

18     on him?

19          A.   He said it was marijuana, and he

20     also said that she -- being that he was on

21     probation, that she asked him when was the

22     last time you smoked marijuana.  Now, this is

23     January 23rd and he said he answered

24     January 9th.  So then she said -- in response

25     to that she said oh, good, it will still be

1              JOHN BURKE

2    in your system then, you know, this way

3    you'll get violated or, you know, but he

4    mentioned that.  He was saying he had nothing

5    on him and that she planted something in his

6    right pocket.

7        Q.  This is what he told you?

8        A.  **This is what he told me.  He said**

9    **that over and over again.**

10       Q.  Did you ever talk to Simon or any

11   members of his family?

12       A.  **No, I have not.**

13            MS. ZWILLING:  Can you mark

14        that, please?

15            (Whereupon, a two-page handwritten

16        statement was marked as Respondents'

17        Exhibit A, for identification, as of

18        this date.)

19       Q.  How did you get to this office

20   today?

21       A.  **I was picked up by Mr. Bobby Leak**

22   **who I previously mentioned who is employed by**

23   **Mr. Grandinette.**

24       Q.  Where did he pick you up from?

25       A.  **He picked me up from that address I**



JOHN BURKE

1
2     gave you.

3          Q.   I'm sorry.  Which address?

4          A.   95A Tuckahoe Avenue.

5          Q.   Can you just take a look at this

6     document that's been marked as Exhibit A?

7          A.   Okay (perusing).

8               MR. GRANDINETTE:  Do you happen

9           to have an extra copy of that?

10              MS. ZWILLING:  I'll make you

11          one.

12         A.   Yes, this is my statement.

13         Q.   When you call it your statement, do

14    you know where you were when you gave this

15    statement?

16         A.   I was in the 7th Precinct in Shirley

17    where the incident occurred.

18         Q.   Do you know where in the 7th

19    Precinct you were?

20         A.   I was out of the cell.  They

21    transferred -- after this happened, they

22    transferred me to another cell across the

23    hallway.  I believe it was the women's side

24    of the holding cells.  And then two

25    detectives came and they put me into the

                              JOHN BURKE

2   interrogation room.

3        Q.   Do you know who you gave the

4   statement to?

5        A.   I do not know their names.  I just

6   know -- physically I can describe them, but I

7   do not know their names.  I can't really tell

8   by the signature at the bottom (perusing).

9        Q.   If you look at the second page,

10  there seems to be a notary public stamp in

11  the name of Alfred Sitcoto (phonetic).

12       A.   Notary public (perusing).  Okay.

13       Q.   Do you see that?

14       A.   I do.

15       Q.   Do you know if Mr. Sitcoto was one

16  of the detectives that was present?

17       A.   I see a signature here, so I do

18  not -- I did not get their names, no.

19       Q.   There were two detectives?

20       A.   There were two detectives.

21       Q.   They were both in plain clothes?

22       A.   Yes, they were in suits.

23       Q.   Did they identify themselves to you

24  at that --

25       A.   Yeah, they had detectives -- they



JOHN BURKE

2  had their badges and, you know, they said

3  they were here to ask me questions about what

4  happened.

5      Q.  You just don't recall their names?

6      A.  I just don't recall their names.

7      Q.  Did you speak with both of them?

8      A.  Yes, they were both present.  One

9  directive did the questioning and who -- the

10  detective who did the questioning also wrote

11  the statement as I was talking.  The other

12  detective just sat there, you know, he wasn't

13  involved, but they were both present.

14      Q.  Did you review the statement before

15  you signed it?

16      A.  I believe I did very quickly

17  (perusing).  I believe so.  Yeah, I did.  He

18  read it back to me and I signed it.  You

19  know, this happened very shortly after

20  this -- this occurred, so my mind was of

21  kind, you know...  I just saw someone commit

22  suicide in front of me, so I was a little,

23  you know...  But I remember he did read it

24  back to me and I signed it.

25      Q.  Would you mind spending a moment to



JOHN BURKE

1

2    read it now?  Because I'm going to want to

3    ask you about its completeness and accuracy.

4          A.   Do you want me to read it out loud

5    or?

6          Q.   Read it to yourself.

7          A.   (Witness perusing.)  Yeah, I know.

8    I know exactly what happened here, so...

9          Q.   Is the statement that's marked as

10   Exhibit A accurate to the best of your

11   recollection?

12         A.   There's some timings here that I

13   think are not exactly correct, but as far as

14   the location of where he was and where I was

15   and what happened as far as what was said

16   between us is correct.

17         Q.   Do you want to point out to me what

18   in the statement you feel is not correct?

19         A.   It says today I arrived at the 7th

20   Precinct at 2:10 p.m. I was arrested at noon

21   that day and I believe I was there a little

22   before 2:10.  And there's a part where it

23   says about 20 minutes later he hung himself

24   after they cut down -- after they cut down

25   the shirt.  So that was --

JOHN BURKE

Q.  Where in the statement are you now?

A.  On the second page.

Q.  If you could just point me to --

A.  Second paragraph.

Q.  Okay.

A.  About 20 minutes later or a
half-hour later I heard this guy say that's
it.  I believe that was -- I think that
was -- that was a longer time before between
them cutting down his T-shirt and walking out
than actually -- then he hung himself.  I'd
say it was closer to about an hour.

Q.  Let me make sure I understand this
correctly.

A.  Forty-five minutes to an hour.

Q.  You are saying that you think it was
closer to an hour between when the T-shirt
was cut down and Mr. Franqui hung himself?

A.  Yeah, yeah.  It wasn't 20 minutes.

Q.  Did you notice that when you signed
the statement?

A.  I did not.  I didn't -- I noticed
this.  I did mentioned this when I was
meeting with the ADA.  So it's on record that



JOHN BURKE

1

2    I did mention that, this -- the time dispute

3    as well.

4         Q.   Do you know what time you actually

5    arrived at the 7th Precinct?

6         A.   Well, I was arrested on noon

7    exactly.  I'd say I got there around -- I

8    mean, the time wouldn't be too far off, but

9    I'd say I got there around 1:30 to 2:00.

10        Q.   Were you wearing a watch that day?

11        A.   I was.

12        Q.   Now, you were in a cell at some

13   point?

14        A.   I was brought directly to the

15   rear -- to the rear of the precinct where all

16   the cells were.

17        Q.   Were you put in the cell as soon as

18   you got there?

19        A.   Yeah, when I got there and the

20   detective who brought me there, his name was

21   Detective Forestill (phonetic), he put me in

22   the rear.  I was in cell three, Jack was in

23   cell one.  And he had to go testify at some

24   court hearing for some other case.  So he

25   said oh, I'll have you sign your confession,



1          JOHN BURKE

2    you know, when I come back later on.   That

3    wasn't until the evening that he returned

4    when everything had already taken place.

5         Q.   Now, when you were put in the cell,

6    were you still wearing your watch in the

7    cell?

8         A.   I believe they took that off of me.

9    They did take it off of me.

10        Q.   Did you have a cell phone or

11   anything else on you --

12        A.   No.

13        Q.   -- at that point that you could use

14   to tell time?

15        A.   No, no.   They confiscated

16   everything.

17        Q.   Was there a clock that you could see

18   in the area so you would know what time it

19   was?

20        A.   No, there was not.

21        Q.   So would it be fair to say that when

22   you speak about times, these are estimates?

23        A.   These are -- these are estimates,

24   yes.   But there was a video.   There is a tape

25   of this, so that will show the correct time

JOHN BURKE

1

2      that lapsed between the events that happened

3      that day.

4          Q.   I understand what you're saying.

5      I'm just inquiring whether you had anything

6      to check the time against.

7          A.   I did not, no.

8          Q.   Now, you mentioned a video.  Have

9      you seen this video?

10         A.   I have not.

11         Q.   How did you learn of this video?

12         A.   Well, there were cameras looking

13     into each cell.  Again, I was in cell three,

14     Jack was in cell one.  There are cameras that

15     were directly across the hall looking into

16     each cell.  They had a reflective mirror I'd

17     say about a foot wide.  And I know because

18     when -- at one point Jack tied his T-shirt

19     to -- he took his T-shirt off and tied up his

20     T-shirt to the bars of the cell to make a

21     noose and he had it up there very quickly,

22     and the cop came running in and cut it down,

23     you know.  So they saw him on the camera

24     doing this and they just cut it down and told

25     him to -- excuse my language, to cut the

---



JOHN BURKE

1

2    shit, you know, and just walked out.

3         Q.   You mentioned that you had been

4    brought into the precinct by a Detective

5    Forestill who left?

6         A.   Yes.

7         Q.   Did you ever have further contact

8    with him?

9         A.   Later on that evening when he

10   returned.

11        Q.   What was your contact with him that

12   evening?

13        A.   Basically he came back after all

14   this transpired and he had me sign my

15   confession at that time.  And then from there

16   they transferred me -- he drove me personally

17   in his car, I was in the passenger seat in

18   cuffs, and he took me to another precinct

19   that night.  I don't know which precinct it

20   was, but he took me to another precinct where

21   I spent the night in.

22        Q.   You mentioned you signed a

23   confession.  Was this a confession to the

24   crime you had been charged with?

25        A.   This was the crime that I was



1              JOHN BURKE

2    arrested for, yeah.

3        Q.  Did you sign it voluntarily?

4        A.  I signed it voluntarily, you know.

5    Again, I had -- I don't even really know what

6    I signed because I was still numb from what I

7    just went through.

8        Q.  Now, you mentioned some sort of

9    reflective mirror?

10       A.  Yes.  Over each camera that was

11   looking into the -- each camera -- again,

12   each cell had a camera across the hall in the

13   corner there looking into each cell and a --

14   there was a reflective mirrored plate that

15   was over each camera.  I'd say it was about a

16   foot wide.

17       Q.  So there was one camera for each

18   cell?

19       A.  For each cell.

20       Q.  How many cells were there?

21       A.  From my recollection, there was six.

22       Q.  The reflective mirrors that you

23   mentioned, were they mounted directly above

24   the camera?

25       A.  No, they were directly like over --

---



JOHN BURKE

1

2       over the cameras.  It was like -- like a

3       shield, you know, but it was over the camera

4       itself.

5           Q.  Were you able to tell what the

6       purpose of the reflecting mirrors were?

7           A.  I don't know what the purpose of

8       that was.

9           Q.  Was this like the kind of mirrors

10      that are sometimes used so you can see around

11      a corner or are you referring to --

12          A.  No, I can see -- I can see the

13      camera behind it, but I was just -- but you

14      could see.  Like it was so wide, just at the

15      angle that it was, you could see the

16      reflection.  So I could see into Jack's cell

17      from that reflection.

18          Q.  From the --

19          A.  From the mirror that was -- from the

20      mirrored camera that was facing into my cell

21      I could see into -- the cell was here, here's

22      cell three and cell one was here and then

23      cell two between us (indicating).  And then I

24      could see because it was so wide, the mirror,

25      you know, I could see like right into his



JOHN BURKE

1

2 cell and he could see into mine.

3     Q.  If you looked at the mirror from in

4 your cell, were you able to see all of the

5 inside of his cell or just part of it?

6     A.  I was able to see the entire -- the

7 entire front of his cell and into it a little

8 bit.  And, I mean, I basically saw him

9 hanging there in that reflection when this --

10 when it happened.

11          MR. GRANDINETTE:  If I may,

12      you're using the word mirror.  Is it

13      a mirror or is a reflective glass

14      cover?

15          THE WITNESS:  No, it's like a

16      Plexiglas cover I should say.

17     A.  Yeah, maybe I'm using the wrong term

18 mirror there, but it was bright enough and

19 shiny enough though where I could see a

20 reflection.  It was kind of like almost

21 slightly mirrored, but like -- what can I

22 say?  Like if you see sunglasses that get a

23 little dark during the sun but you can still

24 see through, like it --

25     Q.  Did it have some sort of reflective

JOHN BURKE

1

2    coating on it?

3        A.   Yeah.   I would say, yeah, yeah.   But

4    you could still see through it.   It wasn't --

5    it wasn't like one of those two-way mirrors

6    you would see in an interrogation room or

7    something like that where you couldn't see

8    through.   It was just like dark.   It was like

9    slightly tinted dark, dark enough where you

10   could still see the camera behind it and you

11   could still see the reflection, you know, of

12   whatever angle it was facing.   It just

13   happened to be I could see right into Jack's

14   cell from -- from -- again, I was in cell

15   three, he was in cell one, so it was like the

16   perfect position.   If I was in any cells

17   further down, I wouldn't have been -- I

18   wouldn't have been able to see.

19       Q.   Were you able to see into any of the

20   other cells from your cell?

21       A.   I can see into cell one and I

22   believe I could see into cell two.

23       Q.   Were you able to see if there were

24   any people in that cell?

25       A.   Yeah.   There was no one in that



JOHN BURKE

1
2       cell, because when I first came in, I saw
3       Jack and then cell two was empty because I
4       looked, and then I was in cell three.  And
5       then there was, you know -- there was no one
6       else in four, five or six.
7            Q.  Were there ever any other prisoners
8       in any of the cells the entire time you were
9       there?
10           A.  No, there was not.
11           Q.  Just you and Jack?
12           A.  Just me and Jack.
13           Q.  Other than the two times that you've
14      mentioned, is there anything else in your
15      statement that's inaccurate?
16           A.  There was one part when I remember
17      reading (perusing).  There's a part where I
18      said -- on the second page about five lines
19      up where it says I heard a loud bang, the guy
20      said he hit his head against the wall, he
21      said that it hurt.  That came before he said
22      that's it, because he did that when he put
23      his T-shirt up and tied it into a noose,
24      which, again, they'll show all of this on the
25      tape, the cop came in, he cut it down and



JOHN BURKE

2    said, you know, cut it out.

3           I think he thought that they were

4    looking at him, so he wanted -- he was

5    screaming for medical attention this whole

6    time that I was in there with him, you know.

7    Originally a cop did come in and say, you

8    know, what are you yelling about, you know.

9    He said -- he was polite and courteous.  He

10   said listen, I need medical attention, I need

11   medical attention, you know, and the officer

12   said well -- the officer's response was well,

13   if we bring you to a hospital, we're just

14   going to bring you right back, kind of like

15   what's the point, you know.  And he asked can

16   I speak, you know -- please speak to your

17   sergeant, you know.  And the cop said, okay,

18   I'll get my sergeant.  And then he walked out

19   and he never came back with a sergeant.

20          So the next -- during this whole

21   process, Jack is screaming at the top of his

22   lungs I need medical attention, I need

23   medical attention, I'll be leaving here in a

24   body bag, you know, if you don't get me

25   medical attention.  And he's screaming this

JOHN BURKE

1

2      at the top of his lungs several times, you

3      know.  And I know that they could hear us

4      because I could hear them chitchatting

5      outside, you know, the police officers

6      talking to each other.  So I mean, if I could

7      hear them talking a regular tone of voice, I

8      knew they heard him screaming his lungs out.

9            And so during the whole process of

10     me talking to him, he just kept on yelling

11     that out, I need medical attention, I'll be

12     leaving here in a body bag.  And when I say

13     yelling, I mean he was howling, you know.

14     And so...

15            But going back to your initial

16     question, yeah, the part where he said --

17     where he bangs his head against the wall, he

18     did that after the officer cut his shirt down

19     because I believe that he thought they could

20     see him and he wanted to get some attention.

21     So he hit his head against the wall, he put

22     his head down the toilet, you know.  And they

23     left him there shirtless because they take

24     his shirt away, they took the piece of the

25     blanket that I gave him away and they walked

---



JOHN BURKE

1

2     out after the T-shirt incident.

3            And that day -- that week was frigid

4     in January, it was about 30 degrees out.   And

5     the back of that cell there was no heat.   I

6     mean, it felt like it was 25 degrees.   And

7     the word I used was inhumane because it was

8     inhumane how cold it was there.   So then he

9     was sitting there upset and shirtless and

10    just freezing.   I mean, you could see your

11    own breath, that's how cold it was.   You

12    know?

13           But, again, back to -- let me get

14    off track here, back to your original

15    question, yeah, that part is a little

16    reversed, so...

