UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------------------------------X
JOAQUIN FRANQUI III, administrator of THE ESTATE
OF JACK FRANQUI IV, SIMON EARL, NICHOLAS                    CV-13-5943
EARL, AND ANNE EARL,                                        (JS)(SIL)

                              **Plaintiffs,**

                 **-against-**                                   **AMENDED**
                                          **COMPLAINT**

THE COUNTY OF SUFFOLK, SUFFOLK COUNTY
POLICE DEPARTMENT, PO KAREN GRENIA, CAPT.
ALEXANDER CRAWFORD, PO NICHOLAS ROBBINS,
PO JANINE LESIEWICZ, PO JAMES V. RIOS,
SGT. KEVIN E. O'REILLY, PO JOSEPH SIMEONE,
PO GEORGE OLIVA, LT. JOHN McHUGH, PO JOHN
BORESHESKY, SGT. JOHN J. DOYLE, PO BRANDI
MCLOUGHLIN, PO LORRAINE ZALESKI, PO DAVID
SAMARTINO, PO BRIAN KLAMMER, AND POLICE
OFFICERS JOHN AND JANE DOES 1-5.

                              **Defendants.**
--------------------------------------------------------------------------------X

        Plaintiffs, JOAQUIN FRANQUI III, Administrator of the Estate of JACK FRANQUI IV,
SIMON EARL, NICHOLAS EARL, AND ANNE EARL by and through their attorneys, THE
LAW OFFICE OF ANTHONY M. GRANDINETTE, state as follows:


## NATURE OF THE ACTION

  1.    This action arises from, among other claims, Suffolk County Police Department
personnel's unlawful arrest, search, seizure, and the fabrication of evidence and denial of due
process rights of JACK FRANQUI IV, their subsequent malicious and shameful physical abuse
of JACK FRANQUI IV during that process, including the excessive use of both physical force
and the unwarranted threatened use of deadly physical force, their subsequent deliberate
indifference to his health, safety, and welfare, their failure to provide adequate medical care,
their deliberate indifference in the proper supervision of  JACK FRANQUI IV while in police
custody, and their subsequent fabrication of documents to cover up their unlawful actions. As a
proximate cause of their actions, and inaction where an affirmative duty to act was required,
JACK FRANQUI IV died by hanging, while surrounded by countless law enforcement personnel
in a Seventh Precinct cell, at the tender age of 26.

  2.    This action arises from, among other claims, Suffolk County Police Department
personnel's violation of the rights and liberties and due process of law guaranteed to SIMON

1

EARL, NICHOLAS EARL, and ANNE EARL by the United States and New York State Constitutions and laws, including the right to be free from the unjustified threatened use of deadly physical force, unlawful seizure, unlawful search, false imprisonment, unnecessary destruction of property, the subsequent harassment and intimidation of SIMON EARL, NICHOLAS EARL, and ANNE EARL by Suffolk County police officers after the death of SIMON's friend JACK FRANQUI IV who died in police custody several hours after being arrested, and the subsequent conspiracy by the Suffolk County police officers to cover up their unlawful actions.

3.    This action seeks compensation for the unconstitutional and tortious conduct by Suffolk County police officers and their supervisors who were the proximate cause of JACK FRANQUI IV's death and needless suffering the day he was entrusted to their care; the actions by the officers who unlawfully arrested and physically abused JACK FRANQUI IV, the actions by the officers who failed to provide JACK FRANQUI IV with adequate medical care and proper supervision, the actions by the officers who ignored JACK FRANQUI IV's repeated pleas for medical assistance, his threats to end his life if he did not receive medical treatment, which went unjustifiably ignored for hours, and the subsequent acts by the officers who lied about the events that occurred that day and fabricated evidence to conceal their unlawful conduct, all in an effort to avoid criminal, civil, and administrative sanctions.

4.    This actions seeks compensation for the unconstitutional and tortious conduct by Suffolk County police officers; the actions by the officers who unlawfully threatened SIMON EARL with deadly physical force and subsequently seized and searched him, the actions by the officers who unlawfully entered and searched SIMON EARL, NICHOLAS EARL, and ANNE EARL's home, the actions by the officers who continuously harassed and intimated SIMON EARL, NICHOLAS EARL, and ANNE EARL over the course of several months and intentionally inflicted upon them severe emotional distress, the actions by the officers who unlawfully stopped SIMON and questioned him regarding his now-deceased friend JACK FRANQUI IV, and the subsequent acts by the officers who lied about the events that occurred and fabricated evidence to conceal their unlawful conduct, all in an effort to avoid criminal, civil, and administrative sanctions.

## JURISDICTION

5.    This action is brought pursuant to 42 U.S.C. §§ 1983 and 1988, the First, Fourth, and Fourteenth Amendments to the United States Constitution, Due Process, and the Constitution and laws of the State of New York.

6.    Jurisdiction is founded upon 28 U.S.C. §§ 1331, 1343, and 2202.

7.    Plaintiffs further invokes the supplemental jurisdiction of this Court to adjudicate pendant state law claims pursuant to 28 U.S.C. § 1367.

8.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b).

2

## PARTIES

9.    JOAQUIN FRANQUI III ("JACK JR."), father of JACK FRANQUI IV, is a resident of Suffolk County.

10.    Plaintiff, JACK SR., as Administrator of the Estate of JACK FRANQUI IV ("JACK SR."), seeks relief on behalf of the Estate of JACK JR.

11.    Plaintiff SIMON EARL ("SIMON") is a resident of Suffolk County.

12.    Plaintiff NICHOLAS EARL ("NICK") is a resident of Suffolk County.

13.    Plaintiff ANNE EARL ("ANNE") is a resident of Suffolk County.

14.    Defendant County of Suffolk ("Suffolk County") is a county within the State of New York and the public employer of the Suffolk County Police Department, individually named police officers, and police officers John and Jane Does 1-10 named as defendants in this action.

15.    Defendant Suffolk County Police Department is a County agency, organized under and existing and operating by virtue of the laws of the State of New York and the County of Suffolk.

16.    Defendant Police Officer Karen Grenia ("GRENIA") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. GRENIA is being sued in her official and individual capacity.

17.    Defendant Lieutenant Alexander Crawford ("CRAWFORD") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. CRAWFORD is being sued in his official and individual capacity.

18.    Defendant Police Officer Nicholas Robbins ("ROBBINS") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. ROBBINS is being sued in his official and individual capacity.

19.    Defendant Police Officer Janine Lesiewicz ("LESIEWICZ") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. LESIEWICZ is being sued in her official and individual capacity.

20.    Defendant Police Officer James V. Rios ("RIOS") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. RIOS is being sued in his official and individual capacity.

21.    Defendant Sergeant Kevin E. O'Reilly ("O'REILLY") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. O'REILLY is being sued in his official and individual capacity.

22.    Defendant Police Officer Joseph Simeone ("SIMEONE") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. SIMEONE is being sued in his official and individual capacity.

23.    Defendant Police Officer George Oliva ("OLIVA") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. OLIVA is being sued in his official and individual capacity.

24.    Defendant Lieutenant John McHugh ("McHUGH") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. McHUGH is being sued in his official and individual capacity.

25.    Defendant Police Officer John Boreshesky ("BORESHESKY") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. BORESHESKY is being sued in his official and individual capacity.

26.    Defendant Sergeant John J. Doyle ("DOYLE") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. DOYLE is being sued in his official and individual capacity.

27.    Defendant Police Officer Brandi McLoughlin ("McLOUGHLIN") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. McLOUGHLIN is being sued in her official and individual capacity.

28.    Defendant Police Officer Lorraine Zaleski ("ZALESKI") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. ZALESKI is being sued in her official and individual capacity.

29.    Defendant Police Officer David Samartino ("SAMARTINO") was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. SAMARTINO is being sued in his official and individual capacity.

30.    Defendant Police Officer Brian Klammer ("KLAMMER"), was at all relevant times an employee of Defendants Suffolk County and Suffolk County Police Department. KLAMMER is being sued in his official and individual capacity.

31.    Defendants Suffolk County Police Department personnel ("JOHN DOE[S]") include police officers, sergeants, and lieutenants, whether on or off duty on January 23, 2013, whose identities are not yet known to Plaintiffs at this time but are known to Defendants, and who were present at or near 6 Cordwood Path and/or at the SCPD Seventh Precinct at relevant times as alleged in this Amended Complaint. Defendant JOHN DOE[S] are being sued in their official and individual capacities.

## NOTICE OF CLAIM

32.   Plaintiffs filed timely Notices of Claims against the County of Suffolk and the Suffolk County Police Department in compliance with General Municipal Law § 50. *See* Exhibits A and B annexed hereto.

33.   At least thirty days have elapsed since the service of said Notices of Claims and Suffolk County has neglected or refused to adjust or pay the claims.

34.   GML § 50-h examinations of JACK SR. SIMON, NICK, and JOHN BURKE ("BURKE"), an eye witness to the events in the Seventh Precinct, were held in advance of commencing this action.

35.   This action has been commenced within one year and ninety days after the happening of the events upon which these claims arise.

## FACTUAL AND GENERAL ALLEGATIONS

### UNLAWFUL POLICE CONDUCT AT 6 CORDWOOD PATH

36.   On January 23, 2013, at approximately 10:30 a.m., JACK JR., age 26, called his friend SIMON informing him that he would like to stop by SIMON's house in order to show SIMON the new car he had just purchased; a 1972 yellow Cadillac El Dorado.

37.   SIMON resides with his parents, NICK and ANNE, at 6 Cordwood Path, Shoreham, New York. 6 Cordwood Path is in a residential neighborhood in Shoreham, New York, called Sound View Acres, which is located in Suffolk County.

38.   JACK JR. had never been to SIMON's house, and therefore SIMON gave JACK JR. directions on how to get there. At approximately 10:45 am, SIMON went outside his house to meet JACK JR.

39.   SIMON began walking down Cordwood Path, toward the intersection of Cordwood Path and Southgate, the direction from which he expected JACK JR. to be coming from. SIMON noticed the yellow Cadillac El Dorado slowly pass the intersection of Cordwood Path and Southgate, and continue heading down Southgate, unsure of where to go.

40.   SIMON increased his pace down Cordwood Path, and when he reached the intersection of Cordwood Path and Southgate, JACK JR. finally noticed SIMON and stopped his car on Southgate, near the intersection of Southgate and North Country Road. SIMON entered JACK JR.'s car, and the car then circled the block to return to SIMON's home. JACK JR. parked his car legally, parallel to the curb, directly in front of SIMON's home, 6 Cordwood Path.

41.    At approximately 11:00 a.m., JACK JR. and SIMON were talking and socializing in a peaceful manner and for lawful purpose directly in front of SIMON's home. Excited about his new purchase, JACK JR., while seated in the car, popped the hood to show SIMON the engine; typical behavior young men have engaged in since the invention of motor vehicles. It was a beautiful winter day, and the two friends were enjoying each other's company.