17    Q.   So what would be the proper order?

18    A.   The proper order would be after

19    he -- after he cut down the shirt, the

20    officer that came in and the two guards that

21    came in -- I'm sorry, the first time was one,

22    one officer and then he just was -- said

23    okay.   They came in -- because they came in

24    with the purpose knowing to cut down his

25    shirt, so they obviously saw what he was

JOHN BURKE

1

2  doing.  You know?  They were like what are

3  you doing, stop doing stupid shit was exactly

4  what he said.  And he cut it down with a

5  knife and just walked out.  They walked out.

6  It was only one officer who spoke though.

7        So then a little -- a few minutes

8  after that he said -- I heard like a loud

9  bang and he hit his head against the wall.

10  He told me -- I said what was that.  He said

11  I just hit my head against the wall, I know

12  it hurt.  He said -- then he said he was wet,

13  so he said he put his head down the toilet.

14  I think he thought they were watching, maybe

15  they would -- if they saw him do this, he

16  would get some medical attention.  But in the

17  meantime, he was screaming at the top of his

18  lungs he needed medical -- I can't stress

19  enough how persistent he was in yelling for

20  help, you know, and saying like I'll leave

21  here in a body bag if you don't get me

22  medical attention.

23        In my opinion, once they saw what he

24  did with the shirt, they should have done

25  something then, you know.  To leave him like

JOHN BURKE

1

2     that in that state, that environment that we

3     were in, how cold it was with no shirt, you

4     know, I just felt it wasn't right, but...

5          Q.   If we could just get back on track.

6          A.   Yeah, sure, sure.

7          Q.   If you can give me the right order,

8     we'll get to the entire story.

9          A.   Yeah, okay.  Yeah, he was tying his

10    shirt and then -- and then after that was

11    when he hit his head against the wall when

12    they took his shirt away.  He hit his head

13    against the wall, put his head down the

14    toilet.  And then it was a while after that

15    when I heard him say that's it, and he took

16    his jeans and he hanged himself --

17         Q.   Okay.

18         A.   -- which, again, the tape will all

19    prove.

20         Q.   Now, when you arrived in the cell

21    area, Jack was already in a cell?

22         A.   Jack was already in cell one when I

23    was brought back to cell three, yes.

24         Q.   You never met him or talked to him

25    before that day?

---



JOHN BURKE

1

2     A.   Never met him in my life, no.

3     Q.   You were put directly into cell

4  three?

5     A.   Yes.

6     Q.   What were you wearing when you were

7  put in the cell?

8     A.   They made me take my sweater off,

9  made me take my shoes off, my belt.  So I was

10  wearing jeans, socks and a T-shirt.  And,

11  again, it was freezing that day, so I had

12  like -- like a -- there was a Styrofoam

13  yellow blanket they put in there.  I was

14  sitting there, just covered up right away

15  because it was just that cold in there.  And

16  then I ripped it up and gave him a piece

17  because he had nothing.

18     Q.   So cells one, two and three were in

19  order next to each other --

20     A.   Yeah.

21     Q.   -- on the same wall?

22     A.   If you walked in, one, two, three,

23  four, five, six were all on one side on the

24  right.

25     Q.   So it's a single wall of cells?



JOHN BURKE

1

2     A.   Yes.

3     Q.   Is there some sort of catwalk

4  outside of the cellblock?

5     A.   Yes.

6     Q.   Now, was there any way you could see

7  out of the cell area?

8     A.   See out of the cell area?

9     Q.   Yes.

10    A.   Yeah, I mean, there were bars, so I

11  could see out.

12    Q.   I'm not talking about out of your

13  cell, but out of the cell area entirely.

14    A.   Yeah, you could see someone, you

15  know.  To the right I could see the door

16  coming in through that catwalk area, you

17  know.  The metal door, I could see that.  I

18  could even see like Jack's hands like when

19  they were around the bars or something like

20  that.  But I could see inside the cell

21  through the reflection on the covering plate.

22    Q.   Right.  But could you see anything

23  outside of the cell area other than the door

24  you mentioned?

25    A.   I could see the bars from the cells

JOHN BURKE

1  
2  next to me, saw the entire catwalk, you know,

3  the entire walkway, again, the door and the

4  camera.

5       Q.   Where was the door that you're

6  referring to?

7       A.   The door was to our left.  So I'm

8  standing here in the cell, there's a catwalk,

9  the door was to the left (indicating).

10      Q.   If you're standing facing the bars,

11  the catwalk --

12      A.   If I'm standing facing the bars, the

13  door was on the left.

14      Q.   If you're standing facing the bars,

15  which way was cell number one?

16      A.   Cell number one was to my left.

17      Q.   Now, was this door open?

18      A.   No.

19      Q.   Do you know what was on the other

20  side of the door?

21      A.   That's the area where we put -- or

22  where my shoes were and my sweater and my

23  belt.  And then when I was walked in there, I

24  saw another pile of clothes which was Jack's

25  stuff because he and I were the only two back

JOHN BURKE

2   there.

3       Q.   Now, at some point after you were

4   put in the cell, you and Jack started

5   talking?

6       A.   Yeah, pretty much immediately, you

7   know.

8       Q.   Who started the conversation?

9       A.   Jack did.

10      Q.   Do you recall what he said to start

11  the conversation?

12      A.   He said what's up, man.  I remember

13  him kind of making a joke.  He's like -- he's

14  like I'm sorry you got arrested for whatever

15  you got arrested for, but he's like I'm kind

16  of glad you did though because now I have

17  some company, you know.  And then he was --

18  then he started talking about how, you know,

19  they arrested me, they put me here because I

20  have an expired inspection sticker and

21  they're out to get me.

22          And then he kept on going on about

23  how this female officer planted something in

24  his pocket and how they're out to get him

25  and, you know, they have like a, you know --

JOHN BURKE

1  
2    they have a mission to get him, you know.  
3    They're out to get me, they're out to get me,  
4    I wasn't doing anything wrong, I just had an  
5    expired inspection sticker, they planted this  
6    on me, you know, they're out to get me.  Of  
7    course, I'm just sitting there.  I just get  
8    in, so I'm just listening at this point.  And  
9    they chased away his dog, he was upset about  
10   that.  And, you know, he was just going on  
11   about that.  And then he started, you know --  
12   he started -- he kept on -- he kept on  
13   referring -- he repeated himself a lot and he  
14   kept on referring, you know -- referring to  
15   the fact that he was, you know -- he was  
16   doing nothing wrong, he had an expired  
17   inspection, why am I sitting in jail for an  
18   inspection.  He's like I can't go back and do  
19   more time.  And then he started like yelling  
20   for -- I medical attention, I need medical  
21   attention.  He was yelling.  
22       Q.  Let's --  
23       A.  Yeah.  
24       Q.  We're going to cover all of this.  
25       A.  That's where the conversation went,  



1          JOHN BURKE

2     yeah.

3          Q.   I just wanted to know how the

4     consideration started.

5          A.   Yeah, yeah.

6          Q.   Now, were you able to see his face

7     at any point?

8          A.   Through the -- through the

9     reflection and then also when I walked in.

10         Q.   Now, at any point during your

11    conversation, did he sound like he might have

12    had some alcohol or drugs in his system?

13         A.   He didn't sound like that at all.

14    He was very courteous, very polite.

15         Q.   How was his mood?

16         A.   He was upset.  He was, you know,

17    scared, upset.  I mean, I found out after the

18    fact that he was on probation and, you know,

19    what was going on.  But at certain times

20    during the conversation he broke down crying.

21    And when the first officer walked in when he

22    was yelling and screaming and yelling and

23    screaming and the guy walked in and said

24    what's going on, what are you yelling and

25    screaming about or, you know, what are you

56

JOHN BURKE

1
2    going on about, you know, he kind of had an

3    attitude towards him, you know.

4            He, too, was very polite with the

5    officer.  Sir, please, I need medical

6    attention, I need medical attention, I, you

7    know -- please, please help me, you know.

8    And that's when the officer replied well, if

9    we take you to a hospital, we'll just, you

10   know -- we'll just end up bring you back

11   right here.

12       Q.  You mentioned that at some point

13   during your conversation he was crying.  Was

14   there anything in particular that seemed to

15   cause him to cry?

16       A.  He was crying because he -- the two

17   things I remember is, one, because of his

18   dog.  He was upset that they chased his dog

19   away, he was very upset about that.  And two

20   was because he kept on saying like he can't

21   do any more time, how he just did this time.

22   And then he's like I can't, you know -- tell

23   my father I can't do this time, I can't do

24   it.

25           And then eventually he started



JOHN BURKE

2 talking about hanging up, you know, I'm going

3 to hang up.  And then he started mentioning

4 his father's phone number and, you know, he

5 asked me to remember that number, please call

6 my father.  And I don't want to go too far

7 ahead because I'm answering your questions.

8      Q.  When he told you those things, did

9 you believe -- did it seem to you that he was

10 serious about hurting himself?

11      A.  You know, at the point I just, you

12 know, I got my own things going right there,

13 so I'm just listening.  And at the point I

14 think, you know, alright, this guy's upset,

15 you know, he just got arrested or whatever,

16 you know, he's not happy about it obviously.

17 And, you know, I didn't know, maybe he's

18 serious, maybe he's not, maybe he's just, you

19 know, talking out of frustration.  I don't

20 think anything.  Just calm down, you know,

21 see what happens, you know.  And, again, I

22 was just arrested, so I was like I got my own

23 problems.  You know what I mean?

24      Q.  Did his hanging himself take you by

25 surprise?

1                        JOHN BURKE

2          A.   Of course.  Because, I mean, he was

3     talking about it and he made it sound like he

4     was going to do it and in the back of my mind

5     I'm thinking -- I'm thinking alright, he

6     won't do it, you know.  And, you know, after

7     the T-shirt incident I thought they would get

8     him some care or do something, you know, once

9     he showed signs that he was, you know, making

10    a noose out of a shirt.

11          So it -- when he did do it, of

12    course it was shocking.  I mean, you witness

13    something like that, it's not like an

14    everyday thing.  So yeah, I was shocked.  But

15    again, he was pleading out for help for hours

16    and hours and hours, you know, so what, you

17    know -- it could have been avoided.

18          Q.   How long did Jack talk about the

19    circumstances of his arrest for?

20          A.   I couldn't give you specifics on

21    that, but he talked about it more in the

22    beginning, I guess, when we first started

23    talking, but he kept on going on about it.

24    And, you know, during the conversation like

25    intermittently he would tell me oh, they

JOHN BURKE

1

2  can't, you know -- how can they have me in

3  jail for this, they're out to get me, the

4  same things over and over again.  Then he

5  would say I need medical attention.  He would

6  just yell.  So he kept on like breaking up

7  the conversation with just yelling, you know.

8      Q.  Did you ask anyone at any point to

9  get him medical attention?

10      A.  I did not, no.  I didn't get

11  involved, to be honest with you.  When the

12  cop first came and said what are you going on

13  about, and he was pleading his case, you

14  know, and the cop said okay, I'll go get the

15  sergeant, because that's what Jack asked, I

16  figured okay, they'll do whatever they got to

17  do here, you know.

18      Q.  How long were you in the cell before

19  an officer came back in to check on what was

20  taking place?

21          MR. GRANDINETTE:  Is that

22          question from initially when he

23          first --

24          MS. ZWILLING:  Yes, from when

25          he gets into the cell, yes.

```
 1                    JOHN BURKE
 2         A.   When I first got in the cell, I'd
 3   say maybe half an hour, close to that.
 4         Q.   Do you know who the officer was?
 5         A.   I can describe him physically.  But
 6   it could be half an hour, an hour.  Again,
 7   you know, I didn't have a watch or anything.
 8         Q.   I understand.
 9         A.   Again, the tape with show it all.
10   But I could describe him, but I don't know
11   his name.
12         Q.   Sure, sure.  If you could describe
13   him, that would be great.
14         A.   He was kind of -- in uniform, kind
15   of heavyset or barrel-chested, short haircut
16   or maybe balding.  I can see him from my cell
17   because I can see from the angle when he
18   walked in.  He kind of said what are you
19   going on about.  He's talking to Jack, and
20   Jack is asking him politely for medical
21   attention, this, that and the other.  At one
22   point Jack said let me talk to your sergeant,
23   please.  And the officer said okay, I'll get
24   him.  And then he left and never came back.
25         Q.   Had Jack up to that point told you
```

JOHN BURKE

1

2      what it was he wanted medical attention for?

3          A.   Well, he said that, again, he was

4      roughed up.  And he just kept on saying --

5      like he was screaming to them if you don't

6      get me medical attention, I'm going to leave

7      here in a body bag.  I mean, he screamed

8      that.  Again, I can't emphasize, he screamed

9      that several, several times.

10         Q.   Who did he say that to?

11         A.   He was just yelling out for the cops

12     to hear him.

13         Q.   When the officer came in --

14         A.   Yeah.

15         Q.   -- to check that first time, what

16     exactly did Jack say to him in terms of

17     requesting medical care?

18         A.   He said I need -- I need medical

19     attention, something to the effect that he

20     was sore and they roughed him up.  Again, he

21     wasn't -- when the officer was, he was

22     speaking -- he wasn't yelling and screaming.

23     He was very courteous and, you know,

24     respectful.  Please, sir, I need medical

25     attention, I need it, you've got to bring me

JOHN BURKE

1

2    to the hospital, I need medical attention, I

3    need medical attention.  And the officer just

4    replied, you know, if we bring you to the

5    hospital, we'll just end up bringing you back

6    here, you know, sarcastically.  So then Jack

7    said please, let me speak to your sergeant,

8    you know.  And that's when the officer --

9    yeah.

10       Q.   Just talking about that

11   conversation, did Jack ask for any

12   psychiatric care at that time?

13       A.   No.

14       Q.   Did he ever ask for psychiatric

15   care?

16       A.   He was just screaming I need medical

17   attention.

18       Q.   So he didn't ask for psychiatric

19   care in particular?

20       A.   Not that I can recall, no.

21       Q.   During that conversation when the

22   officer first came in, did Jack say anything

23   that you interpreted as a threat to harm

24   himself or kill himself?

25       A.   Well, he said, you know, I need



JOHN BURKE

1

2     medical attention, I need medical attention

3     and I'm going to be leaving here in a body

4     bag, so I mean...

5          Q.   He said that when the first officer

6     came in?

7          A.   I believe he did, but not screaming

8     that time because the cop was right there in

9     front of him.  But, again, they heard him

10    saying this because he was screaming it so

11    many times.

12         Q.   After that officer left, did you

13    have a further conversation with --

14         A.   Yeah, I talked to him.

15         Q.   Had he started to calm down at that

16    point?

17         A.   He was -- yeah, he was.  Like when

18    he talked to me, it was just in a normal

19    tone.  He wasn't, you know, screaming or

20    yelling at me.  And he apologized to me for

21    yelling.  He said I'm sorry for yelling and

22    screaming, making all this mess, but, you

23    know, this isn't right, what's going on with

24    me.

25              And then -- and then he kept on



JOHN BURKE

1
2    telling me his father's phone number, and he
3    said 839-0676, you know.  And he was telling
4    me -- then like five minutes would go by and
5    he'd ask me what's that number.  And I'd
6    repeat, da, da, da, ba, ba, ba, you know.  So
7    I -- he's like alright, good.  He's like
8    please call my dad and tell him that I love
9    him and tell him what happened here, you
10   know.
11        And at this time I'm thinking
12   alright, he's just talking, you know, he's
13   full of hot air, you know, he's not really
14   going to do anything.  And he kept on going
15   on, what's the number, ba, ba, ba.  And then
16   intermittently he would start yelling and
17   screaming again, I need medical attention,
18   I'll be leaving here in a body bag if you
19   don't get me medical attention.
20   Q.  Was it your impression that he was
21   just threatening at that time and would not
22   carry it out?
23        MR. GRANDINETTE:  I'm going to
24        object, but -- as an opinion.
25        But answer the question.

JOHN BURKE

1

2  A.  Yeah, I don't know, to be honest

3  with you.  I mean, the fact that he gave me

4  his father's number and all that, it had me

5  concerned, you know.  And especially when

6  that T-shirt incident happened, what happened

7  afterwards, I was very concerned then.  And

8  then when they saw that on the tape and they

9  came in and they cut it down, I figured okay,

10  they'll do something now.