42.    At approximately 11:12 am, a report of a suspicious vehicle was dispatched over the police radio transmissions.

43.    Nothing under these factual circumstances provided reasonable cause to believe that either JACK JR. or SIMON had committed a crime, or were about to commit a crime. Additionally, no warrant had been issued for either young man's arrest.

44.    Notwithstanding the foregoing, while SIMON was standing in front of his home, in broad daylight, looking under the hood of his friend's car, he observed a marked Suffolk County radio motor patrol vehicle ("RMP") traveling in his direction on Cordwood Path. The RMP accelerated, stopping abruptly at a 45 degree angle in the roadway in front of SIMON's home.

45.    GRENIA was operating the RMP, without a partner.

46.    After parking her vehicle at a 45 degree angle blocking the roadway, GRENIA existed her vehicle with her gun drawn. Prior to making any inquiry of either JACK JR. or SIMON, GRENIA pointed her gun at SIMON, threatening him at gunpoint, shouting out orders for SIMON to get on his knees, get down on the ground, raise his arms, and not move.

47.    SIMON complied, kneeling in the street directly in front of his home, with his hands in the air, in broad daylight, and in response to his attempts to orally communicate, was yelled at by GRENIA to shut up and not move.

48.    With SIMON kneeling on the street, arms raised in the air, GRENIA turned her weapon upon JACK JR., who was seated in the driver's seat of his yellow Cadillac. GRENIA began screaming at JACK JR., shouting inconsistent orders at him to get out of the car, and for him to place his hands on the steering wheel where she could she them, not to move, or otherwise she would shoot him.

49.    GRENIA's response to a "suspicious vehicle" may have warranted her approach and reasonable inquiry for license, registration, and the purpose of JACK JR. and SIMON's presence in the area. Even assuming that GRENIA mistakenly perceived a potential crime in progress or a dangerous situation afoot, she could have easily called for and waited on backup to arrive to avoid creating an unnecessarily dangerous and hostile situation.

50.    Under the existing circumstances, GRENIA's conduct, specifically her threatened use of deadly physical force against JACK JR. and SIMON, was objectively unreasonable, unjustified, contrary to proper police protocol and procedure, unconstitutional, and created an unnecessary risk to the health, safety, and welfare of those involved.

51.     Shortly thereafter, other marked and unmarked police vehicles pulled up in front of the EARL home. ROBBINS, LESIEWICZ, and RIOS arrived several minutes after GRENIA, followed by CRAWFORD, Sgt. William J. Ginley, Sgt. Robert S. Strehle, Sgt. William Kerensky, and Unit 773 whose identity is not yet known to Plaintiffs, shortly thereafter. Additional SCPD personnel responded as well. According to GRENIA's deposition testimony, approximately 15-20 SCPD personnel responded to 6 Cordwood Path on January 23, 2013.

52.     JACK JR. yelled out to GRENIA and the other defendants who were quickly surrounding him, which includes LESIEWICZ, RIOS, CRAWFORD, and JOHN DOES, that he had no intention of resisting and that they should not shoot him or his dog, a miniature Doberman Pinscher, *see* Exhibit C annexed hereto, that was in the car with him.

### Defendants Unlawfully Seized and Searched SIMON

53.     ROBBINS and JOHN DOES unlawfully handcuffed SIMON, without having reasonable suspicion, probable cause, or an arrest warrant authorizing them to do so.

54.     ROBBINS and JOHN DOES then unlawfully searched SIMON's person and emptied his pockets thereby seizing its contents, without having obtained a warrant or consent to do so, and despite the fact that no exception to the Fourth Amendment's warrant requirement existed under the circumstances, and placed the contents of SIMON's pockets on the roof of a marked police vehicle.

55.     Defendants did not recover any drugs, drug paraphernalia, or weapons from SIMON's person after they unlawfully searched him.

56.     ROBBINS, GRENIA, and JOHN DOES questioned SIMON, despite the fact that they neither informed him of his Miranda rights nor obtained a waiver of those rights, demanding to know "where are the drugs?!" and "where are the weapons?!" In response, SIMON told the defendants that there were no drugs or weapons, either on his person or in his possession. Despite SIMON's repeated attempts to tell the defendants that there were no drugs or weapons, and that he and his friend were socializing in front of his own home, his responses were ignored by police who threatened to strip-search SIMON right then and there, on the street in front of his own home, in broad daylight, if he did not tell them where the drugs and weapons they claimed he possessed, were located.

57.     By their conduct and verbal threats to strip-search SIMON right then and there, on the street in front of his own home, in broad daylight, the defendants placed SIMON in fear of harmful and offensive contact.

58.     By repeatedly demanding to know "where are the drugs?!" and "where are the weapons?!" particularly where SIMON repeatedly denied possessing drugs or weapons, the defendants made oral defamatory statements regarding SIMON—that he possessed illegal drugs and weapons.

59.    ROBBINS, GRENIA, and JOHN DOES falsely accused SIMON of possessing illegal drugs and weapons. Indeed, SIMON was ultimately released from police custody without being charged with any crime, and the defendants' unlawful searches of SIMON's person, home, and car on that day, and of JACK JR.'s car the next day, did not turn up any drugs, drug paraphernalia, or weapons.

60.    Defendants repeatedly made these false defamatory statements in the presence of each other, thereby publishing the false oral defamatory statements regarding SIMON.

61.    Defendants accused SIMON of possessing illegal drugs and weapons, thereby imputing upon him criminal conduct which constitutes an indictable offense. Therefore, the defendants caused injury to SIMON and their statements constitute slander per se.

62.    SIMON, still in handcuffs and not free to leave, in utter disbelief of what was happening, was then placed in the back of a marked police vehicle by ROBBINS and JOHN DOES, which was parked just a few feet behind JACK JR.'s yellow Cadillac.

63.    Defendants intended to confine SIMON when they handcuffed him and placed him in the back of a marked police vehicle. Defendants unlawfully confined SIMON because they did not have reasonable suspicion or probable cause to believe that SIMON had committed, or was about to commit a crime. Indeed, Defendants did not charge SIMON with violating any crime, nor did they issue him any citation. SIMON did not consent to being confined by defendants, and he was conscious of the confinement.

**Defendants Unlawfully Seized and Searched JACK JR.**

64.    GRENIA continued to act irrationally under the circumstances, violated proper police protocol and procedure, and continued to display excessive use of non-deadly physical force by brandishing her gun at JACK JR., and screaming at and giving conflicting orders to JACK JR.

65.    While GRENIA continued to brandish her weapon at JACK JR., LESIEWICZ entered JACK JR.'s car and restrained and seized JACK JR.'s dog, which was in the back seat of the car.

66.    In fear for his health, safety, and welfare, and in an attempt to fully comply with GRENIA's orders, JACK JR. opened his car door to exit his vehicle.

67.    Notwithstanding the fact that JACK JR. was in complete compliance with the police directives and had made no effort to resist or engage in any hostile behavior, either verbally or physically, while GRENIA continued to point her gun at JACK JR. and threaten him with deadly physical force, CRAWFORD, acting with malicious intent, pulled JACK JR. from his car and threw him to the pavement, on his stomach. CRAWFORD, RIOS, and JOHN DOES then beat and struck JACK JR. over various parts of his body, despite the fact that he was lying prone on the ground and not resisting. These acts were in violation of police policy and procedure, unlawful, excessive and unnecessary, and caused JACK JR. unnecessary and unwarranted physical pain and extreme mental anguish.

68.    CRAWFORD then pressed his knee down on JACK JR.'s back and held him down on the pavement using his body weight as JACK JR. lay injured on the ground, and RIOS subsequently assisted CRAWFORD in placing JACK JR. in handcuffs.

69.    CRAWFORD and RIOS searched JACK JR., and GRENIA, CRAWFORD, and RIOS then placed JACK JR. in the back of GRENIA's RMP, without probable cause to arrest.

70.    Defendants did not recover any drugs, drug paraphernalia, or weapons from JACK JR.'s person after they unlawfully searched him.

71.    GRENIA transported JACK JR. to the Suffolk County Police Department Seventh Precinct ("Seventh Precinct"), approximately thirty minutes after she had first arrived on Cordwood Path.

72.    Defendants' actions were unreasonable, and constituted the excessive use of physical force under the circumstances, assault and battery, and an unlawful arrest and search of JACK JR., all of which took place in the absence of reasonable suspicion or probable cause, and in violation of the United States and New York State Constitutions and laws.

73.    After SIMON's handcuffs had been removed and he was released from the back of the police vehicle in which he had been unlawfully detained, SIMON noticed that the left side of JACK JR.'s face was bruised and bleeding. Prior to the defendants' arrival outside the EARL home, JACK JR. did not have any visible bruises or blood on either his face or other visibly-exposed portions of his body.

74.    On January 24, 2013, the day after JACK JR.'s death, an autopsy was performed by the Suffolk County Office of the Medical Examiner which resulted in findings that JACK JR. had sustained "blunt impact injuries" to his head, torso, and upper and lower extremities. *See* Exhibits D and E annexed hereto. Specifically, the Medical Examiner's report described some of the injuries JACK JR. sustained as follows:

> **Head:** A 4 x 1-1/4" abrasion, with adherent clotted blood, is on the right cheek. Six, 1/8" abrasions are on the helix of the left ear.
>
> On a subsequent internal examination, there is a 1" left parietal subscapular hemorrhage; and two, 1" and 1-1/2" right parietal subscapular hemorrhages. . . .
>
> **Torso:** A 2 x 1-1/2" cluster of linear abrasions is on the right upper back. . . .
>
> On subsequent internal examination, there is a 1 x 1/2" subcutaneous hemorrhage of the mid upper back; and a 1 x 1/2" subcutaneous hemorrhage in the left upper back. . . .

9

**Upper Extremities:** A 1/4", blue contusion is on the posterior right forearm. A 1/2", blue contusion is on the anterior left arm. Five, 1/8", pale, red and scabbed abrasions are on the posterior left arm, elbow and forearm. . . .

**Lower Extremities:** A 1/2" red-brown contusion is on the medial right foot. A 5", curvilinear, red contusion is on the posterior right thigh. A 2", yellow to red-brown contusion is on the posterior right leg. Nine, 1/16" to 1-1/2" abrasions are on the left knee. A 1-1/2", faint blue contusion; and a 1/8" abrasion are on the medial left leg. Three, 1", faint blue contusions are on the posteromedial left leg. A 1/2", yellow-orange contusion is on the lateral left thigh. A 1/16" abrasion is on the medial left foot. . . .

*See* Exhibit D at 4.

75.   Significantly, JACK JR. sustained physical injuries to both sides of his face, which, despite the use of makeup, where clearly visible at his wake. *See* Exhibit E.

76.   JACK JR. suffered these injuries as a direct and proximate result of the defendants' illegal and unconstitutional use of excessive force and cruel and inhumane conduct.