11  Q.  Let's just back up a bit so we can

12  proceed with the chronology.

13  A.  Yeah, sure.

14  Q.  You mentioned the officer came in,

15  they had a conversation.  He said he would

16  get the sergeant and then he left.

17  A.  Then he left.

18  Q.  How long passed until a police

19  officer returned to the cell area?

20  A.  It was after -- it was when he was

21  tying his T-shirt to the bars was the next

22  time the cop came, two cops came in.

23  Q.  The officer that came in the first

24  time, was he one of those two officers?

25  A.  I believe he was, but I could be



1          JOHN BURKE

2   wrong on that.   I mean, obviously the other

3   guy wasn't, but it was either the same kind

4   of guy with the same build.   Again, I don't

5   know any names or anything.   I just saw them,

6   they come in, they say you're doing stupid

7   stuff, cut the S, and then cut down the

8   shirt.   And, again, as they were they -- he

9   was still pleading his case to get medical

10  attention.

11       Q.   What was he saying at that time?

12       A.   He was like I need to go to the

13  hospital, I need to get medical attention, I

14  need to, you know -- I need go to the

15  hospital, I need medical attention, please,

16  sir, please, officers, please, you know, let

17  me talk to your sergeant.   And they basically

18  were in and out very quickly.   They just cut

19  the shirt down, yeah, whatever, and they

20  walked out.   So they didn't really engage in

21  conversation with him that second time.

22       Q.   What did he do or say after they cut

23  the shirt down and left?

24       A.   Well, they left and then it was

25  after that that he was still screaming and



67

JOHN BURKE

1

2  yelling, still making sure I knew his

3  father's number.  And then he started to

4  apologize to me -- well, then he -- I heard a

5  loud thump and he hit his head against the

6  wall.

7          And then I heard like water and then

8  he's like oh, man, I'm all wet.  And, you

9  know, again, he's freezing.  By this time

10 he's shirtless left in the cell, and I can't

11 stress enough how cold it was back there.  It

12 was inhumane cold back there.  There was no

13 heat.  And he said oh, I dumped my head in

14 the toilet, you know.

15         So I think he was trying to get

16 attention, you know, seeing they saw him on

17 the camera with his shirt, maybe they'll see

18 him doing this trying to hurt himself and,

19 you know, doing this and they'll come back

20 and they'll finally bring him to the hospital

21 or bring him -- get him the medical attention

22 that he wanted.

23     Q.  So after -- I'm sorry.  Did you hear

24 him bang his head?

25     A.  I just heard a loud -- like a, you



JOHN BURKE

 2  know, like a -- like loud (indicating).

 3      Q.  Were you able to see him banging his

 4  head?

 5      A.  I didn't see him, but I could -- you

 6  know that thump.  And I said what are you

 7  doing and he said oh, I just banged my head

 8  against the wall, it hurts, man.  I said what

 9  are you crazy, what are you nuts.  And it was

10  hard, too.  I mean, he banged his head hard.

11  Then after that, like I heard swirling of

12  water and then he said I'm all wet.  I'm like

13  what are you doing.  He's like I just put my

14  head in the toilet.

15          So I think he was just trying to get

16  attention, you know.  I think he said -- I

17  think he figured like once they saw him with

18  the shirt they would see him would do this,

19  and, again to repeat myself, that he would

20  get the attention that he wanted.

21      Q.  What do you recall the next thing

22  happening after he told that when he had put

23  his head in the toilet?

24      A.  He was cold because he was there

25  shirtless.  He was shivering.  He started



JOHN BURKE

1
2     talking again about his dog and about his
3     dad.  At one point he told me -- he's like
4     listen, please, tell my dad you can have my
5     boat, you know.  I guess he had a boat.  So
6     he's like, you know, tell my dad I gave you
7     the boat, you can go, you know, you can go
8     fishing, it's a 12-foot boat or whatever, you
9     know.
10            And he was talking, you know, I was
11    trying to tell hey, calm down, calm down,
12    take it easy, maybe they'll let you go
13    tomorrow, you know, just take it easy.  I
14    thought I was going to be getting through to
15    him.  And he was cold and he was cold.  And I
16    was like hey, man, I think they put the heat
17    on or something like that, just saying that
18    to kind of, you know, get him to -- then he
19    started talking about his dog and he started
20    sobbing again and crying, very upset.
21            And then it got quiet, you know, for
22    a while.  And eventually I heard him say
23    that's it.  And then I heard like the
24    ruffling of clothes, and I knew all he had at
25    that point was his jeans.  They took his

JOHN BURKE

1
2   shirt, he had no blanket.  And I hear him
3   like tying it up and stuff like that, you
4   know.  Him saying that's it were like the
5   last words he said.  So then I hear -- if you
6   want me to go on?
7        Q.   Please.
8        A.   Yeah.  Then I hear like a -- tying
9   it up and stuff like that.  I figure -- I
10  figure -- I can see the reflection in the
11  mirror and I can figure alright, he's got his
12  jeans, he's doing the same thing with the
13  jeans that he was doing with the shirt.  So I
14  figured okay, they'll probably come running
15  in here, you know.  So I kind of stayed, you
16  know -- I was like Jack, Jack, you know, but
17  I kind of stayed quiet.
18           The next thing I know I hear like
19  this -- I don't know how to describe this --
20  this like noise against the metal bars.  It
21  was like this hollow ringing.  And I could
22  see in the mirror and I could see like his
23  back facing the bars because he tied it
24  against the bars.  And I heard like gasping
25  for air and stuff like that, shaking, I

JOHN BURKE

1
2     heard, you know, that gasping.  I was
3     thinking oh, my God, this guy is really doing
4     this.  And I'm screaming Jack, Jack, Jack,
5     you know, like cut this out, what are you
6     kidding me, cut this out.  Got no response.
7            And then I still hear the gasping
8     for air and eventually it just went quiet.
9     And I just -- I'm looking at -- I could see
10    what he was doing, and I'm screaming guard,
11    guard, guard.  I'm looking at my camera and
12    I'm pointing like to my left saying, you
13    know, this guy just -- is hurting himself.  I
14    was hoping that maybe he was just acting or
15    whatever and I was hoping they'd come running
16    in any second since they saw that thing with
17    the T-shirt.
18           I'm like okay, they'll be here any
19    second, they'll save him.  And the next thing
20    I know he was hanging there for what seemed
21    like five to ten minutes.
22        Q.   How --
23        A.   And --
24        Q.   I'm sorry.
25        A.   Go ahead.

1          JOHN BURKE

2          Q.   How long a time do you estimate

3     passed between when you first heard him tying

4     the jeans to the bars until you heard what

5     sounded like the noises of the hanging?

6          A.   I would say he was very quick about

7     it.   Once he made up his mind that was it,

8     you know.   He was -- the minute -- once he

9     was done tying those jeans, he did what he

10    had to do.   So it wasn't very -- it wasn't

11    delayed, you know.   He didn't have the jeans

12    hanging there for a while, for half an hour

13    or 20 minutes.   It was like right away.

14         Q.   How long a period of time do you

15    believe passed between when you heard the

16    gasping and when the officers came in?

17         A.   I'd say it was about -- definitely

18    over five minutes because I remember

19    screaming and screaming and screaming

20    guards -- now I'm screaming, guards, guards,

21    you know.   And, again, I'm looking at the

22    camera as I'm screaming and I'm like pointing

23    this way, you know, towards Jack's cell which

24    would be towards the left (indicating).   And

25    I'm screaming, you know, and I'm pointing and

JOHN BURKE

1
2   going this guy, you know, and nothing,
3   nothing.  It got to the point where I just
4   gave up and I was just standing there just in
5   shock.  Like I could hear his bones cracking
6   and stuff, you know.
7           Even before that, you know, he
8   apologized to me.  He said, John, listen, I'm
9   going use the bathroom because I know -- he's
10  like I've heard that when people hang
11  themselves they, you know, shit themselves
12  and urinate and lose control of their, you
13  know, facilities.  And he's like, you know,
14  I'm going to use the bathroom to try to empty
15  myself out or whatever, you know, before I do
16  this.  I'm like come on man, just take it
17  easy, you know, relax, see what happens
18  tomorrow.  And then he went ahead and he did
19  it.
20          And, again, he was just hanging
21  there for what seems definitely five to
22  ten minutes.  It was an eternity, as you can
23  imagine.  And then I'm screaming and yelling.
24  I eventually just gave up because no one was
25  coming.  You'll see on the recording, you

JOHN BURKE

1
2   know, how it all went down.

3          And then finally I hear boots

4   running and, you know, boots running.  I can

5   tell, okay, finally they saw what's going on.

6   Now -- I'm like what's the point now, you

7   know, I'm thinking to myself.  And before

8   they opened the door -- because there's no

9   window on the door.  It's a steel door.

10  Before they opened the door I heard one cop

11  say to the other you have a knife, and they

12  were coming -- they knew what they were

13  walking in on, you know.

14         They weren't just coming to do some

15  random check.  They obviously finally looked

16  at the camera, saw this guy hanging there and

17  they hauled ass down the hallway, you know,

18  down to get into the area, you know.  So they

19  come bursting in and open up the cell and cut

20  him down.  And I hear one say to the other

21  check for a pulse.  And then I hear no pulse,

22  he's dead.

23         Q.  Were you ever able to observe any

24  physical injuries on Jack?

25         A.  That I was not able to do, no, just



JOHN BURKE

1
2     his -- telling me that he was roughed up and
3     that he was sore and he was roughed up, he
4     was mistreated and then, again, him banging
5     his head against the wall and him putting his
6     head down the toilet, which he did.  And,
7     again, I sound like a broken record, but the
8     tape will reveal that.
9          Q.  I'm just asking if you personally
10    saw physical injuries on him.
11         A.  But I -- no, I did not.  Personally
12    I did not, you know.  I mean, I saw him
13    hanging there.
14         Q.  Right.  I just want to know if you
15    saw bruises or cuts or bumps.
16         A.  No, I wasn't in a position to see
17    that, no.
18         Q.  What were you able to see the
19    officers do after they came in?
20         A.  Well, they came in -- again, I'm
21    standing there in shock.  So, you know, they
22    came in and they opened up the cell and --
23         Q.  How many came in?
24         A.  Two.
25         Q.  Had you seen those officers before?

---



JOHN BURKE

1

2      A.  You know, this was -- I would say

3  this was about 5:00 or so, so I mean, it

4  was -- it might have been a different shift.

5  And again, you got to understand, I'm in a

6  state of shock right now, so I'm kind of --

7  don't really -- it could have been one of the

8  same guys who came in earlier, but I can't be

9  100 percent sure about that.

10      Q.  Okay.

11      A.  But the two came in and then

12  eventually everybody came in, and one plain

13  clothes officer was -- I don't know if he was

14  off duty or just got off duty.  He was

15  standing like outside my cell just like

16  looking in shock.  And then eventually they

17  got me, and as I walked out, they had like a

18  sheet above, you know -- above the cell so I

19  couldn't see Jack's body or anything.

20      Q.  How long after the officers entered

21  were you taken out of the area?

22      A.  I'd say about five minutes.  At

23  first I don't think they even really paid

24  attention to me, you know.  They were too

25  busy doing what they were doing with him.



1                    JOHN BURKE

2        Q.   What exactly were they doing with

3   him?

4        A.   Well, I mean, they were checking his

5   pulse and they were shocked that this

6   happened.   And there was no -- there was no

7   pulse and I just heard no pulse.   And they

8   were just quiet basically.

9        Q.   Was anyone trying to render first

10   aid at that time?

11       A.   No, I didn't -- I don't believe so,

12   because when I was walked out a few minutes

13   later, they had a sheet covered up in the

14   front of the cell so I couldn't see him.   But

15   I didn't hear any first aid or CPR.   It was

16   just there was no pulse.   They didn't try to

17   render first aid.

18       Q.   Where were you taken initially when

19   you were taken out of that area?

20       A.   They brought me to what I believe

21   was the women's holding cell area which was

22   basically like across the hall, you know,

23   outside that door.

24       Q.   On the other side of the door?

25       A.   Yeah.

133

JOHN BURKE

```
 1
 2     Q.   So you couldn't see --
 3     A.   No, I couldn't see, yeah.
 4     Q.   Could you hear anything?
 5     A.   Just, you know, like shit or, you
 6   know, damn it.  You know what I mean?  That
 7   kind of deal, you know.  I think the cops
 8   were in shock, too.  Like they couldn't
 9   believe he was actually -- that he actually
10   did this.  You know?  So that was it.
11          And then I was placed over in that
12   cell.  I couldn't tell you how long I was
13   there because, again, I'm just numb at what I
14   just saw.  And the next thing I know I was
15   being questioned by two homicide detectives.
16     Q.   Are those the detectives --
17     A.   The detectives I gave the statement
18   to, yes.
19     Q.   Did you see anyone remove Jack from
20   the precinct?
21     A.   No, I did not see that.
22     Q.   Did you see --
23     A.   I couldn't see from -- even from
24   where I was in the cell, I couldn't see from
25   that --
```

JOHN BURKE

Q.   I take it there were no windows or anything in there?

A.   No, no.  So I don't know, you know. Obviously the detectives came and were taking photos or whatever they had to do or whatever protocol is.

Q.   You did not see that, did you?

A.   I didn't see that.  They just came and they checked out the scene and then they came to talk to me.

Q.   Did you remain -- you were transferred to another precinct?

A.   I was transferred to another precinct.  I couldn't tell you which one it was.  So obviously I guess they wanted -- after I gave my statement, they put me back in the cell or whatever.  Not too long after that, the original Detective Forestill who brought me there came back, you know, and that's when he had me sign my confession. And then basically he then drove me to another precinct, but I couldn't tell you which one it was, and I spent the night there.

1                           JOHN BURKE

2          Q.   Did you ask to be taken out of that

3    precinct?

4          A.   I didn't ask to be taken, no.   They

5    just -- I guess they thought this was good to

6    have me taken out of there.

7          Q.   Did you object to being taken?

8          A.   No, I didn't say anything.

9          Q.   Would it be fair to say you wanted

10   to get out of there?

11         A.   Again, at that point I was numb, so

12   I -- it didn't really matter different.   I

13   knew what happened, he was dead, so, you

14   know.   I guess they thought it best just to

15   transfer me to another -- I guess they were

16   doing their crime scene that entire night

17   anyway, so I'm sure it was a probably a few

18   hours before they even removed the body, you

19   know, or however that works.

20         Q.   Other than the meeting you had with

21   Detective Lane and the ADA last week, have

22   you spoken with anyone from the police

23   department about this matter?

24         A.   Between when I was interviewed that

25   evening by the detectives and then I was

---



81

JOHN BURKE

1

2      transferred to the other precinct, the

3      following morning I was in Riverhead, then

4      Yaphank, no one questioned me, any -- nobody

5      questioned me about this until when I got

6      out.  I called Jack's father the day I got

7      out, told him what had happened, because I

8      went online and I saw how they just reported

9      that he hung himself, there was no signs of

10     trouble or no warning signs, and I was

11     angered by that.  I said how could they do

12     this?

13          So I called -- I was going to call

14     his dad regardless just because I promised

15     his son I would call him, and just to do the

16     right thing I called his dad.  I said this is

17     what really happened, because I remembered

18     that number, you know.  I didn't want to call

19     while I was locked up.

20          So I had told him what had happened

21     and the reports in the news were false.  And

22     I said you do with this information as you

23     will, here's my name, here's my number, you

24     know.  If you're going take action I will be

25     there to support you because your son seemed

JOHN BURKE

1
2  like a nice guy, I got to know him for a

3  couple hours.  And I just felt like what

4  happened wasn't right.  You know?

5      Q.  You mentioned that you saw false

6  reports in the news.  Where were these false

7  reports?

8      A.  I saw them on the Internet.  I went

9  to Google because I figured something like

10  this would be reported, and I typed in -- I

11  think I typed in like 7th Precinct suicide,

12  Suffolk County and I -- sure enough, I got

13  results.

14      Q.  Were these articles on Newsday or

15  some other --

16      A.  I think one of them might have been.

17  Yeah, I think one of them was Newsday, and I

18  couldn't recall the other ones, but the -- I

19  think they might have been -- they could have

20  been all Newsday, but basically each one

21  basically said that he gave no signs of

22  suicide and he gave no warning signs and, you

23  know, everything was calm and smooth.