77.   None of the foregoing physical acts by the defendants were performed for the lawful purpose of restoring order. Additionally, when balanced with the severity of the crimes later charged against JACK JR., misdemeanor offenses, the lack of any immediate threat to Defendants' safety, all of whom were armed and significantly outnumbered JACK JR. and SIMON, coupled with the fact that neither JACK JR. nor SIMON attempted to resist arrest, establish that the defendants' actions were unreasonable and excessive.

**Defendants Unlawfully Entered and Searched SIMON's Home, and Illegally Sought to Obtain Evidence to Justify their Prior Unlawful Conduct, After JACK JR. had Already Been Unlawfully Arrested and SIMON had Already Been Unlawfully Detained**

78.   JACK JR. and SIMON had been socializing in a peaceful manner and for a lawful purpose in front of SIMON's home when the defendants approached and intentionally, wrongfully, and maliciously violated JACK JR. and SIMON's constitutional rights.

79.   Given that nothing under the existing factual circumstances provided the defendants with reasonable suspicion or probable cause to detain or search JACK JR. or SIMON, and that they did not have a warrant authorizing them to do so, the defendants sought to obtain evidence of criminal activity, after the fact, by unlawful and unconstitutional means, in an attempt to justify their prior unlawful actions.

80.   ROBBINS, LESIEWICZ, and JOHN DOES entered the EARL family home, without having obtained a warrant or having been granted consent to do so, and despite the fact that no exigent circumstances existed that would authorize their unwarranted and unconsented entry into the home.

81.   GRENIA later represented that CRAWFORD directed the defendants who entered 6 Cordwood Path, to do so. CRAWORD, a supervisor acting in his official capacity, is therefore also personally liable for the unlawful search of SIMON, NICK, and ANNE's home.

82.   SIMON, NICK, and ANNE all reside at 6 Cordwood Path, and they each had a reasonable expectation of privacy in their home.

83.   NICK and ANNE were not home on January 23, 2013.

84.   Defendants knew that SIMON lived in the home at 6 Cordwood Path because SIMON informed them that he lived in the house, and because its address is listed on SIMON's New York State Driver's License, ROBBINS and JOHN DOES had unlawfully taken from SIMON's pocket. However, the defendants nonetheless never sought SIMON's consent to enter his home prior to doing so, nor did they apply for a warrant authorizing them to enter.

85.   Darryl Moore ("MOORE"), a licensed contractor and owner of DTM contracting, Inc., and Jay Moshier ("MOSHIER"), a part-time carpenter for DTM Contracting, Inc., were present in the EARL home on January 23, 2013, at the time the defendants entered unlawfully.

86.   After the defendants entered the Earl home, without a warrant or consent, they called out "hello, hello," several times. MOORE, who had been working on remodeling a bathroom in the Earl home, responded "hello?" to the police officers' calls, and made his way to the front of the house to see who had entered.

87.   Before MOORE made his way to the front of the house, MOSHIER, who was walking toward the front entrance of the home on his way out of the house, observed two JOHN DOES, one white male with dark hair and a muscular build believed to be ROBBINS (however the true identity of this individual is known to the defendants), and one female with dark hair and a smaller build believed to be LESIEWICZ (however the true identity of this individual is known to the defendants), standing inside the home, in the foyer by the front door. JOHN DOES asked MOSHIER who he was, and MOSHIER told JOHN DOES that he did not authorize them to enter the home given that NICK and ANNE, the owners, were not home at the time.

88.   While MOSHIER informed the JOHN DOES that they did not have consent to enter the home, MOORE came to the front of the house and approached the JOHN DOES who were standing in the foyer by the entrance of the house. The male defendant asked MOORE who he was and who had given him permission to be inside the home. MOORE explained that he was a contractor, hired by NICK and ANNE who were not home at the time, and that their son, SIMON, who lives in the home with his parents, had been letting him into the house. The male defendant showed MOORE SIMON's New York State Driver's License which had been taken from SIMON's pocket after SIMON was seized and searched unlawfully, and asked MOORE if

11

that was the individual who had been letting him into the house. MOORE responded that it was him, SIMON.

89. MOORE then confronted the JOHN DOES and asked them who had given them permission to enter the house, to which they responded, "Nobody we walked in." When MOORE then asked them if they had permission to be inside the house, they responded asking "Why do you have something to hide?" and that "It's none of your business!" The JOHN DOES appeared agitated at this time.

90. MOORE and MOSHIER went back to work.

91. The JOHN DOES inside the EARL home proceeded to the kitchen where they began searching through papers on the kitchen counter and looking inside ashtrays. They also sifted through the ashes in the fireplace located in the den.

92. Several minutes later MOORE heard JOHN DOES walk downstairs to the basement of the EARL home, near the area where the basement is attached to the garage. MOSHIER observed two JOHN DOES searching SIMON's car, which was parked inside the garage which is attached to the basement of the EARL family home.

93. Defendants did not recover any drugs, drug paraphernalia, or weapons from SIMON's home after they unlawfully entered and searched it.

94. Defendants eventually removed SIMON's handcuffs, and SIMON was released from the police vehicle. Defendants did not charge SIMON with violating any crime, nor did they issue him any summons or citation.

95. SIMON immediately went inside his home, at which point he observed one JOHN DOE, a male police officer, searching his basement. SIMON asked JOHN DOE what he was doing in his basement, and the JOHN DOE smirked and left the house.

96. Given that the defendants did not find evidence of criminal activity on either JACK JR. or SIMON's person, in JACK JR.'s car, or in SIMON's home or car, on January 23, 2013, they continued searching for such evidence in an attempt to justify their prior unlawful actions.

97. The next day, one day after JACK JR.'s death, MOSHIER observed GRENIA in front of 6 Cordwood Path. He observed her searching the seats and glove box of JACK JR.'s car which was still parked in front of the EARL home. Neither a warrant nor consent authorizing the search had been obtained. MOSHIER overheard GRENIA speaking into what appeared to be her cell phone, stating that "I can't find anything. There's nothing in here."

98. Defendants did not recover any drugs, drug paraphernalia, or weapons from JACK JR.'s car after they unlawfully searched it.

12

## EVENTS AT THE SEVENTH PRECINCT FOLLOWING
## JACK JR.'S UNLAWFUL ARREST

99.  Subsequent to his unlawful arrest, JACK JR. was taken to the Seventh Precinct in Suffolk County where he was processed, and formally charged with the following crimes: NY VTL § 1192, operating a motor vehicle while under the influence of alcohol or drugs; NY PL § 195.05, obstructing government administration in the second degree; and NY PL § 205.30, resisting arrest. *See* Exhibit F annexed hereto.

100.  All of these alleged charges and the subsequent fabricated police paperwork prepared in support of those charges constitute JACK JR.'s false arrest, the malicious prosecution of his person, and the denial of his right to due process of law.

101.  GRENIA charged JACK JR. with operating a motor vehicle while under the influence of drugs despite the fact that the vehicle engine was not running, she did not observe JACK JR.'s car move because it was parked, and despite the fact that no one observed JACK JR. consume drugs and that no drugs or drug paraphernalia were recovered from JACK JR.'s person or car after the defendants unlawfully searched them.

102.  GRENIA charged JACK JR. with resisting arrest despite the fact that at the time the defendants claim he resisted arrest, there was no lawfully basis upon which to arrest him, and despite the fact that JACK JR. did not resist and was fully cooperative with police at the scene.

103.  GRENIA charged JACK JR. with obstructing governmental administration for allegedly "sicking" his miniature Doberman Pincher on her, despite the fact that at no time did JACK JR. instruct his dog to attack GRENIA, who was screaming at JACK JR. and threatening him at gunpoint.

104.  JACK JR. was falsely charged to cover up the defendants' gross and illegal misconduct. Defendants' fabricated police reports and sworn statements were made with the knowledge of their false and misleading content, and with the mutual understanding between the defendants that they would collectively lie in order to maliciously prosecute JACK JR., and cover up the true facts to avoid criminal, civil, and administrative sanctions.

105.  McHUGH interviewed JACK JR. McHUGH recorded on JACK JR.'s Prisoner Activity Log that "Prisoner has scrapes across left cheek," and that "Prisoner reports scrapes occurred in altercation with police, that he's being treated for anti-anxiety . . ." *See* Exhibit G annexed hereto.

106.  McHUGH also falsely stated that JACK JR. "appears intoxicated unsteady slurred speech." *See id.*

107.  Neither GRENIAN nor McHUGH provided JACK JR. with medical assistance for his visible physical injuries or anxiety.

108.  GRENIA then took JACK JR. to a Crime Control room, where BORESHESKY searched JACK JR. and removed his property from him.

109.  BORESHESKY did not recover any drugs, drug paraphernalia, or weapons from JACK JR.'s person after he searched him.

110.  GRENIA then processed JACK JR., after which BORESHESKY interviewed JACK JR. and took resisting photos, booking photos, and fingerprints.

111.  At 1425 hours (2:25 pm), BORESHESKY lodged JACK JR. in male cell #1 in the cell block of the Seventh Precinct.

112.  BURKE, who had been arrested by detectives earlier that day, had been lodged in male cell #3 sometime prior to JACK JR. being lodged in male cell #1. JACK JR. and BURKE did not know each other prior to JACK JR. being lodged in male cell #1 on January 23, 2013. *See* Exhibit H at 26 annexed hereto.

113.  DOYLE, McLOUGHLIN, and ZALESKI were the desk sergeant and desk officers, respectively, for the 7x3 tour on January 23, 2013, and were responsible for monitoring prisoners, maintaining their Prisoner Activity Log, and ensuring their safety and wellbeing from 7 am to 3 pm.

114.  O'REILLY, SIMEONE, and OLIVA were the desk sergeant and desk officers, respectively, for the 3x11 tour on January 23, 2013, and were responsible for monitoring prisoners, maintaining their Prisoner Activity Log, and ensuring their safety and wellbeing from 3 to 11 pm.

115.  The Seventh Precinct cell in which JACK JR. was placed is subject to New York State law which governs the confinement of pre-trial detainees, including but not limited to those proscribed by the New York State Department of Corrections, and the Suffolk County Police Department. Those applicable rules and regulations were violated by the defendants in this case which resulted in JACK JR.'s death.

116.  On January 23, 2013, during the relevant time that JACK JR. was housed therein, the conditions inside the holding cell were inhumane; the temperature was bitterly cold, and JACK JR. was knowingly placed therein with nothing but a thin blanket, and the tee-shirt, jeans, and socks that he was permitted to keep.

117.  At some point after the defendants removed JACK JR.'s blanket because he attempted to hang himself with it, *see infra* ¶¶ 128-143, BURKE tossed JACK JR. a small piece of his thin blanket so that JACK JR. could help keep himself warm.