24          I think -- one thing I read,

25  Detective Fitzpatrick (phonetic) I think it

83

JOHN BURKE

1

2       might have been or Cop Fitzpatrick even said

3       like oh, yeah, he was fine, he was calm,

4       there was no problem, you know, there was no

5       signs of this at all, you know.  And when I

6       read that I was like, you know, that's

7       ridiculous, that's not the case.  You know,

8       at that time I had no idea what the parents

9       knew or what his father knew or whatever, I

10      just picked up the phone and I called, you

11      know.  For two months I sat on that phone

12      call, you know, because I didn't want to make

13      that call while I was, you know, locked up.

14              And I called his father and told

15      him, you know, listen, this is what happened,

16      your son was yelling for help for hours and

17      demonstrating signs that he was going to hurt

18      himself, you know.  And I told his father

19      what happened on the phone and I just said do

20      with this as you must, you know, as you want

21      to, I'm just letting you know.  And then he,

22      you know, took some legal action which I

23      don't blame him.

24              MS. ZWILLING:  Mr. Grandinette,

25          has anyone -- have you been in touch



84

JOHN BURKE

1           with anyone from Internal Affairs

2           about this?

3                  MR. GRANDINETTE:  No.

4                  MS. ZWILLING:  Have they asked

5           for interviews or anything like that?

6                  MR. GRANDINETTE:  Is this off

7           the record?

8                  MS. ZWILLING:  We can have it

9           off the record, sure.

10                (Whereupon, a discussion was held

11         off the record.)

12               MS. ZWILLING:  Thank you for

13         coming in.  I have no further

14         questions.

15               THE WITNESS:  Thank you.

16               (Time noted:  4:23 p.m.)

17

18

19

20

21

22

23

24

25



1

2                A C K N O W L E D G M E N T

3

4    STATE OF NEW YORK)
                            :ss
5    COUNTY OF SUFFOLK)

6

7         I, JOHN BURKE, hereby certify that I

8    have read the transcript of my testimony taken

9    under oath on August 21, 2013; that the

10   transcript is a true, complete and correct

11   record of what was asked, answered and said

12   during my testimony under oath, and that the

13   answers on the record as given by me are true

14   and correct.

15

16

17                          JOHN BURKE

18

19   Subscribed and sworn to

20   before me, this   day

21   of                    , 2013.

22

23

24      NOTARY PUBLIC

25



```
 1

 2                         I N D E X

 3

 4      WITNESS            EXAMINATION BY           PAGE

 5      John Burke         Arlene Zwilling          3

 6

 7

 8

 9                         EXHIBITS

10      RESPONDENTS'          DESCRIPTION           PAGE

11      A                  A two-page handwritten   30
                           statement
12

13

14

15

16

17

18

19

20

21

22

23

24

25
```



```
 1

 2                    C E R T I F I C A T E

 3

 4      STATE OF NEW YORK)
                               :ss
 5      COUNTY OF SUFFOLK)

 6

 7              I, NICOLE LIMONCELLI, a Notary Public

 8      within and for the State of New York, do

 9      hereby certify:

10              THAT JOHN BURKE, the witness whose

11      testimony is hereinbefore set forth, was duly

12      sworn by me; and

13              THAT the within transcript is a true

14      record of the testimony given by said witness.

15              I further certify that I am not

16      related, either by blood or marriage, to any

17      of the parties in this action; and

18              THAT I am in no way interested in the

19      outcome of this matter.

20              IN WITNESS WHEREOF, I have hereunto

21      set my hand this      day of           , 2013.

22

23                          Nicole Limoncelli

24

25                          NICOLE LIMONCELLI
```



88

```
1                    * E R R A T A *

2     CASE NAME:

3     DATE OF DEPOSITION:

4     NAME OF WITNESS:

5     PAGE LINE

6     ---- ----  CHANGE:-----------------------------

7                     REASON:-----------------------------

8     ---- ----  CHANGE:-----------------------------

9                     REASON:-----------------------------

10    ---- ----  CHANGE:-----------------------------

11                    REASON:-----------------------------

12    ---- ----  CHANGE:-----------------------------

13                    REASON:-----------------------------

14    ---- ----  CHANGE:-----------------------------

15                    REASON:-----------------------------

16    ---- ----  CHANGE:-----------------------------

17                    REASON:-----------------------------

18    ---- ----  CHANGE:-----------------------------

19

20                     WITNESS SIGNATURE

21

22    SUBSCRIBED AND SWORN TO BEFORE

23    ME THIS 30th DAY OF  SEPT  , 20 13

24    ----------------------------------

25    NOTARY PUBLIC    MY COMMISSION EXPIRES may 4th 2017
```

ROBERT LEAKE
Notary Public, State of New York
Registration #01LE6205017
Qualified in Nassau County
Commission Expires May 4, 2017

Five Star Reporting, Inc.   90 John Street - Ste. 411 - New York, NY 10038   Phone: 631.224.5054   Fax 631.224.3926

**1**

1:30 36:9
100 1:12 2:9 76:9
11 17:7 19:20
1-10 1:9
114 2:4
11501 2:5
11788 2:9
11th 19:22 20:6
12-foot 69:8
12th 20:6
1977 16:10
1989 17:6
1st 16:10

**2**

2:00 36:9
2:10 34:20,22
20 20:22 34:23 35:7,20
    72:13 88:23
2001 17:11
2003 23:14
2013 1:13 85:9,21
    87:21
21 1:13 85:9
22nd 11:11 20:2
23rd 20:12 29:23
25 47:6

**3**

3 86:5
3:06 1:14
30 47:4 86:11
34-10 22:16

**4**

4:23 84:17
420 2:4

**5**

5:00 76:3

**50-H** 1:2,19 3:19

**6**

60 20:5

**7**

7th 20:17 31:16,18
    34:19 36:5 82:11

**8**

839-0676 64:3
89 17:10

**9**

95A 3:13 31:4
96 23:8
9th 29:24

**A**

able 41:5 42:4,6
    43:18,19,23 55:6
    68:3 74:23,25 75:18
above-entitled 1:17
accuracy 34:3
accurate 34:10
accurately 4:15,18
across 6:24 7:2
    12:17,19 31:22
    38:15 40:12 77:22
acting 71:14
action 1:17 81:24
    83:22 87:17
actually 13:11 17:12
    24:5 35:12 36:4 78:9
ADA 6:4,9,10,15 7:20
    8:7 9:19,23 14:4
    15:12 24:4 35:25
    80:21
ADA's 7:19
address 3:11 16:13
    22:14 30:25 31:3
advised 8:18 10:3
    12:13
Affairs 84:2
afternoon 3:15,16

afterwards 65:7

against 1:7 22:2,5 38:6
    44:20 46:17,21
    48:9,11 49:11,13
    67:5 68:8 70:20,24
    75:5
agency 7:10
ago 6:3,13 11:17 14:3
    22:21 23:14 24:4
agreeable 5:10
ahead 25:9 28:16 57:7
    71:25 73:18
aid 77:10,15,17
air 64:13 70:25 71:8
alcohol 55:12
Alfred 32:11
allow 4:10
already 37:4 49:21,22
alright 57:14 58:5
    64:7,12 70:11
am 16:18,19 25:20
    28:3 54:17 87:15,18
Amendment 18:4
angered 81:11
angle 41:15 43:12
    60:17
answer 3:24 4:12,21
    64:25
answered 29:23 85:11
answering 57:7
answers 85:13
Anthony 2:3,6,14 8:8
anyone 8:6 59:8 77:9
    78:19 80:22 83:25
    84:2
anything 15:22,23
    16:7 23:11,15
    24:22,24 25:15
    37:11 38:5 44:14
    51:22 54:4 56:14
    57:20 60:7 62:22
    64:14 66:5 76:19
    78:4 79:3 80:8 84:6
anyway 80:17
apartment 16:22

17:12,15
apologize 67:4
apologized 63:20 73:8
appearance 24:8
appearing 5:6
April 10:19 13:21
area 17:15 37:18 49:21
    51:7,8,13,16,23
    52:21 65:19 74:18
    76:21 77:19,21
Arlene 2:10 3:17 86:5
arrest 21:23 25:16
    26:17 27:4,8,18,24
    28:6,12 58:19
arrested 20:12,14
    21:9,16 25:2,18
    34:20 36:6 40:2
    53:14,15,19
    57:15,22
arrived 34:19 36:5
    49:20
articles 82:14
ass 74:17
Assistant 3:17 7:5
attention 28:10
    45:5,10,11,22,23,25
    46:11,20 48:16,22
    54:20,21 56:6 59:5,9
    60:21 61:2,6,19,25
    62:2,3,17 63:2
    64:17,19
    66:10,13,15
    67:16,21 68:16,20
    76:24
attitude 56:3
attorney 3:18 7:6
    18:12
Attorneys 2:3,8
August 1:13 85:9
aunt 17:2
Avenue 22:17 31:4
avoided 58:17
away 20:23 27:14
    46:24,25 49:12
    50:14 54:9 56:19



72:13

---
**B**

ba 64:6,15

badges 33:2

bag 45:24 46:12 48:21 61:7 63:4 64:18

balding 60:16

bang 44:19 48:9 67:24

banged 68:7,10

banging 68:3 75:4

bangs 46:17

Barbara 19:13

barrel-chested 60:15

bars 38:20 51:10,19,25 52:10,12,14 65:21 70:20,23,24 72:4

basically 11:25 12:9 13:3 15:15 27:22 29:5 39:13 42:8 66:17 77:8,22 79:22 82:20,21

bathroom 73:9,14

beat 28:18

begin 4:8,11

beginning 58:22

behind 41:13 43:10

believe 6:4,18 10:18 13:15,16,20 14:17 15:14,17 22:16 24:20 31:23 33:16,17 34:21 35:9 37:8 43:22 46:19 57:9 63:7 65:25 72:15 77:11,20 78:9

belt 50:9 52:23

best 34:10 80:14

better 12:15

bit 23:8 25:2 42:8 65:11

blame 83:23

blanket 46:25 50:13 70:2

blood 87:16

boat 69:5,7,8

Bobby 8:9,11 30:21

body 45:24 46:12 48:21 61:7 63:3 64:18 76:19 80:18

bogus 27:6

bones 73:5

boots 74:3,4

born 16:9,10

bottom 32:8

breaking 59:6

breath 47:11

bright 42:18

bring 45:13,14 56:10 61:25 62:4 67:20,21

bringing 62:5

broke 55:20

broken 75:7

Brooklyn 20:15

brought 36:14,20 39:4 49:23 77:20 79:20

bruises 75:15

build 66:4

building 6:5,18,19 12:18

bumps 75:15

Burke 1:16 2:4 3:10,15 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1

81:1 82:1 83:1 84:1 85:7,17 86:5 87:10

bursting 74:19

busy 76:25

---
**C**

calm 57:20 63:15 69:11 82:23 83:3

camera 38:23 40:10,11,12,15,17,24 41:3,13,20 43:10 52:4 67:17 71:11 72:22 74:16

cameras 38:12,14 41:2

Cantres 8:25

C-A-N-T-R-E-S 8:25

car 39:17

care 58:8 61:17 62:12,15,19

carry 64:22

case 22:13 24:6 36:24 59:13 66:9 83:7 88:2

catwalk 51:3,16 52:2,8,11

cause 56:15

cell 31:20,22 36:12,17,22,23 37:5,7,10 38:13,14,16,20 40:12,13,18,19 41:16,20,21,22,23 42:2,4,5,7 43:14,15,20,21,22,24 44:2,3,4 47:5 49:20,21,22,23 50:3,7 51:7,8,13,20,23 52:8,15,16 53:4 59:18,25 60:2,16 65:19 67:10 72:23 74:19 75:22 76:15,18 77:14,21 78:12,24 79:18

cellblock 51:4

cells 31:24 36:16 40:20 43:16,20 44:8 50:18,25 51:25

Central 19:16

certain 55:19

certify 85:7 87:9,15

CHANGE 88:6,8,10,12,14,16,18

charge 17:25 18:6,14,19,25 21:12,13 23:11

charged 21:11,19 39:24

charges 21:8,23,25 27:6

chased 54:9 56:18

check 38:6 59:19 61:15 74:15,21

checked 79:10

checking 77:4

child 19:6

children 23:2

chitchatting 46:4

chronology 65:12

circumstances 23:22 58:19

Claim 3:20,23

Claimant 1:6 2:3

class 23:7

clear 4:5

clock 37:17

close 60:3

closer 35:13,18

clothes 32:21 52:24 69:24 76:13

coating 43:2

cold 47:8,11 49:3 50:15 67:11,12 68:24 69:15

college 23:8

coming 51:16 73:25 74:12,14 84:14

COMMISSION 88:25

commit 33:21



community 23:8,9

company 53:17

complete 20:5 85:10

completeness 34:3

concerned 65:5,7

conducting 3:18

Conduit 22:16

confession 36:25
    39:15,23 79:21

confiscated 37:15

Connecticut 16:11

connection 16:6 21:20

consideration 55:4

contact 5:25 8:20
    9:3,10 10:16
    13:11,14,19 39:7,11

contacted 5:24 6:6
    8:23 9:2

continuously 21:15

control 73:12

conversation 12:21
    25:10 53:8,11 54:25
    55:11,20 56:13
    58:24 59:7 62:11,21
    63:13 65:15 66:21

conversations 16:2

convicted 18:7 19:2,8
    23:10

conviction 18:10,20

cop 38:22 44:25
    45:7,17 59:12,14
    63:8 65:22 74:10
    83:2

cops 26:13,19,24
    61:11 65:22 78:7

copy 14:19,22,24
    15:4,5 31:9

corner 40:13 41:11

correct 34:13,16,18
    37:25 85:10,14

correctly 35:15

counsel 6:23 8:9,19
    10:5,24 13:16 18:3

Country 2:4

County 1:8 2:8 3:18
    7:9,12,13,15,17
    17:12 19:11 20:13
    82:12 85:5 87:5

couple 82:3

course 54:7 58:2,12

court 4:12
    19:8,10,11,12,15
    24:5,7 36:24

courteous 45:9 55:14
    61:23

cover 42:14,16 54:24

covered 50:14 77:13

covering 51:21

CPR 77:15

cracking 73:5

crazy 68:9

crime 39:24,25 80:16

criminal 19:14 21:25

cry 56:15

crying 55:20 56:13,16
    69:20

cuffs 39:18

current 22:22

currently 16:18 17:17
    26:25

custody 20:10 21:15

cut 34:24 35:19
    38:22,24,25 44:25
    45:2 46:18 47:19,24
    48:4 65:9 66:7,18,22
    71:5,6 74:19

cuts 75:15

cutting 35:11

————————
D

da 64:6

dad 25:23 26:2 64:8
    69:3,4,6 81:14,16

damn 78:6

dark 42:23 43:8,9

DA's 6:24 7:13,17

date 6:7 9:11,13,16
    19:21,24,25 30:18
    88:3

dates 20:7

day 9:13,20 10:8
    12:3,8,22 13:5,9
    14:2,14 26:22 34:21
    36:10 38:3 47:3
    49:25 50:11 81:6
    85:20 87:21

days 19:20 20:3,4,5

dead 74:22 80:13

deal 78:7

December 16:10

defense 18:11

definitely 72:17 73:21

degrees 47:4,6

delayed 72:11

demonstrating 83:17

Dennison 6:19

department 1:8 2:8
    80:23

deposition 5:22 6:5,8
    88:3

describe 32:6
    60:5,10,12 70:19

DESCRIPTION 86:10

detail 12:25

details 12:8 25:2 27:20
    28:19

detective 6:12
    7:6,7,9,12 8:7,15,20
    9:4,9,22 11:16 12:21
    15:12 33:10,12
    36:20,21 39:4 79:19
    80:21 82:25

detectives 15:18 20:13
    31:25
    32:16,19,20,25
    78:15,16,17 79:5
    80:25