118.  BURKE subsequently described the conditions of the Seventh Precinct cell block, as follows:

14

> I cannot stress how cold it was in the holding cell area. It was actually inhumane!! I remember being curled up on a bench, shivering, holding on to a small blanket that was like a piece of cardboard issued to me. Jack asked for a piece of my blanket, which I gave him. You could see your breath in the air.

*See* Exhibit I at 2 annexed hereto.

119.  Defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s health, safety, and welfare by maintaining a cell with unreasonably low temperatures, placing him in that cell, and failing to provide adequate means for JACK JR. to keep himself warm. The cell block area was physically separated from the rest of the precinct by a door. No police officers were in the cell block area itself, but were on the opposite side of the doorway, in an area which was adequately heated. Defendants were also adequately dressed for the climate.

120.  The cell block area was also unsanitary and reeked a horrible smell.

121.  After JACK JR. was placed in male cell #1, he yelled out to the defendants, over the course of hours, stating directly and unequivocally that he needed medical attention and begged to be taken to a hospital. *See* Exhibit H at 45-46, 54, 58-59.

122.  JACK JR.'s cries for help were heard, but ignored by all defendants.

123.  However, early on, one male JOHN DOE did enter the cell block area, asking JACK JR. why he was screaming. JACK JR. lowered his voice and politely and respectfully informed him that he needed to go to a hospital for medical attention. In an apparent attempt to dissuade him from seeking medical help, the JOHN DOE told JACK JR. that even if the defendants took JACK JR. to a hospital, they would have to bring him right back to the precinct. Still desiring medical care, JACK JR. asked the JOHN DOE if he could speak to the officer's supervisor. The officer responded words to the effect of "okay I will get him." Unfortunately, neither the officer nor his supervisor returned to provide him with medical care. *See* Exhibit H at 45, 55-56.

124.  After some time passed and no one came to speak to JACK JR., he began yelling and pleading once again for some medical assistance. Specifically, JACK JR. repeatedly yelled out that he needed medical attention, and that if he did not receive medical attention, he would be leaving the holding cell in a "body bag." *See id.* at 45-46, 48.

125.  Despite the doorway separating the holding cells from the rest of the precinct, the JOHN DOES outside the holding cell area where able to hear JACK JR.'s pleas for medical attention because BURKE, who was being held just two cells away from JACK JR., was able to hear the defendants on the opposite side of the door conversing in normal conversational levels. *See id.* at 45-46.

126.  As more time passed and JACK JR.'s persistent cries for help were ignored, he told BURKE that BURKE should tell his father, JACK SR., that JACK JR. did not have drugs on him when he was arrested, that he did not let his dog out of his car to attack the police at the scene, that SIMON knew the truth about what had occurred earlier that day, and that he could not go back to jail. JACK JR. requested that BURKE memorize his father's telephone number, which BURKE did, and eventually told BURKE that he was "going to hang up." *See id.* at 56-57.

127.  JACK JR. desperately tried to get the police officers' attention. At one point, he stuck his head in the toilet bowl and banged his head against the holding cell wall, all the while screaming and pleading for medical assistance, yelling that he would be leaving in a "body bag" if he was not given treatment, and that he couldn't go back to jail. JACK JR. did this knowing that video cameras were positioned directly across from the individual holding cells for the specific purpose of monitoring detainees' conduct, and therefore, in large part, to prevent exactly what happened in this case—an inmate suicide. No officer responded to his cries for help. *See id.* at 46, 48, 67.

128.  JACK JR. took the thin yellow blanket which had been provided to him by police personnel, and tied it around the cell bars fashioning a noose. When this occurred, SIMEONE and a JOHN DOE ran back to the cell block area and removed the blanket from the bars. Although SIMEONE was a desk officer for the 3x11 tour, he stated that he believes this incident occurred during the 7x3 tour. *See supra* ¶¶ 113-14.

129.  The rules governing holding facilities and prisoner safety mandate that all incidents of attempted suicide, regardless of whether an injury results thereby, shall be reported.

130.  The rules governing holding facilities and prisoner safety mandate that a prisoner who attempts suicide shall be transported to the nearest hospital for a medical examination.

131.  The rules governing holding facilities and prisoner safety mandate that all prisoner movement, including visible emotional and behavioral conditions, shall be recorded on the individual's Prisoner Activity Log.

132.  The rules governing holding facilities and prisoner safety mandate that Prisoner Activity Log's be maintained truthfully and accurately.

133.  The rules governing holding facilities and prisoner safety mandate that personal inspection visits be conducted of each prisoner, at a minimum, every thirty minutes, and that the true and accurate time of each personal inspection be recorded on the Prisoner Activity Log with the prisoner's condition.

134.  The rules governing holding facilities and prisoner safety mandate that prisoner surveillance via video surveillance "is only an aid in the observation of the lodged prisoners, and does not negate the need for inspection visits by the designated officer."

135.  The rules governing holding facilities and prisoner safety mandate that if a prisoner is deemed dangerous or emotionally disturbed, which includes threats of suicide, the prisoner shall be under "continuous physical observation."

136.  Notwithstanding the rules governing prisoner safety, Neither DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, nor OLIVA, reported the fact that JACK JR. tied a blanket around his cell bars and attempted to hang himself, and the incident was not recorded on JACK JR.'s Prisoner Activity Log. *See* Exhibit G.

137.  Notwithstanding the rules governing prisoner safety, Neither DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, nor OLIVA increased the monitoring of JACK JR., did not ensured that JACK JR. was under "continuous physical observation," or otherwise undertook any additional precautionary measures to ensure his safety.

138.  Notwithstanding the rules governing prisoner safety, Neither DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, nor OLIVA provided JACK JR. with medical care or transported him to a hospital to receive such care.

139.  Notwithstanding the rules governing prisoner safety, Neither DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, nor OLIVA transported JACK JR. to a holding facility with a detention attendant, and did not transport him to a Comprehensive Psychiatric Emergency Program ("CPEP").

140.  JACK JR.'s mother, Phyllis Franqui, called approximately five times and spoke with O'REILLY to inquire about the whereabouts and welfare of her son. During one such phone call at approximately 1735 hours (5:35 pm), O'REILLY, rather than being courteous and professional as required, stated to her that "Ma'am, I'm gonna hang the phone up on you." During that same phone conversation, SIMEONE is overheard in the background stating regarding JACK JR., that "he was tying the blanket, that's why we don't give them blankets. I don't know why they give them blankets. He was tying the blanket around the, um –."

141.  During another phone conversation, SIMEONE is once again overheard in the background, this time stating regarding JACK JR. that "[h]e was tying his blanket to the bars. We took the blanket away from him. [Unintelligible]. They need a PO back there by the cell block with an activity log." O'REILLY and SIMEONE were interviewed by the SCPD Internal Affairs Bureau regarding the events at the Seventh Precinct, and particularly these statements. Transcripts of the interviews are annexed as Exhibits J, and K, respectively.

142.  SIMEONE made these statements to his supervisor O'REILLY, and to OLIVA and Police Officer Aid Denise Reidway ("REIDWAY"), who were all assigned to the front desk of the Seventh Precinct.

143.  Notwithstanding the rules governing prisoner safety, and the fact that the defendants affirmatively acknowledged that JACK JR. required to be under constant personal observation, neither DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, nor OLIVA provided JACK JR. with medical care or transported him to a hospital to receive such care, or provided him with continuous physical observation which would have prevented his untimely death.

144.  After his initial failed attempt at hanging himself with the yellow blanket, JACK JR. continued pleading for medical assistance, and crying out that he could not go back to jail.

145.  JACK JR.'s cries for help were ignored, and at approximately 1740 hours (5:40 pm) JACK JR. took off his t-shirt and tied it around his cell bars fashioning a noose, in a second attempt to hang himself.

146.  SIMEONE observed JACK JR. tying his t-shirt to the bars through the video surveillance monitors that are stationed on the front desk of the Seventh Precinct. SIMEONE informed O'REILLY and OLIVA, who were at the front desk, that JACK JR. was tying something to the bars. O'REILLY then looked in the monitors and observed JACK JR. tying a white article of clothing to the top of the bars in male cell #1.

147.  O'REILLY and SIMEONE then entered the holding cell area and cut down the t-shirt to prevent JACK JR. from hanging himself. *See* Exhibit H at 38, 44-45.

148.  Notwithstanding that the defendants were now aware that JACK JR. attempted to hang himself on two separate occasions, that McHUGH noted on JACK JR.'s Prisoner Activity Log that he was being treated for anti-anxiety, coupled with the fact that JACK JR. had been screaming that the defendants would have to remove him in a body bag if he did not receive medical attention, neither O'REILLY, SIMEONE, nor OLIVA increased the monitoring of JACK JR., did not ensured that JACK JR. was under "continuous physical observation," or otherwise undertook any additional precautionary measures to ensure his safety.

149.  Notwithstanding that the defendants were now aware that JACK JR. attempted to hang himself on two separate occasions, that McHUGH noted on JACK JR.'s Prisoner Activity Log that he was being treated for anti-anxiety, coupled with the fact that JACK JR. had been screaming that the defendants would have to remove him in a body bag if he did not receive medical attention, neither O'REILLY, SIMEONE, nor OLIVA provided JACK JR. with medical care or transported him to a hospital to receive such care.

150.  Notwithstanding that the defendants were now aware that JACK JR. attempted to hang himself on two separate occasions, that McHUGH noted on JACK JR.'s Prisoner Activity Log that he was being treated for anti-anxiety, coupled with the fact that JACK JR. had been screaming that the defendants would have to remove him in a body bag if he did not receive medical attention, neither O'REILLY, SIMEONE, nor OLIVA transported JACK JR. to a holding facility with a detention attendant, and did not transport him to CPEP.

151.  Rather, O'REILLY and SIMEONE left the cell block area immediately after cutting down the t-shirt. They left JACK JR. with no way of keeping himself warm other than with his jeans and socks, despite the fact that it freezing in the cell and JACK JR.'s hair was now visibly wet from having put his head in the toilet bowl.

152.  After O'REILLY and SIMEONE exited the cell block area, JACK JR. began crying again, stating that he could not go back to jail. JACK JR. asked BURKE to repeat his father's phone number to him, and told BURKE to tell JACK JR.'s father that he loved him. *See* Exhibit H at 64.

153. JACK JR. continuously screamed, yelled, and pleaded for medical assistance, telling the defendants that he would be leaving in a "body bag" if he was not given treatment. His desperate and repeated cries for medical help, display of protracted irrational behaviors, persistent verbal threats of suicide, and affirmative physical acts to carry out those threats of suicide, were all ignored by the defendants. Astonishingly and contrary to all rules, regulations, procedures, laws, and moral decency, JACK JR. was left alone to eventually carry out his threats, and kill himself by hanging himself with his own blue jeans affixed to his holding cell bars.

154. JACK JR. took off his blue jeans. Notwithstanding the fact that he stood in his cell in his underwear and socks, no defendant took affirmative action to help JACK JR.