different 17:15 76:4
    80:12

difficult 4:16

direct 13:11

directive 7:24 33:9

directly 11:18 36:14
    38:15 40:23,25 50:3

discuss 12:22 18:5

discussed 12:24,25

discussion 8:3 25:5
    84:11

discussions 15:8

dispute 36:2

District 7:6

document 31:6

dog 27:13,14 54:9
    56:18 69:2,19

done 48:24 72:9

door 51:15,17,23
    52:3,5,7,9,13,17,20
    74:8,9,10 77:23,24

drive 24:11

dropped 24:12

drove 24:5 39:16 79:22

drugs 55:12

duly 3:3 87:11

dumped 67:13

duration 11:22

during 8:19 25:9,10
    27:7,17,23 28:6,8
    42:23 45:20 46:9
    55:10,20 56:13
    58:24 62:21 85:12

duty 76:14

DWI 23:13

————————
E

Earl 24:16,17

earlier 76:8

East 17:10 23:7

Eastchester 3:13

easy 69:12,13 73:17

effect 61:19

either 13:12 66:3 87:16

else 23:15 37:11
    44:6,14



emphasize 61:8

employed 7:12 8:12
   30:22

employee 7:16

empty 44:3 73:14

endangering 19:5

engage 66:20

entered 76:20

entire 42:6,7 44:8 49:8
   52:2,3 80:16

entirely 51:13

environment 49:2

escorted 20:17,19

especially 65:5

ESQ 2:6,10

Estate 1:4

estimate 72:2

estimates 37:22,23

eternity 73:22

evening 15:18 37:3
   39:9,12 80:25

event 13:2

events 3:22 25:16 38:2

eventually 56:25 69:22
   71:8 73:24 76:12,16

everybody 76:12

everyday 58:14

everything 4:14,17
   37:4,16 82:23

exact 9:16

exactly 14:24 29:3
   34:8,13 36:7 48:3
   61:16 77:2

EXAMINATION 1:16
   3:6 86:4

examined 3:4

exchanged 24:22

excuse 25:21 38:25

Exhibit 30:17 31:6
   34:10

EXHIBITS 86:9

expired 25:18,20 26:12

27:5 28:2,5 53:20
   54:5,16

EXPIRES 88:25

explain 11:2

extension 25:21

extra 31:9

---

**F**

face 23:18 55:6

facilities 73:13

facing 41:20 43:12
   52:10,12,14 70:23

fact 54:15 55:18 65:3

fair 37:21 80:9

false 81:21 82:5,6

family 3:20 24:14
   30:11

father 10:20 11:5
   25:11 27:19 56:23
   57:6 81:6 83:9,14,18

father's 57:4 64:2 65:4
   67:3

feel 34:18

felt 47:6 49:4 82:3

female 26:15,16 29:16
   53:23

Fifth 18:4,16

figure 70:9,10,11

figured 59:16 65:9
   68:17 70:14 82:9

filed 3:20

finally 67:20 74:3,5,15

fine 15:6 83:3

fingertips 20:8

finish 4:11

first 3:3 10:15 12:20
   13:10,14,18,20
   17:24 23:24 26:3
   44:2 47:21 55:21
   58:22 59:12,23 60:2
   61:15 62:22 63:5
   65:23 72:3 76:23
   77:9,15,17

Fisch 2:14

fishing 69:8

Fitzpatrick 82:25 83:2

five 9:17 17:21,22
   22:20 44:6,18 50:23
   64:4 71:21 72:18
   73:21 76:22

foot 38:17 40:16

Forestill 36:21 39:5
   79:19

forth 12:11 87:11

Forty-five 35:16

forward 5:8,15,16

Franqui 1:5 3:20 13:15
   23:17 25:6 35:19

Franqui's 11:5

freezing 47:10 50:11
   67:9

frigid 47:3

front 33:22 42:7 63:9
   77:14

frustration 57:19

full 64:13

---

**G**

gasping 70:24 71:2,7
   72:16

General 1:19

gets 5:14 59:25

getting 25:9 69:14

given 85:13 87:14

glad 53:16

glass 42:13

God 71:3

Google 82:9

graduate 23:5

Grandinette 2:3,6,14
   5:5,16,24,25 6:20,22
   7:4,11,20,23 8:8,12
   10:6,16,25 12:13
   13:12,25 15:3 16:5
   18:11,22 23:25
   30:23 31:8 42:11
   59:21 64:23 83:24
   84:4,7

Grandinette's 8:17
   9:25 10:2 24:19

great 60:13

guard 71:10,11

guards 47:20 72:20

guess 19:14 58:22
   69:5 79:16
   80:5,14,15

guilty 19:2,7,19

guy 35:8 44:19 55:23
   66:3,4 71:3,13 73:2
   74:16 82:2

guys 76:8

guy's 57:14

---

**H**

haircut 60:15

half 14:12 60:3,6 72:12

half-hour 35:8

hall 38:15 40:12 77:22

hallway 31:23 74:17

hand 87:21

hands 51:18

handwritten 30:15
   86:11

hang 57:3 73:10

hanged 49:16

hanging 42:9 57:2,24
   71:20 72:5,12 73:20
   74:16 75:13

happen 22:7 31:8

happened 9:19 10:22
   11:2,3 12:3,5,8
   13:3,4 14:13,25
   25:13,24 31:21
   33:4,19 34:8,15 38:2
   42:10 43:13 64:9
   65:6 77:6 80:13
   81:7,17,20 82:4
   83:15,19

happens 57:21 73:17

happy 15:4 57:16

hard 68:10

harm 62:23



hauled 74:17

Hauppauge 1:12 2:9 6:24

having 3:3

head 4:22 5:2 6:16 14:25 44:20 46:17,21,22 48:9,11,13 49:11,12,13 67:5,13,24 68:4,7,10,14,23 75:5,6

hear 28:23 46:3,4,7 61:12 67:23 70:2,5,8,18 71:7 73:5 74:3,20,21 77:15 78:4

heard 9:6 26:3 35:8 44:19 46:8 48:8 49:15 63:9 67:4,7,25 68:11 69:22,23 70:24 71:2 72:3,4,15 73:10 74:10 77:7

hearing 1:2 3:19 5:21 36:24

heat 47:5 67:13 69:16

heavyset 60:15

he'd 64:5

held 1:17 8:3 21:22 84:11

help 12:12 48:20 56:7 58:15 83:16

hereby 85:7 87:9

herein 3:2

hereinbefore 87:11

here's 41:21 81:23

hereunto 87:20

he's 7:14,15 8:12 45:25 53:13,15 54:18 56:22 57:16,17,18 60:19 64:7,12,13 67:8,9,10 68:13 69:3,6 70:11,12 73:9,13 74:22

hey 69:11,16

High 23:5,7

Highway 1:12 2:9

hit 28:18 44:20 46:21 48:9,11 49:11,12 67:5

holding 31:24 77:21

hollow 70:21

homicide 78:15

honest 16:21 59:11 65:2

hoping 71:14,15

hospital 45:13 56:9 62:2,5 66:13,15 67:20

hot 64:13

hour 35:13,16,18 60:3,6 72:12

hours 58:15,16 80:18 82:3 83:16

howling 46:13

hung 34:23 35:12,19 81:9

hurt 44:21 48:12 67:18 83:17

hurting 29:7 57:10 71:13

hurts 68:8

---

**I**

I'd 11:21 18:4 22:20 23:21 35:12 36:7,9 38:16 40:15 60:2 64:5 72:17 76:22

idea 26:22 83:8

identification 30:17

identify 32:23

I'll 6:22 7:4 12:11 15:3 31:10 36:25 45:18,23 46:11 48:20 59:14 60:23 64:18

I'm 3:17,18,21 8:22 17:24 18:7 19:3 20:20,23 22:23 25:9 26:6 28:10,15 29:6,7 31:3 34:2 38:5 42:17 47:21 51:12 52:7,12

53:14,15 54:7,8 57:2,7,13 58:5 61:6 63:3,21 64:11,23 67:8,23 68:12 71:4,9,10,11,12,18,2 4 72:20,21,22,25 73:8,14,16,23 74:6,7 75:9,20 76:5,6 78:13 80:17 83:21

imagine 73:23

immediately 9:15 11:21 53:6

impression 64:20

inaccurate 44:15

incident 12:22 15:19 20:19 31:17 47:2 58:7 65:6

indicated 5:5

indicating 41:23 52:9 68:2 72:24

information 10:23,24 19:4 81:22

informed 8:17 9:9

inhumane 47:7,8 67:12

initial 14:9 24:2,19 26:5 46:15

initially 59:22 77:18

injuries 74:24 75:10

inquiring 38:5

inside 42:5 51:20

inspection 25:18,21 26:12 27:5 28:3,4 53:20 54:5,17,18

instead 4:21 22:9

intention 16:16 18:18

interested 87:18

intermittently 58:25 64:16

internal 84:2

internet 82:8

interpreted 62:23

interrogation 32:2 43:6

interviewed 80:24

interviews 84:6

invoke 18:15

involved 33:13 59:11

Island 17:9 22:9,11

Islip 19:16

isn't 63:23

it's 4:12 7:23 14:25 16:14 17:2 19:5 28:25 35:25 42:15 50:25 58:13 69:8 74:9

IV 1:5

I've 14:23 24:2 73:10

---

**J**

Jack 1:5 3:20 10:21 13:15 23:17 24:25 25:6,10,14,15 36:22 38:14,18 44:3,11,12 45:21 49:21,22 53:4,9 58:18 59:15 60:19,20,22,25 61:16 62:6,11,22 70:16 71:4 74:24 78:19

Jack's 10:20 41:16 43:13 51:18 52:24 72:23 76:19 81:6

jail 11:7 21:2 25:20 28:4 54:17 59:3

Jamaica 22:17

JANE 1:9

January 20:12 29:23,24 47:4

jeans 49:16 50:10 69:25 70:12,13 72:4,9,11

job 4:12

John 1:8,16 2:4 3:10 4:1 5:1 6:1 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1

Five Star Reporting, Inc.   90 John Street - Ste. 411   New York, NY 10038   Phone: 631.224.5054   Fax 631.224.3926 

33:1 34:1 35:1 36:1
37:1 38:1 39:1 40:1
41:1 42:1 43:1 44:1
45:1 46:1 47:1 48:1
49:1 50:1 51:1 52:1
53:1 54:1 55:1 56:1
57:1 58:1 59:1 60:1
61:1 62:1 63:1 64:1
65:1 66:1 67:1 68:1
69:1 70:1 71:1 72:1
73:1,8 74:1 75:1
76:1 77:1 78:1 79:1
80:1 81:1 82:1 83:1
84:1 85:7,17 86:5
87:10

**joke** 53:13

**Jr** 25:11,14,15

**judge** 19:13 22:12

---
K
---
**Kahn** 19:13 22:12

**kicked** 28:19

**kidding** 71:6

**kill** 62:24

**knew** 25:13 46:8 67:2
69:24 74:12 80:13
83:9

**knife** 48:5 74:11

**knowledge** 16:3,4

---
L
---
**Lane** 6:12 7:7,24
8:15,20 9:4,23 11:17
12:21 15:12 80:21

**Lane's** 9:10

**language** 38:25

**lapsed** 38:2

**last** 22:18 26:4 29:22
70:5 80:21

**later** 20:18 34:23
35:7,8 37:2 39:9
77:13

**Law** 1:19 2:3,8,14

**lawyer** 20:4

**leading** 25:16

**Leak** 8:9,11 30:21

**learn** 5:21 25:4 38:11

**learned** 25:5

**leave** 48:20,25 61:6

**leaving** 45:23 46:12
63:3 64:18

**led** 27:3

**legal** 18:3 83:22

**Let's** 54:22 65:11

**letting** 83:21

**life** 50:2

**Limoncelli** 1:20
87:7,25

**Lindenhurst** 17:13

**LINE** 88:5

**lines** 44:18

**listen** 45:10 69:4 73:8
83:15

**listening** 54:8 57:13

**little** 6:14 23:8 25:2
33:22 34:21 42:7,23
47:15 48:7

**lived** 16:12
17:3,8,10,11

**located** 8:23

**location** 34:14

**locked** 81:19 83:13

**long** 11:12 16:12
17:3,8,20 22:9,10
58:18 59:18 65:18
72:2,14 76:20 78:12
79:18

**longer** 35:10

**lose** 73:12

**lost** 16:23

**lot** 54:13

**loud** 34:4 44:19 48:8
67:5,25 68:2

**love** 64:8

**lungs** 45:22 46:2,8
48:18

---
M
---
**ma'am** 3:16 16:8 17:19

21:18

**mail** 13:17 15:4,7

**man** 53:12 67:8 68:8
69:16 73:16

**Manhattan** 16:22

**March** 11:11 19:21,22
20:2,6

**marijuana** 29:19,22

**marital** 22:22

**mark** 30:13

**marked** 30:16 31:6
34:9

**marriage** 87:16

**married** 22:24

**Massachusetts** 17:6

**matter** 1:4 16:7
80:12,23 87:19

**may** 42:11

**maybe** 42:17 48:14
57:17,18 60:3,16
67:17 69:12 71:14

**Meadow** 17:10 23:7

**mean** 12:23 14:24
26:25 28:23,25 36:8
42:8 46:6,13 47:6,10
51:10 55:17 57:23
58:2,12 61:7 63:4
65:3 66:2 68:10
75:12 76:3 77:4 78:6

**means** 3:21

**meant** 29:4

**meantime** 48:17

**medical** 28:9
45:5,10,11,22,23,25
46:11 48:16,18,22
54:20 56:5,6 59:5,9
60:20
61:2,6,17,18,24
62:2,3,16 63:2
64:17,19 66:9,13,15
67:21

**meet** 8:16 9:18,21,22
10:4 12:2,9,10,16

**meeting** 6:13,17
8:5,6,13,19 9:12
10:7 14:4,9 24:2,4

35:25 80:20

**members** 24:13 30:11

**Memorial** 1:12 2:9

**men's** 16:21

**mention** 36:2

**mentioned** 3:22 6:5,9
11:4 17:16 21:12
23:12 25:6,11,17,25
27:9,11,12,17
28:11,21 30:4,22
35:24 38:8 39:3,22
40:8,23 44:14 51:24
56:12 65:14 82:5