155. Next, JACK JR. affixed his own jeans to the cell bars. Notwithstanding the fact that he stood in his cell in his underwear with his jeans tied to the cell bars, no defendant took affirmative action to help JACK JR. *See* Exhibit H at 69-71.

156. Next, JACK JR. fashioned a noose from his jeans which were affixed to his cell bars. Notwithstanding the fact that he stood in his cell in his underwear, with his jeans affixed to the cell bars tied like a noose, no defendant took affirmative action to help JACK JR. *See id.*

157. Next, JACK JR. placed his head and neck inside the noose fashioned from his jeans, which were affixed to the cell bars. Notwithstanding the fact that he stood in his cell in his underwear, jeans affixed to the cell bars with his head inside the fashioned noose, no defendant took affirmative action to help JACK JR. *See id.*

158. Next, JACK JR., as he repeatedly threatened to do if not afforded medical assistance by shouting to defendants over the course of hours, hung himself from the noose, fashioned from his blue jeans which he had affixed to his holding cell bars. Notwithstanding the fact that JACK JR. was hanging, with his head inside the noose fashioned from his own blue jeans which he had affixed to the cell bars, virtually naked, clad only in his underwear and socks, no defendant took affirmative action to help JACK JR. *See id.*

159. BURKE, hearing gasping sounds coming from JACK JR.'s cell, screamed out to the defendants for help. However, no one responded for several minutes. *See id.* at 69-73

160. Before defendants finally entered the cell block area, BURKE heard one officer ask another if he had a knife on him, suggesting that the defendants finally looked at their monitor which was on the front desk of the Seventh Precinct, taking notice of JACK JR. hanging in his cell. *See id.* at 74.

161. At approximately 1820 hours (6:20 pm), SIMEONE finally looked at the video-surveillance monitor which was directly in front of his chair at the front desk of the Seventh Precinct, and told O'REILLY and OLIVA that JACK JR. was attempting to hang himself.

162. O'REILLY, SIMEONE, OLIVA, and Police Officer Martin Cummings ("CUMMINGS") rushed back to the cell block area, where they saw JACK JR. hanging by his jeans which were tied around his neck and the cell bars, with his back against the cell bars.

163.  Once inside male cell #1, SIMEONE attempted to untie JACK JR.'s jeans from around his neck. O'REILLY however directed SIMEONE not to untie the jeans, claiming that JACK JR. was dead and that area was now a crime scene.

164.  BURKE heard one defendant direct another defendant to check for a pulse, and that officer responded that there was none. *See* Exhibit H at 74.

165.  Neither O'REILLY, SIMEONE, OLIVA who is an EMT, or CUMMINGS attempted to perform CPR on JACK JR. Rather, after O'REILLY declared the area a crime scene, JACK JR. was left hanging by his jeans tied around his neck, and OLIVA started a Scene Log.

166.  Defendants knew or should have known that JACK JR. was clearly suicidal and a danger to himself. DOYLE, McLOUGHLIN, ZALESKI, O'REILLY, SIMEONE, and OLIVA knew or should have known that:

      a.  JACK JR. was being treated for anti-anxiety.

      b.  JACK JR. repeatedly yelled that he would be leaving the holding cell in a body bag if he did not receive medical assistance.

      c.  JACK JR. had been acting irrationally for hours while in the defendants' direct presence including but not limited to making express verbal threats of suicide, physical acts in furtherance of suicide, irrational physical acts such as sticking his head in the toilet bowl, banging his head against the wall, and disrobing, amongst other evidence warranting medical assistance. These acts all occurred while JACK JR. was in the defendants' custody during which time they were charged with ensuring his safety and wellbeing.

      d.  JACK JR. actually attempted to hang himself with a blanket prior to hanging himself with his jeans.

Additionally O'REILLY, SIMEONE, and OLIVA knew or should have known that JACK JR. actually attempted to hang himself with his t-shirt prior to hanging himself with his jeans, after his first failed attempt to hang himself with a blanket.

167.  Defendants individual and collectively failed to provide JACK JR. with the minimal standard of care proscribed by law for a prisoner in custody within the confines of a holding cell within the State of New York.

168.  As a direct result of their failure to provide JACK JR. with the minimum standard of care required, their failure to comply with rules, regulations, and laws, their failure to act, and their deliberate inaction when a duty to act existed, the defendants were the proximate cause of JACK JR.'s death.

169.  Following JACK JR.'s death, the case was investigated by the Suffolk County Homicide Bureau. That same day, BURKE was interviewed by detectives wherein he conveyed his observations and account of the events.

170.  BURKE's statement was written by Suffolk Homicide Detective Ciccotto to ensure the detectives' control over the precise language used therein. By way of example of controlling the language within "BURKE's" written statement, Ciccotto cleverly crafts the following paragraph:

> The guy [JACK JR.] was yelling that he needed medical assistance. He was telling me that he was going to hang himself.

*See* Exhibit L annexed hereto.

171.  By way of contrast, in all BURKE's other statements and sworn testimony, BURKE makes it clear that JACK JR. told the *defendant officers* that they would be taking him out in a body bag if he did not receive medical treatment—over the course of hours. *See* Exhibits H and I. JACK JR.'s statements about his intention to commit suicide were not limited to conversations between himself and BURKE. To the contrary, the defendants were all on notice of JACK JR.'s state of mind.

172.  Notwithstanding the foregoing, on the date of JACK JR.'s death, BURKE informed the Suffolk County Homicide Squad that JACK JR. had requested medical assistance, threatened suicide, had taken physical steps to hang himself prior to actually doing so, and that the defendants herein assigned to the Seventh Precinct had knowledge thereof. *See* Exhibit L.

173.  Notwithstanding these facts, in multiple newspaper articles describing what happened in the Seventh Precinct holding cell on January 23, 2013, Lieutenant Fitzpatrick, Commander of the Suffolk County Police Department Homicide Squad, intentionally misled the media about what took place—both at the scene of JACK JR.'s arrest and at the Seventh Precinct. As to the facts which preceded JACK JR.'s death at the Seventh Precinct, Lieutenant Fitzpatrick was quoted by several different papers that JACK JR. was calm and "appeared at ease with the police officers," and that "[t]here was no indication he was suicidal." *See* Exhibit M annexed hereto.

## CRUEL AND UNUSUAL TREATMENT

174.  Defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct regarding JACK JR.'s health, safety, and welfare while he was being placed under arrest, given the severity of the crimes charged, the lack of any real danger posed to the officers at the scene, and the fact that he was not resisting arrest when the defendants repeatedly beat and struck him as he lay prone on the ground.

175.  Defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct regarding JACK JR.'s health, safety, and welfare by maintaining a holding cell with unreasonably low temperatures, leaving him in that holding cell in nothing more than a tee shirt, and failing to provide adequate means for JACK JR. to keep

himself warm.

176.  Defendants, under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional malicious conduct regarding JACK JR.'s health, safety, and welfare by their intentional failure to provide JACK JR. with medical care despite his repeated cries for medical assistance and his threats to hang himself, and by ignoring his irrational physical acts while in the holding cell as well as his prior physical acts in furtherance of a suicide attempt.

177.  By engaging in the aforementioned conduct, independently and collectively, the defendants, under color of law, deprived JACK JR. of his constitutional right to be free from cruel and unusual treatment as a person in their custody, in violation of the United States and New York State Constitutions and laws.

178.  The defendants' actions were objectively of sufficient seriousness such that JACK JR. was denied the minimal civilized measure of life's necessities, and the defendants possessed a sufficiently culpable state of mind associated with the unnecessary and wanton infliction of pain.

## DEFENDANTS SUBSEQUENTLY HARASSED AND INTIMATED SIMON, NICK, AND ANNE

179.  GRENIA and JOHN DOES subsequently harassed and intimidated SIMON, a witness to the initial police misconduct against himself and JACK JR. prior to JACK JR.'s death, and SIMON's parents NICK and ANNE, by threatening them directly and indirectly by words and actions.

180.  GRENIA and JOHN DOES harassed and intimidated SIMON, NICK, and ANNE by repeatedly driving by the family's home, slowly, multiple times per week, over the course of the ensuing months.

181.  GRENIA harassed and intimidated SIMON, NICK, and ANNE by entering the family's driveway and unlawfully recording license plate numbers of the vehicles that were parked therein.

182.  GRENIA and JOHN DOES harassed and intimidated SIMON, NICK, and ANNE by parking police cruisers at the top of Cordwood Path claiming to 'watch the stop sign.' Prior to the defendants' unlawful actions on January 23, 2013, police vehicles were rarely seen on Cordwood Path. However, after repeatedly seeing a police vehicle stationed at the top of the road, SIMON approached and asked GRENIA what was going on, and if there's anything he should be aware of. However, GRENIA retorted that she's "watching the stop sign" and that it was none of SIMON's business.

183.  Defendants intimidated SIMON by questioning members of SIMON's community about him.

184.  GRENIA, SAMARTINO, and KLAMMER harassed and intimidated SIMON when they unlawfully seized and searched SIMON and his vehicle on April 9, 2013.

185.  GRENIA conducted a predicate traffic stop of SIMON near the corner of Southgate and Norman on April 9, 2013, which lasted approximately one hour.

186.  When GRENIA first approached SIMON's car, SIMON informed her that he was recording the encounter on his cell phone. GRENIA ordered SIMON to close his cell phone, which he did. GRENIA took SIMON's cell phone from his hand, and placed it on top of his car.

187.  GRENIA then went back to her marked patrol vehicle, and approximately 12 minutes after she first stopped SIMON, asked KLAMMER to call her on her cell phone. GRENIA requested SAMARTINO and KLAMMER respond to the scene of the traffic stop.

188.  GRENIA, SAMARTINO, and KLAMMER directed SIMON to exit his vehicle, however given the defendants' unlawful actions over the prior months, SIMON feared for his safety. When SIMON told them that he did not want to get out of his car, GRENIA said he didn't have a choice, he will be getting out one way or another, and that they will force him out if necessary.

189.  After being forced to exit his vehicle, SAMARTINO and KLAMMER unlawfully patted SIMON down and searched his person.

190.  GRENIA screamed and yelled at SIMON, demanding to know where he was going, and screaming that SIMON had better respect her authority.

191.  SIMON informed GRENIA that he was on his way to get a haircut. However, GRENIA continued screaming at him, yelling that she does not believe him, and stating that "are you the next Adam Lanza!"

192.  GRENIA, SAMARTINO, and KLAMMER searched SIMON's car, including the glove box, and a small black satchel located on the floor near the back seat of the car, after SIMON explicitly informed them that he did not consent to the search. Additionally, no exception to the Fourth Amendment's warrant requirement existed which would have otherwise excused the defendants' search of SIMON's car without having obtained a warrant authorizing them to do so.