**mentioning** 26:12,15
28:5 57:3

**mess** 63:22

**message** 8:24 11:20

**met** 11:16 12:17
13:20,25 14:2,3
15:11 23:17,23,24
24:3,13,16 26:21
49:24 50:2

**metal** 51:17 70:20

**mid-July** 9:15

**mind** 4:8,20 33:20,25
58:4 72:7

**mine** 42:2

**Mineola** 2:5

**minor** 19:6

**minute** 72:8

**minutes** 9:17 11:22
20:22 34:23
35:7,16,20 48:7 64:4
71:21 72:13,18
73:22 76:22 77:12

**Mirel** 2:14

**mirror** 38:16 40:9
41:19,24
42:3,12,13,18
70:11,22

**mirrored** 40:14 41:20
42:21

**mirrors** 40:22 41:6,9
43:5

**misdemeanor** 23:13



mission 54:2

mistreated 26:13
27:7,21 29:11 75:4

moment 8:2 33:25

months 16:14 17:13
83:11

mood 55:15

morning 81:3

mounted 40:23

move 19:3

moved 17:5,14

Municipal 1:19

myself 25:10 68:19
73:15 74:7

**N**

Nassau 23:9

nature 18:14 28:20

news 81:21 82:6

Newsday 82:14,17,20

nice 24:11 82:2

Nicole 1:20 87:7,25

night 20:19 39:19,21
79:24 80:16

nobody 81:4

nodding 4:22

nods 5:2

noise 70:20

noises 72:5

Non-Party 1:16

noon 34:20 36:6

noose 38:21 44:23
58:10

normal 63:18

notary 1:21 3:3
32:10,12 85:24 87:7
88:25

noted 84:17

nothing 30:4 50:17
54:16 73:2,3

notice 3:19,23 35:21

noticed 35:23

numb 40:6 78:13 80:11

nuts 68:9

**O**

oath 85:9,12

object 64:24 80:7

obtained 10:24 13:15

obviously 4:25
12:17,23 13:2 28:24
47:25 57:16 66:2
74:15 79:5,16

occasions 23:20

occurred 31:17 33:20

offhand 7:19

office 2:14 6:6,24
7:13,17 8:17
10:2,7,17 12:14 16:6
24:20 30:19

officer 7:15 8:23,25
9:10,13,21 17:17
22:8 26:15,16
29:13,16 45:11
46:18 47:20,22 48:6
53:23 55:21 56:5,8
59:19 60:4,23
61:13,21 62:3,8,22
63:5,12 65:14,19,23
76:13

officers 46:5 65:24
66:16 72:16
75:19,25 76:20

officer's 45:12

OFFICERS 1:8

OFFICES 2:3

oh 29:25 36:25 58:25
67:8,13 68:7 71:3
83:3

okay 4:6,23 5:19 7:2
9:24 12:5,11,15
20:16 21:4 31:7
32:12 35:6 45:17
47:23 49:9,17
59:14,16 60:23 65:9
70:14 71:18 74:5
76:10

old 2:4 17:7

ones 82:18

online 81:8

open 22:4 52:17 74:19

opened 74:8,10 75:22

opinion 48:23 64:24

opportunity 5:17

order 47:17,18 49:7
50:19

original 15:16 47:14
79:19

Originally 45:7

outcome 87:19

outside 46:5 51:4,23
76:15 77:23

**P**

p.m 1:14 34:20 84:17

page 32:9 35:3 44:18
86:4,10 88:5

pages 14:11,12,13

paid 76:23

papers 14:5

paragraph 35:5

parents 83:8

parole 21:20

particular 56:14 62:19

particulars 18:8,19
21:10

parties 87:17

passed 65:18 72:3,15

passenger 39:17

pay 10:6,10,13,14

pending 22:2

people 4:15 43:24
73:10

percent 76:9

perfect 43:16

period 72:14

permanent 16:17,19

persistent 48:19

person 13:12 27:18

personally 39:16

75:9,11

perusing 31:7 32:8,12
33:17 34:7 44:17

Pettigrew 7:21 9:23

P-E-T-T-I-G-R-E-W
7:21

phone 8:14 11:22 12:8
13:12 37:10 57:4
64:2 83:10,11,19

phonetic 6:12 8:10
19:14 24:17 32:11
36:21 82:25

photos 79:6

physical 28:7 74:24
75:10

physically 27:8 28:25
32:6 60:5

pick 30:24

picked 23:25 30:21,25
83:10

piece 46:24 50:16

pile 52:24

placed 78:11

plain 32:21 76:12

planted 26:17 29:13,17
30:5 53:23 54:5

plate 40:14 51:21

plea 19:9,19 20:2

plead 19:7

pleading 58:15 59:13
66:9

pleasantries 24:21

please 3:9,12 4:21
30:14 45:16 56:5,7
57:5 60:23 61:24
62:7 64:8 66:15,16
69:4 70:7

pled 19:2

Plexiglas 42:16

pocket 30:6 53:24

point 34:17 35:4 36:13
37:13 38:18 45:15
53:3 54:8 55:7,10
56:12 57:11,13 59:8
60:22,25 63:16



69:3,25 73:3 74:6 80:11

**pointing** 71:12 72:22,25

**police** 1:8 7:9,15 27:21 46:5 65:18 80:22

**polite** 45:9 55:14 56:4

**politely** 60:20

**position** 43:16 75:16

**precinct** 20:18,20,23 31:16,19 34:20 36:5,15 39:4,18,19,20 78:20 79:13,15,23 80:3 81:2 82:11

**prepares** 5:13

**present** 2:13 6:12 8:6 16:13 32:16 33:8,13

**presently** 27:2

**pretty** 53:6

**previous** 27:2

**previously** 30:22

**prior** 9:7 11:14

**prisoners** 44:7

**probably** 6:14 70:14 80:17

**probation** 8:22,23 9:10,13,21 17:16,18,20 18:2 22:4,8 29:21 55:18

**problem** 9:25 12:6,11 18:13 83:4

**problems** 57:23

**proceed** 65:12

**process** 28:9 45:21 46:9

**promised** 81:14

**proper** 47:17,18

**protocol** 79:7

**prove** 49:19

**provide** 6:23 7:4

**psychiatric** 62:12,14,18

**public** 1:21 3:4

32:10,12 85:24 87:7 88:25

**pulse** 74:21 77:5,7,16

**punched** 29:8

**punching** 28:25

**purely** 21:22

**purpose** 41:6,7 47:24

**pursuant** 1:18

**putting** 75:5

Q

**Queens** 8:24 22:9,12,13,14,17

**question** 4:4,10,11,21 26:5,8 46:16 47:15 59:22 64:25

**questioned** 78:15 81:4,5

**questioning** 33:9,10

**questions** 3:22 4:3,9 15:16,20 33:3 57:7 84:15

**quick** 72:6

**quickly** 33:16 38:21 66:18

**quiet** 69:21 70:17 71:8 77:8

R

**ran** 27:14

**random** 74:15

**rather** 18:4

**reading** 44:17

**really** 12:7 32:7 40:5 64:13 66:20 71:3 76:7,23 80:12 81:17

**rear** 36:15,22

**reason** 4:2 88:7,9,11,13,15,17

**recall** 15:20 29:9 33:5,6 53:10 62:20 68:21 82:18

**received** 8:14

**recollection** 34:11

40:21

**record** 3:8,11 5:4 8:2,4 15:25 26:9 35:25 75:7 84:8,10,12 85:11,13 87:14

**recorded** 15:9

**recording** 73:25

**referred** 8:5

**referring** 19:23 26:23 41:11 52:6 54:13,14

**reflecting** 41:6

**reflection** 41:16,17 42:9,20 43:11 51:21 55:9 70:10

**reflective** 38:16 40:9,14,22 42:13,25

**regardless** 81:14

**regular** 46:7

**related** 87:16

**relax** 73:17

**release** 11:6,10 19:21,23,25

**released** 10:20 11:5,7,11 20:11 21:17

**remain** 79:12

**remember** 20:3 33:23 44:16 53:12 56:17 57:5 72:18

**remembered** 81:17

**remove** 78:19

**removed** 80:18

**render** 77:9,17

**repeat** 64:6 68:19

**repeated** 54:13

**rephrase** 4:4

**replied** 56:8 62:4

**reported** 81:8 82:10

**reporter** 1:20 4:13,24 5:13 26:10

**reports** 81:21 82:6,7

**representation** 12:16

**represented** 16:6

**requested** 8:13,16 9:18 18:12

**requesting** 61:17

**reside** 22:10,11

**residence** 16:17,19

**respect** 3:19

**respectful** 61:24

**Respondents** 1:10 2:8 30:16 86:10

**responding** 4:20

**response** 29:24 45:12 71:6

**results** 82:13

**retained** 7:16

**return** 16:16

**returned** 13:9 37:3 39:10 65:19

**reveal** 75:8

**reversed** 47:16

**review** 5:14,17 33:14

**Richard** 7:24

**ride** 24:9

**ridiculous** 83:7

**ringing** 70:21

**ripped** 50:16

**Riverhead** 11:15 19:16,17 20:24,25 81:3

**Road** 2:4 3:13

**room** 4:14 32:2 43:6

**rough** 29:2

**roughed** 27:22,23 28:7,17,22,24 29:6,10 61:4,20 75:2,3

**ruffling** 69:24

**run-in** 27:2

**running** 38:22 70:14 71:15 74:4

S

**sarcastically** 62:6



sat 33:12 83:11

save 71:19

saw 15:14 33:21 38:23
42:8 44:2 47:25
48:15,23 52:2,24
65:8 66:5 67:16
68:17 71:16 74:5,16
75:10,12,15 78:14
81:8 82:5,8

scared 55:17

scene 26:16 79:10
80:16

school 23:4,5,7

screamed 61:7,8

screaming 45:5,21,25
46:8 48:17
55:22,23,25 61:5,22
62:16 63:7,10,19,22
64:17 66:25 71:4,10
72:19,20,22,25
73:23

seat 39:17

second 32:9 35:3,5
44:18 66:21
71:16,19

Section 1:18

seeing 67:16

seem 20:7 57:9

seemed 56:14 71:20
81:25

seems 32:10 73:21

seen 14:23 24:2 38:9
75:25

send 5:6

sergeant 45:17,18,19
59:15 60:22 62:7
65:16 66:17

serious 57:10,18

service 10:13

several 46:2 61:9

shaking 70:25

sheet 76:18 77:13

shelter 16:21

shield 41:3

shift 76:4

shiny 42:19

Shirley 20:18 31:16

shirt 34:25 46:18,24
47:19,25 48:24
49:3,10,12 58:10
66:8,19,23 67:17
68:18 70:2,13

shirtless 46:23 47:9
67:10 68:25

shit 39:2 48:3 73:11
78:5

shivering 68:25

shock 73:5 75:21
76:6,16 78:8

shocked 58:14 77:5

shocking 58:12

shoes 50:9 52:22

short 60:15

shorthand 1:20

shortly 33:19

showed 58:9

sign 5:20 14:5,16
15:23 36:25 39:14
40:3 79:21

signature 32:8,17
88:20

signed 33:15,18,24
35:21 39:22 40:4,6

signs 58:9 81:9,10
82:21,22 83:5,17

similar 24:18

Simon 24:16,17
25:12,23,24 26:2,3
27:10,13,16 30:10

single 22:23 50:25

sir 56:5 61:24 66:16

Sitcoto 32:11,15

sitting 47:9 50:14
54:7,17

situation 25:3

six 11:14 17:13 21:7
40:21 44:6 50:23

slightly 42:21 43:9

smart 10:3

smoked 29:22

smooth 82:23

sobbing 69:20

socks 50:10

somebody 16:20

someone 10:16 24:18
28:24 33:21 51:14

sometime 9:15 10:19

somewhat 16:16

Somewhere 20:22

son 81:15,25 83:16

sore 26:14 28:23 29:7
61:20 75:3

sorry 26:6 28:15 31:3
47:21 53:14 63:21
67:23 71:24

sort 40:8 42:25 51:3

sound 55:11,13 58:3
75:7

sounded 72:5

South 22:16

speak 4:15,21 11:23
24:22 33:7 37:22
45:16 62:7

speaking 61:22

specifics 58:20

spending 33:25

spent 39:21 79:24

spoke 6:4,9 9:17
11:19,21 13:8 14:15
27:18 48:6

spoken 4:25 11:17
80:22

Sr 13:15 23:17 25:6

ss 85:4 87:4

Stamford 16:11

stamp 32:10

standing
52:8,10,12,14 73:4
75:21 76:15

start 53:10 64:16

started 53:4,8,18
54:11,12,19 55:4
56:25 57:3 58:22
63:15 67:3 68:25
69:19

state 1:21 3:4,8,11
17:4,5 49:2 76:6
85:4 87:4,8

statement 15:5,17
30:16 31:12,13,15
32:4 33:11,14
34:9,18 35:2,22
44:15 78:17 79:17
86:11

statements 14:7,10
15:13

stating 18:14

status 22:22

stayed 70:15,17

staying 16:20,21
22:12,15,19

steel 74:9

sticker 27:5 28:3,4
53:20 54:5

stop 48:3

story 49:8

street 6:25 7:3
12:18,19

stress 48:18 67:11

stuck 24:9

stuff 52:25 66:7
70:3,9,25 73:6

stupid 48:3 66:6

Styrofoam 50:12

Subscribed 85:19
88:22

Suffolk 1:8 2:8
7:9,11,13,14,16
17:12 19:11
20:13,22 82:12 85:5
87:5

suicide 33:22 82:11,22

Suite 2:4

suits 32:22



sun 42:23

sunglasses 42:22

supply 18:23

support 81:25

sure 3:25 6:22
20:20,23 25:25
28:10 35:14 49:6
60:12 65:13 67:2
76:9 80:17 82:12
84:10

surprise 57:25

sweater 50:8 52:22

swirling 68:11

sworn 3:3 85:19 87:12
88:22

system 30:2 55:12

_____ T _____

taking 59:20 79:5

talk 13:17 25:12,23
26:2 30:10 58:18
60:22 66:17 79:11

talked 49:24 58:21
63:14,18

talking 11:6 21:2 26:23
27:3,13,24 33:11
46:6,7,10 51:12
53:5,18 57:2,19
58:3,23 60:19 62:10
64:12 69:2,10,19

tape 15:8,25 37:24
44:25 49:18 60:9
65:8 75:8

temporary 16:14,15

ten 9:17 11:22 20:3,4
23:14 71:21 73:22

term 28:17 42:17

terms 61:16

testified 3:5

testify 36:23

testimony 5:7 85:8,12
87:11,14

Thank 84:13,16

Thanks 7:22

that's 4:14,17 5:10

13:5,6 15:6 19:4
23:16 26:2 27:3
28:11 31:6 34:9 35:8
44:15,22 47:11
49:15 52:21 54:25
56:8 59:15 62:8
69:23 70:4 79:21
83:6,7

themselves 32:23
73:11

there's 4:7 34:12,22
44:17 52:8 74:8

they'd 71:15

they'll 44:24 59:16
65:10 67:17,19,20
69:12 70:14
71:18,19

they're 53:21,24 54:3,6
59:3

THIS____DAY 88:23

threat 62:23

threatening 64:21

thump 67:5 68:6

tied 38:18,19 44:23
70:23

till 17:10

timings 34:12

tinted 43:9

today 3:19 6:7 13:24
30:20 34:19

Todd 7:20

toilet 46:22 48:13
49:14 67:14
68:14,23 75:6

tomorrow 69:13 73:18

tone 46:7 63:19

top 6:15 45:21 46:2
48:17

touch 12:14 83:25

towards 56:3 72:23,24

trace 20:8

track 47:14 49:5

tragic 13:2

train 24:12

transcript 5:7,13
85:8,10 87:13

transfer 80:15

transferred 21:6 22:13
31:21,22 39:16
79:13,14 81:2

transpired 14:14 39:14

trouble 81:10

true 85:10,13 87:13

truth 12:4 13:4

try 73:14 77:16

trying 67:15,18 68:15
69:11 77:9

T-shirt 35:11,18
38:18,19,20 44:23
47:2 50:10 58:7
65:6,21 71:17

Tuckahoe 3:13 31:4

turn 9:2

two-page 30:15 86:11

two-way 43:5

tying 49:9 65:21 70:3,8
72:3,9

typed 82:10,11

_____ U _____

uncle 17:2

understand 4:3 35:14
38:4 60:8 76:5

understanding 7:14
10:12

uniform 60:14

upset 25:19 27:15 47:9
54:9 55:16,17
56:18,19 57:14
69:20

urinate 73:12

_____ V _____

Veterans 1:12 2:9

video 37:24 38:8,9,11

violated 30:3

violation 21:20

violations 22:5

voice 13:16 46:7

voluntarily 40:3,4

_____ W _____

walked 24:21 39:2
45:18 46:25 48:5
50:22 52:23
55:9,21,23 60:18
66:20 76:17 77:12

walking 35:11 74:13

walkway 52:3

wall 44:20 46:17,21
48:9,11 49:11,13
50:21,25 67:6 68:8
75:5

warning 81:10 82:22

wasn't 12:7,24 33:12
35:20 37:3 43:4,5
49:4 54:4 61:21,22
63:19 66:3 72:10
75:16 82:4

watch 36:10 37:6 60:7

watching 48:14

water 67:7 68:12

wearing 36:10 37:6
50:6,10

weed 26:18

week 8:15 9:12 12:19
47:3 80:21

weeks 6:3,13
11:14,15,17 14:3
21:5,7 22:20 24:4

welfare 19:5

we'll 12:10 49:8
56:9,10 62:5

we're 45:13 54:24

wet 48:12 67:8 68:12

whatever 9:24 43:12
53:14 57:15 59:16
66:19 69:8 71:15
73:15 79:6,18 83:9

WHEREOF 87:20

Whereupon 8:3 26:9
30:15 84:11



**whether** 29:7 38:5

**whole** 45:5,20 46:9

**who's** 8:23

**whose** 87:10

**wide** 38:17 40:16
   41:14,24

**willing** 12:12

**window** 74:9

**windows** 79:2

**witness** 1:17 3:2 5:14
   7:2 34:7 42:15 58:12
   84:16 86:4
   87:10,14,20 88:4,20

**woman** 29:13

**women's** 31:23 77:21

**worked** 22:7

**works** 80:19

**write** 15:21

**writing** 15:14,21

**writings** 15:13

**written** 14:7

**wrong** 14:20 42:17
   54:4,16 66:2

**wrote** 14:14 33:10

---
                Y
---

**Yaphank** 11:8,10,12
   19:24 20:11 21:6,17
   81:4

**yell** 59:6

**yelling** 28:9 45:8
   46:10,13 48:19
   54:19,21 55:22,24
   59:7 61:11,22
   63:20,21 64:16 67:2
   73:23 83:16

**yellow** 50:13

**Yonkers** 17:14

**York** 1:12,22 2:5,9
   3:4,14 17:4,5 20:15
   85:4 87:4,8

**you'll** 28:10 30:3 73:25

**yourself** 34:6

**you've** 44:13 61:25

---
                Z
---

**Zwilling** 2:10 3:7,17
   6:20 7:8,18,22,25
   15:6 18:6,17,24 26:7
   30:13 31:10 59:24
   83:24 84:5,9,13 86:5



# EXHIBIT H

In the matter of the ESTATE OF JACK FRANQUI IV AND
SIMON NICHIOLAS AND ANNE EARLE                        AFFIDAVIT