193.  GRENIA, SAMARTINO, and KLAMMER questioned SIMON about JACK JR. and the incident that had occurred on January 23, 2013, even after SIMON specifically told them that he had a lawyer and that he did not want to answer their questions.

194.  GRENIA repeatedly mocked and provoked SIMON, presumably into committing an act which would provide her with probable cause to arrest him, and stated to SIMON "let's step into the woods."

195.  GRENIA mocked, threatened, and intimated SIMON, asking him if he was going to go home crying to his mommy, and shouted that "you are three seconds from being kneed in the balls!"

23

196.  Defendants' unlawful search of SIMON's car did not turn up evidence of criminal activity. Therefore, GRENIA, acting with malice, falsely and issued SIMON two traffic tickets for violating NY VTL § 1163(b), failing to signal at least 100 feet prior to making a turn, and NY VTL § 319(3), failing to produce an insurance card upon request. *See* Exhibit N annexed hereto. As a result, SIMON's driver's license was subsequently suspended.

197.  On September 29, 2014, the People withdrew the VTL § 319(3) charge for failing to produce an insurance card, and presented their case as to the VTL § 1163(b) charge for failing to signal, before a Suffolk County Traffic Violations Bureau Judge.

198.  GRENIA maliciously prosecuted SIMON, when she filed false charges against him, which were later terminated in his favor.

199.  At the hearing, GRENIA testified in detail about the traffic stop that, among other things, after she passed the vehicle which SIMON was driving on April 9, 2013, the car whose license plate she had previously unlawfully recorded and checked, drive in the opposite direction on North Country Road, she observed the vehicle make a right turn onto Norman Drive without signaling. GRENIA testified that she then made a U-turn, and pulled the driver over on Norman Drive. GRENIA testified that Simon presented no immediate threat to her health, safety, and welfare, and that she called for backup based upon her concern that SIMON may file false allegations against her. GRENIA admitted that after backup arrived, SIMON was removed from the car, patted down, searched for weapons, and thereafter, all three officers searched the interior of SIMON's car.

200.  SIMON testified at the hearing as well—that he did not violate any vehicle and traffic laws, and was completely cooperative with the officers. Notwithstanding those facts, he was removed from his car against his wishes, patted down and searched, and that all three officers present at the scene over his objection and without a lawful basis, thoroughly searched his car.

201.  At the conclusion of the hearing, at which GRENIA and SIMON both testified, the violation issued by GRENIA was dismissed on the merits. *See* Exhibit O annexed hereto.

202.  On April 9, 2014, GRENIA, SAMARTINO, and KLAMMER intended to seize SIMON when they forced him to exit his car and did not permit him to leave while they unlawfully questioned him and searched his car and cell phone. SIMON did not consent to being seized by the defendants but rather specifically informed the defendants that he did not want to leave his car, and SIMON was conscious of the seizure.

203.  After GRENIA, SAMARTINO, and KLAMMER left the scene of the traffic stop, SIMON immediately checked his cell phone and noticed that the recording he had made at the beginning of the traffic stop had been deleted, without his knowledge or consent.

204.  Defendants' unlawful seizure and search of SIMON's cell phone constitutes a meaningful interference with SIMON's possessory interest in his property. Additionally, the defendants unlawfully and unnecessarily destroyed SIMON's property when they deleted the recording within his cell phone without SIMON's knowledge or consent.

205.  Defendants intentionally harassed and intimidated SIMON, NICK, and ANNE over the course of several months, through at least June 28, 2013, with the specific intent to intimate them, and with the specific intent to cause them to suffer severe emotional distress, and/or with the reckless disregard of the severe emotional distress their conduct would cause to SIMON, NICK, and ANNE. For example, despite having no evidence in support, GRENIA admitted under oath that she represented to various members of the Seventh Precinct to watch SIMON, that he's a criminal, and that he's been known to engage in unlawful activity.

206.  Defendants' continued harassment and intimidation of SIMON, NICK, and ANNE over the course of several months was severe, pervasive, and objectively offensive.

207.  Defendants' continued harassment and intimidation of SIMON, NICK, and ANNE over the course of several months was extreme and outrageous, and went far beyond the bounds of decency tolerated by a civilized society.

208.  Defendants, by their continued harassment and surveillance of SIMON, NICK, and ANNE, caused SIMON, NICK, and ANNE to fear for their safety.

209.  Defendants, by their continued harassment and surveillance of SIMON, NICK, and ANNE, caused SIMON, NICK, and ANNE to suffer severe emotional distress.

## DEFENDANTS' FAILURE TO INTERCEDE, TO PERFORM THEIR DUTIES AS REQUIRED BY LAW, AND THEIR FABRICATION AND CONCEALING OF EVIDENCE FROM INVESTIGATING STATE AND LOCAL AUTHORITES TO AVOID ADMINISTRATIVE, CIVIL, AND CRIMINAL SANCTIONS WHICH OTHERWISE WOULD FOLLOW FROM THEIR MISCONDUCT

210.  The rules governing the actions of police officers impose an affirmative duty to intercede and prevent crimes and other misconduct committed by other police officers.

211.  The rules governing the actions of police officers impose an affirmative duty to report such crimes and other misconduct whenever they become aware of it.

212.  The rules governing the actions of police officers impose an affirmative duty to intercede on behalf of citizens when it is known that excessive force has been used.

213.  The rules governing the actions of police officers impose an affirmative duty to intercede on behalf of citizens whose constitutional rights are being violated in the presence of other police officers.

214.  The rules governing holding facilities and prisoner safety mandate that the audio-surveillance equipment be inspected to ensure it is working adequately.

215.  The rules governing holding facilities and prisoner safety mandate that Prisoner Activity Logs be maintained truthfully and accurately.

216.  The rules governing the actions of police officers impose an affirmative duty to intercede if medical care is being delayed or denied to a prisoner who is suffering from an illness or injury.

217.  The rules governing the actions of police officers impose an affirmative duty to intercede to prevent cruel and unusual treatment.

218.  Defendants failed to ensure that the cell block audio-surveillance equipment was working adequately. According to reports by the Suffolk County Homicide Bureau, the audio-surveillance system was on the "off" and/or "low volume" setting.

219.  Defendants failed to accurately maintain JACK JR.'s Prisoner Activity Log.

220.  Defendants failed to perform personal inspection visits of JACK JR. every thirty minutes, and to check on his status and wellbeing.

221.  Defendants failed to provide JACK JR. with continuous observation.

222.  Defendants failed to provide JACK JR. with necessary medical care, and failed to transport JACK JR. to a hospital to receive such care.

223.  Defendants acknowledged that JACK JR. required constant personal observation, yet failed to monitor JACK JR.'s status and wellbeing and failed to provide him with the minimum standard of medical care proscribed by laws, rules, regulations, and national, State, and local standards for health services in jails.

224.  Defendants' failure to remove JACK JR. to a hospital or continuously monitor his behavior constituted deliberate indifference, an egregious deviation from acceptable administrative, legislative, and departmental rules and regulations and state and federal laws, regulations, and guidelines designed to ensure the health, safety, and welfare of prisoners placed in holding cells within the State of New York.

225.  Defendants, under color of law, deprived JACK JR. of his constitutional right to medical treatment and inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s medical needs despite his continuous desperate pleas over the span of several hours for medical assistance, and despite his oral and physical acts placing them on notice of his strong likelihood of committing suicide.

226.  Defendants each had an opportunity to intercede on JACK JR.'s behalf to ensure that JACK JR. was not the victim of excessive physical force, unjustified threatened use of deadly physical force, false arrest, malicious prosecution, cruel and unusual treatment, and they each had an opportunity to intercede and ensure that he was provided adequate medical assistance— all clearly established statutory and constitutional rights of which a reasonable person would have known—yet failed to do so, knowing that their fellow officers' conduct did violate those rights guaranteed to JACK JR.

227.  Defendants each had a realistic opportunity to intercede on SIMON's behalf to ensure that SIMON was not the victim of unjustified threatened use of deadly physical force, unlawful seizure, unlawful search, false imprisonment, and to ensure that SIMON's property was not unnecessarily destroyed and that his due process rights were not violated—all clearly established constitutional and statutory rights of which a reasonable person in the officers' positions would have known—yet failed to do so, knowing that their fellow officers' conduct did violate those rights guaranteed to SIMON and that their failure to intercede on SIMON's behalf permitted their fellow officers to violate SIMON's rights.

228.  Defendants each had a realistic opportunity to intercede on NICK and ANNE's behalf to ensure that NICK and ANNE were not the victims of an unlawful search—a clearly established constitutional and statutory right of which a reasonable person in the officers' positions would have known—yet failed to do so, knowing that their fellow officers' conduct did violate those rights guaranteed to NICK and ANNE and that their failure to intercede on NICK and ANNE's behalf permitted their fellow officers to violate NICK and ANNE's rights.

229.  Defendants each failed to intervene or report the above mentioned conduct when they became aware of it.

230.  Defendants failed to perform duties inherent in the nature of their office.

231.  The individual Defendants, under color of law, conspired with each other, reached a mutual understanding, and acted to undertake a course of conduct to injure, oppress, threaten, and intimidate JACK JR. and SIMON, a witness to the initial police misconduct, in the free exercise and enjoyment of the rights, privileges, and due process of the law secured to them by the United States and New York State Constitutions and laws, including the right to be free from the intentional use of unreasonable force; to be free from cruel and unusual treatment as one in the custody of the defendants; to be free from the denial of adequate medical attention; to be free from unnecessary and wanton infliction of pain; and to not be deprived of life without due process of law.

232.  The individual defendants, under color of law, conspired with each other, reached a mutual understanding, and acted to undertake a course of conduct to injure, oppress, threaten, and intimidate SIMON, NICK, and ANNE in the free exercise and enjoyment of the rights, privileges, and due process of law secured to them by the United States and New York State Constitutions and laws, including the right to be free from unjustified threatened use of deadly physical force, unlawful seizure, unlawful search, false imprisonment, unnecessary destruction of property, and the violation of their due process rights.

233.  Thereafter, the defendants fabricated evidence of what had occurred in an attempt to justify their unlawful and egregious conduct and avoid administrative, civil, and criminal sanctions. For example, the defendants fabricated and falsified police reports and documents, and gave false statements, both oral and written.

234.  Defendants intentionally misrepresented and withheld material acts when they were interviewed by members of the Suffolk County Police Department, in an effort to falsely report the true nature of the events and to avoid and shield members of the Department from civil, criminal, and administrative sanctions for their unlawful acts and omissions.

235.  Defendants lied to State investigators and fabricated and altered physical evidence and written incident reports to conceal wrongdoing to avoid and shield members of the Department from civil, criminal, and administrative sanctions for their unlawful acts and omissions.

236.  Lieutenant Fitzpatrick, Commander of the Suffolk County Police Department Homicide Squad, intentionally misled the media about the factual events—both at the scene of JACK JR.'s arrest and at the Seventh Precinct.