                    -against-

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY POLICE
DEPARTMENT, POLICE OFFICERS JOHN AND JANE DOES 1-10

John Burke, being duly sworn deposes and says under penalty of perjury:

My name is John Burke. On January 23, 2012, I was arrested in Brooklyn N.Y. by
Suffolk County detectives and brought back to the Suffolk County's 7th precinct in
Shirley N.Y. At that time, I was brought to the rear of the precinct and placed in an
area that contained holding cells. That area was in the rear of the precinct down a
hallway to the left, after walking through a doorway. As I was being walked to my
cell, I observed a man now known to me, as Jack Franqui. Jack was sitting quietly
inside cell #1. He was wearing a white t-shirt, blue jeans, and had dark colored hair.
Outside his cell I saw a small pile of clothes. I was placed in cell #3. Before entering
the cell, I was asked to take off my belt and shoes. I specifically remember how cold
it was that day, and especially inside the cell area. There was no heat and you could
see your breath as you spoke. A short time after being placed in my cell, Jack began
speaking to me. Jack was telling me that he was arrested by a female police officer.
Jack informed me that the female officer asked him when he had smoked marijuana
last. Jack said, "It was January 9th." The officer's reply to him was, "Good, it will show
up in your system." Jack went on to say that he had just gotten out of jail recently,
and the police at the time of Jack's arrest were saying that Jack sicked his dog on
them. Jack said that was absolute nonsense, "the dog just ran out of his car". Jack
was getting more and more upset and also told me the police had "roughed him up
and were out to get him". Jack started saying, "I think I'm going to hang up." At that
time I didn't really know what that meant. Jack began screaming at the top of his
lungs, words to affect that: "I need medical assistance", "I need to go to the hospital".
"I need medical attention." Jack was screaming loudly. There was no way the officers
outside the doorway did not hear him. I know this because I could hear small bits of
conversation that the officers where having right outside the door. I'm not sure of
the exact time that had passed, but a substantial time elapsed before a police officer
finally came back to the cell area. The officer asked Jack "what he was going on
about?" Jack informed the officer that he wanted to go to the hospital, and that he
needed medical attention. The officer replied that if Jack went to the hospital, that
they are just going to bring Jack back to the precinct--suggesting they were not going
to take Jack to the hospital. At that point, Jack asked the officer, "Let me speak
to your sergeant." The officer replied, "Ok" but never came back. After a while, once
Jack realized that a supervisor was not coming back to see him, he started yelling
again words to the affect of:, "If you don't get me medical attention, I'm leaving here
in a body bag." I cannot be sure of the number of times that Jack yelled for medical

assistance, but it was continuous and obviously the officers were simply ignoring him.

I cannot stress how cold it was in the holding cell area. It was actually inhumane!! I remember being curled up on a bench, shivering, holding on to a small blanket that was like a piece of cardboard issued to me. Jack asked me for a piece of my blanket, which I gave him. You could see your breath in the air.

After some time, once again Jack started yelling at the top of his lungs words to the affect that: "I need medical assistance. I need medical assistance." At one point Jack started to yell "I'm having chest pains". When his cries for help were ignored, Jack again told me, "I'm just going to hang up." At that point, Jack kept asking me to memorize his dad's phone number over and over and over again. Jack started saying, "When I do this, tell my dad I didn't have drugs on me. I never let my dog out after the police. Please tell my dad Simon knows the real story about what had happened today, and again asked me to repeat his fathers phone number back to him. Which, I did. Jack said, "Tell my father I can't go back to jail." At that point, Jack again started yelling again words to the affect of: "Guard, I need to go to the hospital. I need medical assistance or I am gonna leave here in a body bag ."

I know for a fact there where cameras inside the holding area. The cameras were positioned above the cells and were visible to see. They were facing directly towards the individual cells. At that point, Jack stuck his head in the toilet and started banging his head on the wall and screaming, "I need medical assistance." Then Jack proceeded to tie his t-shirt onto the bars of the cell like a noose. I could see what Jack was doing from one of the camera lens that was facing his cell. At that point, two officers came finally came into the cell area and cut Jack's t-shirt off the bars to prevent him from hanging himself. Approximately one hour went by between the time the first officer came back to the cell area, and these officers came back to cut down Jack's tee shirt from the cell. I thought for sure at that point it was clear Jack was having a mental breakdown and Police would take him to a hospital. But the officers just left the room and refused to help him. I could not believe they did nothing and just left him alone blowing off his pleas for help. I can honestly say that anyone with half a brain would have realized this kid was in trouble.

After they left, Jack started crying and saying, "I can't go back to jail, and saying something about being worried about his dog." Jack again asked me to repeat back his father's phone number. Jack started telling me, "I could have his boat and to please tell his dad that he loved him, and not to let him die in vain." Jack then started to explain to me that when people hang themselves their bowels empty and started to apologize in advance because he was going to hang himself and it was going to smell.  I started to get nervous and told Jack to calm down and please stop talking like that. At that point it got quiet, and I thought Jack might have calmed down or be laying down in his cell, or possibly even fell asleep. A short time later, I heard some rustling. I realized later Jack was tying his pants to the cell. I started to hear a gurgling sound, and ran over to the front of my cell and look to my left and saw

Jack's body handing and twitching. I started to yell, "Jack! Jack!" All I could hear was gurgling and then quiet. I started screaming at the top of my lungs, "Guard! "Guard!" I was frantically pointing at the camera towards Jack's cell. I would estimate five to maybe ten minutes had gone by before anybody even came back to the cell area. I know for a fact, before the officers entered the cell area, they must have seen Jack on the cameras. The reason I say this, is before the officers entered the cell area, I heard one of the officers saying, "Do you have a knife?" Once the officers entered the cell area, I heard one officer say, "Check for a pulse." And I heard another one say," There is none." At that point, I was moved across the hallway to another area of cells that I believe was utilized for females. Eventually detectives came and asked me about the incident. I described in detail, about how Jack was screaming on and off for four to four and a half hours for medical attention and was ignored. The detectives wrote a statement for me and asked me to sign it. At the time I was distraught and I dont recall what they wrote in the statement. I still can't believe that after the first time Jack tied his shirt to the bars and repeatedly asked to go to a hospital over and over again or he would be leaving in a body bag, that officers just ignored him.  He was screaming for hours repeatedly at the top of his lungs. I can't believe that the police allowed this to happen.

After I was released from jail I saw an article in the newspaper. I read that nothing out of the ordinary transpired after Jack's arrest, , that he was calm during the arrest process, and before Jack hung himself, there were no indications that he was susicidal. I was upset by the article and reached out to Jack's father. I did this because I did made a promise to Jack that I would call his dad and wanted to keep that promise. I felt it was the right thing to do. What was reported in the paper appeared to be the exact opposite of the true facts. I was concerned the police going to lied about what happened after I read the article.

 I am certain that had someone taken the time to listen and help Jack he would certainly be alive today. The fact is that many police officers heard Jack's legitimate cries for help and simply ignored him for hours. What happened that day is the exact opposite of what you would expect of police behavior under the existing circumstances. It was shocking that nobody helped this poor kid and it appeared to be intentionally done to make him suffer. I am giving this statement to Private investigator Robert Leake and it is the truth.

Signature                                                              John Burke, Witness

SWORN BEFORE ME WED the 3RD DAY OF July 2013

ROBERT LEAKE
Notary Public, State of New York
Registration #01LE6206017
Qualified in Nassau County
Commission Expires May 4, 2017

# EXHIBIT I

POLICE DEPARTMENT
COUNTY OF SUFFOLK, N.Y.

1 OF 2

I John Burke being duly sworn deposes and says I am 35 years old. I was born on 12/1/77. I live at 89 Porter Ave, Brooklyn.

Today I arrived at the 7th pct. at 2:10 p.m. The detectives put me in a cell some time before 3:00 p.m. I know I was in cell #3. There was a guy in the first cell, and there was an empty cell between us.

I was talking to the guy about How cold it was. He told me his name was Jack. I threw him a piece of my yellow (blanket) jacket.

The guy said he just got out of jail a couple of days ago and he was arrested for some DWI charge. He was saying that the cops knew him and they were out to get him. He said that he couldn't do any more time.

The guy was yelling that he needed medical assistance. He was telling me that he was going to hang himself.

A guard came in and talked to him. The guy told the guard that he needed medical assistance. He told the guard that he wanted to speak to a boss. The guard left but he didn't come back.

The guy was saying that he was going to hang himself. He was telling me to call his father and made me memorize the phone number, 839-0676. (cont. page 2)

SWORN TO BEFORE ME

JAN. 23 2013

ALFRED M. CICCOTTO
NOTARY PUBLIC, STATE OF
NO. 01CI
TERM EXPIRES 3/24/15

PDCS-7129

53-0113::9/96pa

POLICE DEPARTMENT
COUNTY OF SUFFOLK, N.Y.

SWORN STATEMENT OF JOHN BURKE                    2 OF 2

(cont. from page 1) I could see the guys reflection in the black camera cover. He was tying his shirt to the bars. 2 guards came in and took the guys shirt and the blanket.

About 20 minutes or half hour later, I heard the guy said, "that's it." I heard him taking off his pants and I could hear him tying them off. I heard what sounded like his body hitting the bars. I heard his gasping for air. I started yelling for the guards. The guards came about 5 or 10 minutes later.

After before the guy said, "that's it," I heard a loud bang. The guy said he hit his head against the wall. He said that it hurt.

I have read the above statement consisting of two pages taken by Det. Ciccotto here in the 7TH precinct and I swear it is all true.

SWORN TO BEFORE ME

JAN. 23, 2013

ALFRED M. CICCOTTO
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01CI5074751, SUFFOLK COUNTY
TERM EXPIRES 3/24/15

PDCS-7129

53-0113-9/96ss

# EXHIBIT J

History                                                                   search    Searcl



ACON RECORD
■media
oflongisland.com

**FOLLOW TIMES BEACON RECORD**

oard on
d upper

yan girl
)

## Rocky Point man who hung himself had previous run-in with cops

**By Erika Karp**
**write the author**

yan girl
)

oard on



**Join us on Facebook!**
Add Times Beacon Record Ne
to your social network



**Follow us on Twitter!**
Get top TBR News headlines
your feed





**Village Beacon Record**

January 31, 2013 | 09:41 AM

A Rocky Point man who gave police no indication he was a threat to himself committed suicide while in custody at the Seventh Precinct in Shirley on Wednesday, Jan. 23, Suffolk County police report.

Officers say they arrested Jack Franqui, 27, shortly before noon that day and charged him with driving while impaired by drugs, resisting arrest and obstruction of governmental administration. Franqui was then transported to the precinct, where he was to be held overnight for arraignment, they report.

Lt. Jack Fitzpatrick, an officer with the Suffolk County Police Homicide Squad who is investigating the case, said Franqui was held there for about five hours when, at approximately 7 pm, officers discovered Franqui had hung himself in is cell. Franqui was pronounced dead at the scene. Fitzpatrick declined to say what Franqui used to hang himself, but said it was not something already found in the cell.

He added that officers had seen Franqui alive a short time before the incident, but declined to say exactly how much time had passed. When asked if Franqui had given police indication he may attempt to harm himself, Fitzpatrick said, "None at all."

Fitzpatrick added that in December 2011, Franqui was arrested after police who were called found Franqui armed with a handgun and "possibly suicidal." Fitzpatrick alleges that in an altercation with police, Franqui fired the gun.

According to court records, Franqui pleaded guilty to charges including intent to cause physically injury to an officer, menacing a police officer, resisting arrest, criminal possession of a weapon in the second degree, among others. Franqui was sentenced to six months in prison and probation for five years. Earlier this month, Franqui was ruled to have violated his probation.

Fitzpatrick said detectives are still investigating Franqui's death.

Franqui's father, also named Jack Franqui, declined to speak in a telephone call. A woman who answered the phone at the Franquis' home said, "He doesn't have



**Newsday**

# Rocky Point man hangs himself in police custody

January 24, 2013 by TANIA LOPEZ / tania.lopez@newsday.com

A Rocky Point man who killed himself while in police custody Wednesday after being arrested on charges of driving under the influence of drugs showed no signs of being suicidal when he was processed, police said Thursday.

Jack Franqui, 26, was found dead at 7 p.m. in a Seventh Precinct holding cell, where he hanged himself, just over seven hours after his arrest on impaired driving while on drugs, resisting arrest and obstruction, police said.

Lt. Jack Fitzpatrick, commander of the Suffolk police homicide squad, which is investigating the death, said Franqui had been questioned about his mental status and any medications he took and filled out forms used to assess detainees.

"There was no indication he was suicidal," Fitzpatrick said.

However, Fitzpatrick said, about a year ago, Franqui was involved in a call in which he appeared to be "suicidal." Police responded to a report that Franqui had a shotgun, which he did not, but when police arrived, Franqui retrieved a handgun and wrestled with officers before a shot was fired. No one was injured. Fitzpatrick had no additional details.



At the time of his death, Franqui was on probation after pleading guilty last month to a weapons charge.

Franqui's father, also named Jack Franqui, reached by phone last night, was too distraught to talk and declined to comment.

advertisement | advertise on newsday

The state Commission of Correction, which investigates all deaths in police custody, has launched a probe, a spokesman said.

Franqui's arrest on Wednesday came after police received a 911 call of a suspicious vehicle parked in the vicinity of Cordwood Path in Shoreham, Fitzpatrick said. An officer responding to the call told investigators she spotted Franqui sitting alone in the vehicle and smelled the odor of marijuana coming from the car.

She asked Franqui to step out of the vehicle, he said, but instead Franqui opened the driver's side of the Cadillac, revealing a dog. "He has a Doberman in the car and he said 'get her.' She's so alert, she slams the door back closed," Fitzpatrick said.

The officer called for backup and Franqui was arrested after a scuffle, he said.



**Ahead**

that fits your life

onalized

perience that's flexible, practical and affordable.
een, where you are and where you want to go.

r to connect your past experience to your future
ign a degree program and identify work and life
you college credit so you can finish sooner.

the next term.

visit www.esc.edu





Day!

al
er

February 18th

age
sized
ay
ens/

ord}

# OUR TOWNS

# Suicide in a jail cell

BY TANIA LOPEZ
tania.lopez@newsday.com

A Rocky Point man who killed himself while in police custody Wednesday after being arrested on charges of driving under the influence of drugs showed no signs of being suicidal when he was processed, police said yesterday.

Jack Franqui, 26, was found dead at 7 p.m. in a Seventh Precinct holding cell, where he hanged himself, just over seven hours after his arrest on impaired driving while on drugs, resisting arrest and obstruction, police said.

Lt. Jack Fitzpatrick, commander of the Suffolk police homicide squad, which is investigating the death, said Franqui had been que___ ___d about his mental status and any medications he took and filled out forms used to assess detainees.

"There was no indication he was suicidal," Fitzpatrick said.

However, Fitzpatrick said, about a year ago, Franqui was involved in a call in which he appeared to be "suicidal." Police responded to a report that Franqui had a shotgun, which he did not, but when police arrived, Franqui retrieved a handgun and wrestled with officers before a shot was fired. No one was in-

jured. Fitzpatrick had no additional details.

At the time of his death, Franqui was on probation after pleading guilty last month to a weapons charge.