## SUPERVISOR LIABILITY

237.  O'REILLY and DOYLE are supervisory personnel who were discharged with the responsibility to, and owed a duty of care to prisoners such as JACK JR. to

   a.  oversee the daily operations of the Seventh Precinct personnel,

   b.  supervise and ensure that police personnel comply with the Suffolk County Police Department rules, regulations, and protocol governing the arrest process, mental and physical health evaluations, and housing and supervision of prisoners detained within the precinct cells,

   c.  supervise and ensure that police personnel comply with federal, state, and local laws, rules, regulations, and protocol governing the housing and supervision of prisoners detained within the precinct holding cells, and

   d.  implement immediate redial measures when necessary to ensure the health, safety, and welfare of prisoners.

238.  Based upon the facts outlined above, O'REILLY and DOYLE were aware of, or should have been aware of, that the police personnel they were charged with supervising failed to comply with Suffolk County Police Department rules, regulations, and protocol governing the arrest process, mental and physical health evaluations, and housing and supervision of prisoners detained in the  precinct cells.

239.  O'REILLY and DOYLE were aware of, or should have been aware of, JACK JR.'s need for constant supervision pending medical treatment.

240.  O'REILLY and DOYLE were made aware of JACK JR.'s request for medical attention based upon JACK JR.'s persistent cries for medical attention and threats of suicide, yet ignored those pleas for help thereby directly participating in the aforementioned violations of JACK JR.'s constitutional and statutory rights.

28

241.  O'REILLY and DOYLE were made aware of JACK JR.'s request for medical attention and threats of suicide through oral report(s) of a subordinate(s) and/or visual observations, yet ignored the report(s), thereby participating in the aforementioned constitutional and statutory violations against JACK JR.

242.  O'REILLY and DOYLE were grossly negligent in their supervision of their subordinates in that JACK JR. persistently cried out for medical attention and threatened suicide, yet defendant supervisors failed to give orders to ensure JACK JR.'s health, safety, and welfare under the existing circumstances, failed to monitor the situation, and failed to engage in remedial action, thereby allowing subordinate(s) to continue to engage in unconstitutional and unlawful acts.

243.  O'REILLY and DOYLE thereby grossly breached the duty of care they owed to JACK JR.

244.  O'REILLY and DOYLE's gross breach of their duty of care to JACK JR. directly and proximately caused the aforementioned constitutional and statutory violations against JACK JR. resulting in JACK JR.'s injuries.

245.  O'REILLY and DOYLE were deliberately indifferent to JACK JR.'s clearly defined constitutional and statutory rights in that they ignored JACK JR.'s persistent cries for medical attention and threatened suicide, and/or ignored oral report(s) indicating JACK JR.'s repeated requests for medical attention and threats of suicide, and/or ignored their visual observations of JACK JR., individually and/or collectively, which placed the defendant supervisors on notice of a substantial risk of serious physical harm to JACK JR.—the threat of suicide and a failed attempt of suicide—yet failed to give orders to ensure JACK JR.'s health, safety, and welfare under the existing circumstances, failed to monitor the situation and failed to engage in remedial action. The forgoing failures individually and/or collectively constitute deliberate indifference on the part of the defendant supervisors by failing to act on information indicating that unconstitutional acts were occurring.

246.  As a direct and proximate result of the defendants' actions, JACK JR. suffered the injuries and damages described above.

247.  The actions of all defendants complained of herein were performed within the scope of their employment and under color of law.

## CAUSES OF ACTION – JACK JR.

### COUNT ONE
### 42 U.S.C. § 1983 – False Arrest

248.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-247 as though fully set forth herein.

249.  Defendants, acting under color of law, violated JACK JR.'s right to be free from false arrest, in violation of the United States and New York State Constitutions and laws.

### COUNT TWO
### 42 U.S.C. § 1983 – Unreasonable and Excessive Force

250.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-249 as though fully set forth herein.

251.  Defendants, acting under color of law, violated JACK JR.'s right to be free from unreasonable and excessive physical force, in violation of the United States and New York State Constitutions and laws.

### COUNT THREE
### 42 U.S.C. § 1983 – False Imprisonment

252.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-251 as though fully set forth herein.

253.  Defendants, acting under color of law, violated JACK JR.'s right to be free from false imprisonment, in violation of the United States and New York State Constitutions and laws.

### COUNT FOUR
### 42 U.S.C. § 1983 – Denial of Adequate Medical Treatment

254.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-253 as though fully set forth herein.

255.  Defendants, acting under color of law, violated JACK JR.'s right to adequate medical treatment, in violation of the United States and New York State Constitutions and laws.

## COUNT FIVE
### 42 U.S.C. § 1983 – Cruel and Unusual Treatment

256. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-255 as though fully set forth herein.

257. Defendants, acting under color of law, violated JACK JR.'s right to free from cruel and unusual treatment, in violation of the United States and New York State Constitutions and laws.

## COUNT SIX
### 42 U.S.C. § 1983 – Unnecessary and Wanton Infliction of Pain

258. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-257 as though fully set forth herein.

259. Defendants, acting under color of law, inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s medical needs by denying him adequate medical care despite his continuous pleas to obtain such care, in violation of the United States and New York State Constitutions and laws.

## COUNT SEVEN
### 42 U.S.C. § 1983 – Due Process Violations

260. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-259 as though fully set forth herein.

261. Defendants, acting under color of law, violated JACK JR.'s right to due process under law due to their intentional and malicious conduct, and their failure to act when required, while JACK JR. was in their custody and care in the Seventh Precinct, in violation of the rights and liberties guaranteed to JACK JR. by the United States and New York State Constitutions and laws.

## COUNT EIGHT
### 42 U.S.C. § 1983 – Failure to Intercede

262. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-261 as though fully set forth herein.

263. Defendants, acting under color of law, violated JACK JR.'s constitutional and statutory rights by their failure to intercede to protect his clearly established constitutional and statutory rights, in violation of the United States and New York State Constitutions and laws.

## COUNT NINE
## 42 U.S.C. § 1983 – Supervisory Liability

264.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-263 as though fully set forth herein.

265.  Defendants, acting under color of law, violated JACK JR.'s constitutional and statutory rights by their failure to properly supervise and intercede to protect JACK JR.'s clearly established statutory and constitutional rights.

## COUNT TEN
## Pendent State Claim for False Arrest

266.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-265 as though fully set forth herein.

267.  Defendants, acting under color of law, violated JACK JR.'s right to be free from false arrest, in violation of the United States and New York State Constitutions and laws.

## COUNT ELEVEN
## Pendent State Claim for False Imprisonment

268.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-267 as though fully set forth herein.

269.  Defendants, acting under color of law, violated JACK JR.'s right to be free from false imprisonment, in violation of the United States and New York State Constitutions and laws.

## COUNT TWELVE
## Pendent State Claim for Assault and Battery

270.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-269 as though fully set forth herein.

271.  Defendants, acting under color of law, unlawfully assaulted and battered JACK JR.

## COUNT THIRTEEN
## Pendent State Claims for Denial of Adequate Medical Treatment

272.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-271 as though fully set forth herein.

273.  The rules governing the operation of holding facilities impose an affirmative duty upon defendants to provide medical care to pre-trial detainees.

274.  Defendants breach that duty of care to JACK JR. thereby causing him injury.

275.  Defendants, acting under color of law, violated JACK JR.'s right to receive adequate medical treatment pursuant to State and local rules and regulations.

## COUNT FOURTEEN
### Pendent State Claim for Failure to Properly Maintain and Monitor a Holding Cell and Prisoners Detained Therein

276.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-275 as though fully set forth herein.

277.  The rules governing the maintenance of holding facilities impose an affirmative duty upon defendants to maintain holding facilities in reasonable conditions.

278.  The rules governing the maintenance of holding facilities prohibit confining detainees in holding cells with degrading conditions such as inadequate heating or conditions likely to be injurious to health, safety, and welfare.

279.  The conditions in the Seventh Precinct holding cell were degrading and inhumane; there was no heating, the temperature was bitterly cold, the conditions were unsanitary, and JACK JR. was given nothing to keep himself warm except his t-shirt, jeans, and socks that he was permitted to keep.

280.  Defendants inflicted unnecessary and wanton pain to JACK JR. due to their intentional conduct and/or deliberate indifference to JACK JR.'s health, safety, and welfare by maintaining a holding cell with unreasonably low temperatures, placing him in that holding cell, and failing to provide adequate means for JACK JR. to keep himself warm or transfer JACK JR. to a similar facility with adequate heating.

281.  Defendants, acting under color of law, breached their duty of care to JACK JR. and failed to properly maintain a holding cell pursuant to State and local rules and regulations, thereby causing injury to JACK JR.

## COUNT FIFTEEN
### Pendent State Claim for Failure to Properly Supervise a Holding Cell Pursuant to State Law

282.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-281 as though fully set forth herein.

283.  The rules governing the operation of holding facilities impose an affirmative duty upon officers maintaining such facility to periodically check the status of the physical and mental wellbeing of prisoners, maintain a proper Prisoner Activity Log, and when warranted, continuously monitor detainees amongst other regulatory requirements. The defendants breached their duties of care to maintain thereby causing injury to JACK JR.

284.  Defendants failed to comply with the statutory and regulatory requirements to supervise a holding cell within the State of New York.

285.  Defendants, acting under color of law, failed to properly supervise JACK JR.'s holding cell pursuant to State and local rules and regulations, thereby causing injury to JACK JR.

## COUNT SIXTEEN
### Pendent State Claims for Intentional and Negligent Infliction of Emotional Distress

286.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-285 as though fully set forth herein.

287.  Defendants acted intentionally and maliciously when they repeatedly beat and struck JACK JR. after they pulled him from his car and threw him on the ground.

288.  These actions were extreme and outrageous given that JACK JR. was on the ground and not resisting arrest, and exceeds all bounds of decency usually tolerated by a civilized society.

289.  These actions were committed with the intent to cause JACK JR. to suffer extreme mental and emotional distress, agony, and anxiety, or with the reckless disregard of the extreme mental and emotional distress, agony, and anxiety such actions would likely cause.

290. JACK JR. did indeed suffer extreme mental and emotional distress, agony, and anxiety as a direct and proximate result of defendants' actions.

291.  Defendants' actions unreasonably endangered JACK JR.'s physical safety.

292.  Defendants' actions caused JACK JR. to fear for his safety.

293.  Defendants caused JACK JR. to hang himself just several hours later at the prospect of having to remain in jail under the supervision of law enforcement personnel.

294.  Defendants acted intentionally and maliciously when they ignored JACK JR.'s continuous desperate pleas and cries for medical treatment while in their custody.

295.  These actions were extreme and outrageous given that JACK JR. had been beaten by defendants while being placed under arrest, and suffered physical injuries as a result of the defendants' conduct.

296.  These actions were extreme and outrageous given that JACK JR. screamed and pleaded for medical assistance continuously for several hours.