Franqui's father, also named Jack Franqui, reached by phone last night, was too distraught to talk and declined to comment.

The state Commission of Correction, which investigates all deaths in police custody, has launched a probe, a spokesman said.

Franqui's arrest on Wednesday came after police received a 911 call of a suspicious vehicle parked in the vicinity of Cordwood Path in Shoreham, Fitzpatrick said. An officer responding to the call told investigators she spotted Franqui sitting alone in the vehicle and smelled the odor of marijuana coming from the car.

She asked Franqui to step out of the vehicle, he said, but instead Franqui opened the driver's side of the Cadillac, revealing a dog. "He has a Doberman in the car and he said 'get her.' She's so alert, she slams the door back closed," Fitzpatrick said.

The officer called for backup and Franqui was arrested after a scuffle, he said.

## CRIME&courts

### ROCKVILLE CENTRE

**Pedestrian, 84, fatally struck**

An 84-year-old man walking across Merrick Road in Rockville Centre in a crosswalk yesterday was struck and killed by a tractor trailer, Nassau County police said.

Police said the victim, Juan Galdos of Rockville Centre, was pronounced dead at the scene.

The accident occurred about 11:45 a.m., and police closed Merrick Road in both directions between Cumberland Street and North Long Beach Road for nearly four hours to investigate.

Detectives said the victim was crossing Merrick Road from north to south in a marked crosswalk at Oceanside Road when he was hit by a 2003 Peterbilt tractor trailer driven by a 59-year-old man.

The tractor trailer was eastbound in the right lane of Merrick Road at Oceanside Road when it struck Galdos, police said. Detectives said there appears to be no criminality. — GARY DYMSKI

### KINGS PARK

**GET THE LATEST AT
newsday.com/crime**

USE OUR INTERACTIVE
CRIME MAP

GET CRIME ALERTS
FROM YOUR COMMUNITY

Responding to an unrelated call in the Kings Plaza parking lot, 66 Indian Head Rd., Fourth Precinct Officer Thomas Spica spotted the man at 12:06 a.m., passed out in the driver's seat of a vehicle with its engine running, police said. The man had a hypodermic needle in his lap, police said.

Officers Douglas Nassisi, Patricia Davis and Kenneth Kaufold also responded, and a dose of intranasal Narcan was administered, as well as rescue breathing, police said.

Another dose of Narcan was administered when Kings Park Rescue members arrived and took the man to St. Catherine of Siena Medical Center in Smithtown. There, a third dose was administered

Case 2:13-cv-05943-JS-SIL   Document 1   Filed 10/29/13   Page 167 of 172 PageID #: 167



TurboTax ✔
The power to keep
what's yours.™

Personalized for you, to keep more of
your hard-earned money.

START NOW

Editor **Rich Arleo** rich.arleo@patch.com          Like 1k  **Patch Newsletter**   **Nearby**   **Join**  **Sign In**



MillerPlace-RockyPointPatch.    24°


Drive more local traffic
to your dealership.
ADVERTISE NOW ▸  Patch

| **Home** | **News** | **Events** | **Directory** | **Pics & Clips** | **Commute** | **Real Estate** | **More Stuff** |

**Police & Fire**

# Cops: Man Who Hanged Himself in Custody Didn't Seem Suicidal

**Investigation remains ongoing into Wednesday evening suicide at Seventh Precinct.**

By **Joseph Pinciaro**  **Email the author**  January 25, 2013

Recommend 5   Tweet 1        **Email**      **Print**       **14 Comments**

Related Topics: **Seventh Precinct**, **Suffolk County Police**, and **Suicide**

Police said on Friday that a **Rocky Point man who hanged himself in police custody** less than 48 hours earlier had not shown prior signs of suicide during his arrest and processing, but on the contrary, appeared at ease with police officers after previously resisting arrest in a Shoreham neighborhood.

"After the altercation, the officers' entire interaction with him was calm," said Lt. Jack Fitzpatrick commander of the Suffolk Police homicide squad, which is conducting an investigation into the death.

Fitzpatrick noted that the Rocky Point man, 27-year-old Jack Franqui, had previous run-ins with the law.

In December of 2011, Suffolk Police were called to Franqui's home at the time after reports of a man waving a shotgun outside, Fitzpatrick said. Upon police arrival, Franqui did not have a shotgun, but later reportedly pulled a handgun on police, resulting in a wrestling match that ended up with a gunshot firing into the cieling of the home.

He was later evaluated at Mather Hospital, and at the time of Wednesday's incident, did not have a license to drive.

According to Fitzpatrick, on Wednesday, police received a report of a suspicious vehicle on Cordwood Path in Shoreham, an area that has seen a few burglaries recently.

The responding officer smelled marijuana in the car upon approaching and after asking Franqui to get out, he reportedly told a Doberman Pinscher in the car to 'get her,' referring to the female cop.

She slammed the door before the dog could get out, Fitzpatrick said, and after a brief scuffle, Franqui was brought to Seventh Precinct headquarters in Shirley, where he was later lodged in a cell alone.

While video cameras monitor holding cells, Fitzpatrick was unsure how a prisoner was able to have the time to fashion a noose and hang himself.

"That's part of the investigation," he said.

Email me updates about this story.      Enter your email address      Keep me posted

Recommend 5    Tweet 1       **Email**       **Print**

# EXHIBIT K

# Surrogate's Court of the County of Suffolk

On the Date Written Below LETTERS OF ADMINISTRATION were granted by the Surrogate's Court of Suffolk County, New York as follows:

**File #: 2013-3311**

Name of Decedent: **Jack Franqui IV**          Date of Death: 01-23-2013

Domicile: **County of Suffolk**

Type of Letters Issued: **LETTERS OF ADMINISTRATION**

Fiduciary Appointed: **Joaquin Franqui**

**Limitations:**
**That as to the cause of action for wrongful death set forth in the petition, the authority of the fiduciary is limited and restricted to prosecution and settlement thereof, and the defense of any claim or actions arising therefrom. Except as provided under EPTL 5-4.6, the fiduciary as well as any attorneys who represents them, are restricted and prohibited from receiving or distributing any money resulting therefrom, without further order of this court.**

THESE LETTERS, granted pursuant to a decree entered by the court, authorize and empower the above-named fiduciary or fiduciaries to perform all acts requisite to the proper administration and disposition of the estate/trust of the Decedent in accordance with the decree and the laws of New York State, subject to the limitations and restrictions, if any, as set forth above.

Dated:  September 9, 2013

IN TESTIMONY WHEREOF,  the seal of the Suffolk County Surrogate's Court has been affixed.

WITNESS, Hon John M Czygier Jr, Judge of the Suffolk County Surrogate's Court

*Michael Cipollino*

————————————————————————

Michael Cipollino, Chief Clerk

*These Letters are Not Valid Without the Raised Seal of the Suffolk County Surrogate's Court*

Certificate# 78751

# Surrogate's Court of the State of New York
## Suffolk County

File#: 2013-3311

## Certificate of Appointment of Administrator

IT IS HEREBY CERTIFIED that Letters for the Estate of the Decedent named below have been granted by this Court, and such Letters are unrevoked, are valid and are in full force as of this date.

**Name of Decedent:** Jack Franqui IV

**Date of Death:** January 23, 2013

**Domicile:** County of Suffolk

**Fiduciary Appointed:** Joaquin Franqui

**Letters Issued:** LETTERS OF ADMINISTRATION

**Letters Issued On:** September 9, 2013

**Limitations:**
That as to the cause of action for wrongful death as set forth in the petition, the authority of the fiduciary is limited and restricted to prosecution and settlement thereof, and the defense of any claim or actions arising therefrom. Except as provided under EPTL 5-4.6, the fiduciary, as well as any attorneys who represents them, are restricted and prohibited from receiving or distributing any money resulting therefrom, without further order of this court.

THESE LETTERS, granted pursuant to a decree entered by the court, authorize and empower the above-named fiduciary or fiduciaries to perform all acts requisite to the proper administration and disposition of the estate/trust of the Decedent in accordance with the decree and the laws of New York State, subject to the limitations and restrictions, if any, as set forth above.

and such Letters are unrevoked and in full force as of this date.

**Dated: September 9, 2013**
**Riverhead, New York**

IN TESTIMONY WHEREOF, the seal of the Suffolk County Surrogate's Court has been affixed.

WITNESS, Honorable John M Czygier Jr, Judge of the Suffolk County Surrogate's Court.

*Michael Cipollino*

Michael Cipollino, Chief Clerk
Suffolk County Surrogate's Court

*This Certificate is Not Valid Without the Raised Seal of the Suffolk County Surrogate's Court*

# EXHIBIT L

*The Branch*

FUNERAL HOME
551 Route 25A Miller Place, NY 11764
631.744.9700

The Branch Funeral Home
is owned and operated by
The Vigilante Family

Number   13003M-3

Date of Death   January 23, 2013

Name of Deceased   Jack Franqui, IV

Date   January 24, 2013   Place of Death   Shirley

## ITEMIZATION OF FUNERAL SERVICES AND MERCHANDISE SELECTED

The following are the charges for the services, merchandise and items you have selected. You will not be charged for any item you do not choose unless it is necessary because of other selections you have made. Any such charges are explained below.
(Indicate N/A for items of service and/or merchandise that are not provided.)

**I.   FUNERAL HOME CHARGES**

A.   Alternative Services
1.   Direct Cremation .................... N/A
2.   Direct Burial ........................ N/A

B.   Transfer of remains to funeral establishment including personnel, equipment and vehicle .......... $585.00

C.   Preparation of Remains
1.   Embalming (including use of preparation room) If you select a funeral for which this firm requires embalming, such as a funeral with viewing, you may have to pay for embalming. You do not have to pay for embalming if you do not approve if you select arrangements such as direct cremation or direct burial. If we charge for embalming, we will explain why below. .......... $1,095.00

2.   Other Preparation (including use of preparation room but excluding embalming)
a.   Topical Disinfection ................ N/A
b.   Custodial Care ..................... $275.00
c.   Dressing/Casketing ................. $95.00
d.   Cosmetology ........................ N/A
e.   Restoration ........................ N/A
f.   ................................... N/A

D.   Arrangements
Basic arrangements: including funeral director, other staff, equipment and facilities to respond to initial request for service, the arrangement conference, securing of necessary authorizations and coordination of service plans with parties involved in the final disposition of the deceased. .......... $1,890.00

E.   Supervision (funeral director and staff)
1.   Supervision for visitation ......... $375.00
2.   Supervision for funeral service .... $475.00
3.   Supervision for graveside service .. N/A
4.   ................................... N/A

F.   Use of the facilities
1.   Use of the facilities for visitation ... $1,510.00
2.   Use of facilities for funeral service ... N/A

G.   Livery
1.   a.   Hearse or ..................... $495.00
     (Specify Type:)
     b.   Alternative vehicle .......... N/A
2.   Flower vehicle ..................... N/A
3.   Limousine(s) ....................... N/A
     (Specify number:___@___/limousine)
4.   Passenger car(s) ................... N/A
     (Specify number:___@___/limousine)
5.   ................................... N/A

H.   Merchandise
1.   Casket or alternative container .... $1,200.00
     (Describe and show price)
     a.   Supplier:   Mibo
     b.   Model name or number:   Duvalin Rental
     c.   Interior:   Oak
     d.   Material:   Crepe

2.   Outer Interment Receptacle ......... N/A
     (Describe and show price)
     a.   Supplier:
     b.   Model name or number:
     c.   Material:

3.   Additional Merchandise & Services Selected
1.   Memorial Cards ..................... N/A
2.   Acknowledgment Cards ............... N/A
3.   Memorial Package ................... N/A
4.   Urn ................................ $375.00
5.   Flowers ............................ $295.00
6.   Video Tribute ...................... $150.00
7.   Clothing ........................... $150.00
8.   ................................... N/A
9.   ................................... N/A
10.  ................................... N/A
11.  ................................... N/A

**TOTAL FUNERAL HOME CHARGES ........ $8,965.00**

I.   Limited Services
1.   Forwarding remains to .............. N/A
2.   Receiving remains from ............. N/A

---

**II.   CASH ADVANCES**

The sums are estimated charges for goods or services that will be paid to others. We will charge you no more for these items than is actually paid by third parties. (Describe and show estimated charges)

1.   Cemetery/Crematory Charges ......... $543.00
2.   Clergy Honoraria ................... $250.00
3.   Death Certificate Transcripts ...... $30.00
4.   Gratuities ......................... N/A
5.   ME Cremation Clearance ............. N/A
6.   Monument Permit Fee ................ N/A
7.   Monument Foundation ................ N/A
8.   ................................... N/A
9.   ................................... N/A
10.  ................................... N/A
11.  ................................... N/A

**III.   ESTIMATED TOTAL OF CASH ADVANCES**
1.   Funeral Home Charges ............... $8,965.00
2.   Cash Advances ...................... $823.00

**TOTAL FUNERAL CHARGES**

**IV.   EXPLANATION OF CHARGES**

Explain charges for embalming and for any items that are not required by law or not required for cremation or other protective requirements, or cemetery requirements, cremation requirements or other selections made.

_____
_____

### ACKNOWLEDGEMENT OF RECEIPT
I have received this itemization of funeral services and merchandise selected.

X _[signature]_

Signature   Date   January 24, 2013

_[signature]_
Signature of Licensed Funeral Director   Date   January 24, 2013

John H. Vigilante
Printed or Typed Name of Funeral Director

### PUBLIC NOTICE
The New York State Department of Health is responsible for licensing and regulating New York State funeral directing under Public Health Law. You may contact the department at:

Bureau of Funeral Directing, New York State Department of Health
Hedley Park, 6th Floor, 433 River Street, Troy, New York 12180

**EXCLUSION OF WARRANTY.** The only warranties, express or implied, granted in connection with the goods sold with this funeral service are the express written warranties, if any, extended by the manufacturers thereof. No other warranties are extended by the seller hereof. **We hereby expressly disclaim all warranties of merchantability or fitness for a particular purpose and are extended by the**

---

## STATEMENT OF FUNERAL GOODS AND SERVICES SELECTED

INVOICE TO:   Joaquin Franqui
83 Magnolia Dr
Rocky Point, NY 11778

The undersigned hereby authorizes the above funeral establishment or its representatives to obtain custody of the remains of Jack Franqui, IV

Initial and state your relation to the deceased ☐JF   ☑ father

The undersigned hereby authorizes the above funeral establishment or its representatives to ☑ embalm   ☐ not to embalm the remains of Jack Franqui, IV

Initial and state your relation to the deceased ☐JF   ☑ father

"Charges are for those items that are used. If we are required by law to use any item, we will explain the reasons in writing below."

**TOTAL FUNERAL CHARGES   $9,788.00**

Date   January 24, 2013

The foregoing statement has been read by (to) me and I hereby acknowledge receipt of a copy of same and agree to pay the above funeral account and for such additional services and materials as are ordered by me, on or before _____. I agree that this account is due and payable in accordance with the terms of this agreement, and undersigned hereby agrees to pay any and all costs and attorney's fees incurred in connection with the collection of this account.

Prior to the discussion of these funeral arrangements, I was presented with a copy of this funeral firm's "General Price List" for which I hereby acknowledge receipt, and have had the opportunity to review the items listed. Casket Price List and Outer Interment Receptacle Price List made available.

The liability hereby assumed is in addition to the liability imposed by law upon the estate and heirs, and shall not constitute a release thereof.

TERMS: This account becomes due _January 28, 2013_. If bill remains unpaid beyond _January 28, 2013_ a late charge of 1.5_ % per month (annual rate _18_ %) may be added to the unpaid portion of the balance due.

By _[signature]_
Relation to _Deceased_

_[signature]_
Signature

Relation to Deceased   father

**ADDITIONS OR ALTERATIONS OF SERVICES AND MERCHANDISE SELECTED.** The following changes represent items of service and/or merchandise ordered or altered subsequent to the original funeral agreement.

**AUTHORIZATION INITIAL**

By _[signature]_
Print Name of Licensed Funeral Director

_[signature]_

Total Adjustments to Funeral Charges   $   $2,013.00

**ADJUSTED TOTAL**   $7,775.00

**CREDIT**   $0.00

**BALANCE DUE**   $7,775.00