297.  These actions were extreme and outrageous given that Defendants knew or should have known that JACK JR. was clearly suicidal and a danger to himself. Defendants knew or should have known that:

    a.  J ACK JR. was being treated for anti-anxiety.

    b.  JACK JR. repeatedly yelled that he would be leaving the holding cell in a body bag if he did not receive medical assistance,

    c.  JACK JR. actually attempted to hang himself with his t-shirt prior to hanging himself with his jeans, and

    d.  JACK JR. had been acting irrationally for hours while in the defendants' direct presence including but not limited to making express verbal threats of suicide, physical acts in furtherance of suicide, irrational physical acts such as sticking his head in the toilet bowl, banging his head against the wall, and disrobing, amongst other evidence warranting medical assistance. These acts all occurred while JACK JR. was in the defendants' custody during which time they were charged with ensuring his safety and wellbeing.

    e.  JACK JR. actually attempted to hang himself with a blanket, and with his t-shirt, prior to hanging himself with his jeans

298.  Defendants' intentional failure to act where a duty to act existed, was done with the intent to cause JACK JR. to suffer extreme mental and emotional distress, agony, and anxiety, or with the reckless disregard of the extreme mental and emotional distress, agony, and anxiety such actions would likely cause.

299.  JACK JR. did indeed suffer extreme mental and emotional distress, agony, and anxiety as result of defendants' actions.

300.  Defendants' actions unreasonably endangered JACK JR.'s physical safety.

301.  Defendants' actions perpetuated JACK JR.'s fear of the police, and caused him to hang himself at the prospect of having to remain in jail under the supervision of law enforcement personnel.

302.  Defendants, acting under color of law, intentionally and/or negligently inflicted emotional distress to JACK JR.

## COUNT SEVENTEEN
### Pendent State Claim for Intentional or Malicious Harm (Prima Facie Tort)

303.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-302 as though fully set forth herein.

304.  Defendants' actions were motivated by malice and/or disinterested malevolence.

305.  Defendants acted without excuse or justification.

306.  As a direct and proximate result of defendants' actions, JACK JR. suffered physical

injuries—"blunt impact injuries" to his head, torso, and upper and lower extremities.

## COUNT EIGHTEEN
### Pendent State Claim for Wrongful Death Pursuant to EPTL § 5-4.1
### and Survival Pursuant to EPTL § 11-3.2.

307.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-306 as though fully set forth herein.

308.  JACK JR. died on January 23, 2013. *See* Exhibit P annexed hereto.

309.  Plaintiff, JOAQUIN FRANQUI III, was appointed Administrator of the Estate of JACK FRANQUI IV on September 9, 2013. *See* Exhibit Q annexed hereto.

310.  JACK JR. left surviving next of kin.

311.  Defendants acted wrongfully when they intentionally failed to provide JACK JR. with medical assistance despite his repeated pleas for such treatment.

312.  Defendants acted wrongfully when they intentionally failed to provide JACK JR. with medical assistance despite the fact that they knew or should have known that JACK JR. was clearly suicidal and a danger to himself.

313.  Defendants' wrongful acts directly and proximately caused JACK JR. conscious pain and suffering.

314.  Defendants' wrongful acts caused JACK JR.'s death given that he hung himself because of their failure to provide him with medical assistance, as he had repeatedly informed them he would do.

315.  JACK SR., JACK JR.'s father, incurred funeral expenses in the amount of $7,775.00, and other expenses not yet known. *See* Exhibit R annexed hereto.

316.  If JACK JR. had not died in the Seventh Precinct holding cell on January 23, 2013, defendants would be directly liable to him for their intentionally wrongful acts.

**CAUSES OF ACTION – SIMON, NICK, and ANNE**

**COUNT NINETEEN**
**42 U.S.C. § 1983 – Unlawful Seizure**

317.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-316 as though fully set forth herein.

318.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful seizure on January 23, 2013 when they seized his person and possessions in violation of the United States and New York State Constitutions and laws.

**COUNT TWENTY**
**42 U.S.C. § 1983 – Unlawful Seizure**

319.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-318 as though fully set forth herein.

320.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful seizure on April 9, 2013 when they seized his person and possession in violation of the United States and New York State Constitutions and laws.

**COUNT TWENTY-ONE**
**42 U.S.C. § 1983 – False Imprisonment**

321.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-320 as though fully set forth herein.

322.  Defendants, acting under color of law, violated SIMON's right to be free from false imprisonment on January 23, 2013 in violation of the United States and New York State Constitutions and laws.

**COUNT TWENTY-TWO**
**42 U.S.C. § 1983 – Unlawful Search**

323.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-322 as though fully set forth herein.

324.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on January 23, 2013 when they searched his person and emptied his pockets in violation of the United States and New York State Constitutions and laws.

## COUNT TWENTY-THREE
## 42 U.S.C. § 1983 – Unlawful Search

325.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-324 as though fully set forth herein.

326.  Defendants, acting under color of law, violated SIMON, NICK, and ANNE's right to be free from an unlawful search on January 23, 2013 when they searched their family home, 6 Cordwood Path, Shoreham, New York in violation of the United States and New York State Constitutions and laws.

## COUNT TWENTY-FOUR
## 42 U.S.C. § 1983 – Unlawful Search

327.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-326 as though fully set forth herein.

328.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on April 9, 2013 when they searched his car in violation of the United States and New York State Constitutions and laws.

## COUNT TWENTY-FIVE
## 42 U.S.C. § 1983 – Unlawful Search

329.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-328 as though fully set forth herein.

330.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on April 9, 2013 when they searched his person and possessions in violation of the United States and New York State Constitutions and laws.

## COUNT TWENT-SIX
## 42 U.S.C. § 1983 – Due Process Violations

331.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-330 as though fully set forth herein.

332.  Defendants, acting under color of law, violated SIMON, NICK, and ANNE's right to due process under law by their continues harassment and intimidation following the defendants' unlawful actions on January 23, 2013, in violation of the rights and liberties guaranteed to SIMON, NICK, and ANNE by the United States and New York State Constitutions and laws.

## COUNT TWENTY-SEVEN
### 42 U.S.C. § 1983 – Due Process Violations

333.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-332 as though fully set forth herein.

334.  Defendant GRENIA, acting under color of law, violated SIMON's right to due process under law by unlawfully seizing and searching his person on April 9, 2012, and by subsequently fabricating and falsifying instruments charging him with violating NY VTL § 1163(b) and NY VTL § 319(3). GRENIA's intentional actions caused a criminal process to be initiated against SIMON, based upon false evidence, in violation of the rights and liberties guaranteed to SIMON by the United States and New York State Constitutions and laws.

## COUNT TWENTY-EIGHT
### 42 U.S.C. § 1983 – Malicious Prosecution

335.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-334 as though fully set forth herein.

336.  Defendant, acting under color of law, violated SIMON's right to be free from malicious prosecution by malicious filing false charges against SIMON on April 9, 2013, and prosecuting SIMON for those charges, which terminated in his favor.

## COUNT TWENTY-NINE
### 42 U.S.C. § 1983 – Failure to Intercede

337.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-336 as though fully set forth herein.

338.  Defendants, acting under color of law, violated SIMON, NICK, and ANNE's constitutional and statutory rights by their failure to intercede on their behalf to protect their clearly established constitutional and statutory rights, in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY
### Pendent State Claim for Unlawful Seizure

339.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-338 as though fully set forth herein.

340.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful seizure on January 23, 2013 when they seized his person and possessions in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-ONE
### Pendent State Claim for Unlawful Seizure

341.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-340 as though fully set forth herein.

342.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful seizure on April 9, 2013 when they seized his person and possessions in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-TWO
### Pendent State Claim for False Imprisonment

343.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-342 as though fully set forth herein.

344.  Defendants, acting under color of law, violated SIMON's right to be free from false imprisonment on January 23, 2013 in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-THREE
### Pendent State Claim for Unlawful Search

345.  Plaintiff repeats and realleges the allegations set forth in paragraphs 1-344 as though fully set forth herein.

346.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on January 23, 2013 when they searched his person and emptied his pockets in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-FOUR
### Pendent State Claim for Unlawful Search

347.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-346 as though fully set forth herein.

348.  Defendants, acting under color of law, violated SIMON, NICK, and ANNE's right to be free from an unlawful search on January 23, 2013 when they searched their family home, 6 Cordwood Path, Shoreham, New York in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-FIVE
### Pendent State Claim for Unlawful Search

349.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-348 as though fully set forth herein.

350.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on April 9, 2013 when they searched his car in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-SIX
### Pendent State Claim for Unlawful Search

351.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-350 as though fully set forth herein.

352.  Defendants, acting under color of law, violated SIMON's right to be free from an unlawful search on April 9, 2013 when they searched his person and possessions in violation of the United States and New York State Constitutions and laws.

## COUNT THIRTY-SEVEN
### Pendent State Claim for Assault and Battery

353.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-352 as though fully set forth herein.

354.  Defendants, acting under color of law, unlawfully assaulted and battered SIMON on January 23, 2013.

## COUNT THIRTY-EIGHT
### Pendent State Claim for Assault

355.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-354 as though fully set forth herein.

356.  Defendants, acting under color of law, unlawfully assaulted SIMON on April 9, 2013.

## COUNT THIRTY-NINE
### Pendent State Claim for Slander

357.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-356 as though fully set forth herein.

358.  Defendants, acting under color of law, slandered SIMON.

## COUNT FOURTY
### Pendent State Claim for Harassment and Intimidation

359.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-358 as though fully set forth herein.

360.  Defendants, acting under color of law, unlawfully harassed and intimated SIMON, NICK, and ANNE over the course of several months following the defendants' unlawful actions on January 23, 2013.

## COUNT FOURTY-ONE
### Pendent State Claims for Intentional and Negligent Infliction of Emotional Distress

361.  Plaintiffs repeat and reallege the allegations set forth in paragraphs 1-360 as though fully set forth herein.

362.  Defendants, acting under color of law, intentionally and/or negligently inflicted severe emotional distress upon SIMON, NICK, and ANNE.


**WHEREFORE**, Plaintiffs request the following relief jointly and severally as against all the defendants:

1. A trial by jury on all issues;

2. An award of compensatory damages in an amount to be determined at trial;

3. An award of punitive damages in an amount to be determined at trial;

4. Disbursements, costs, and attorneys' fees pursuant to 42 U.S.C. § 1988; and

5. Such other and further relief as this Court may deem just and proper.

Dated: Mineola, New York
      January 1, 2014                 Respectfully submitted,

                                   The Law Office of Anthony M. Grandinette
                                   Attorneys for Plaintiffs
                                   114 Old Country Road, Suite 420
                                   Mineola, New York 11501
                                   (516) 877-2889


                    By:       /s/ Mirel Fisch
                               Mirel Fisch, Esq.
                               Anthony M. Grandinette, Esq.